USDC SCAN INDEX SHEET

















TKL   6/15/06   9:28

3:05-CV-01018   NATIONAL WESTERN V.

*54*

*AMDCMP.*

**ORIGINAL**

FILED

2006 JUN 15   AM 8: 27

SOUTHERN DISTRICT...

NUNC PRO TUNC

BY

JUN 12 2006

1   LERACH COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
2   JOHN J. STOIA (141757)
    THEODORE J. PINTAR (131372)
3   HELEN I. ZELDES (220051)
    RACHEL L. JENSEN (211456)
4   655 West Broadway, Suite 1900
    San Diego, CA  92101
5   Telephone:  619/231-1058
    619/231-7423 (fax)
6
    BARRACK, RODOS & BACINE
7   STEPHEN R. BASSER (121590)
    JOHN L. HAEUSSLER (215044)
8   402 West Broadway, Suite 850
    San Diego, CA  92101
9   Telephone:  619/230-0800
    619/230-1874 (fax)
10
    Co-Lead and Interim Class Counsel
11

12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

13   In re NATIONAL WESTERN LIFE              )   No. 05-CV-1018-JM(LSP)
     INSURANCE DEFERRED ANNUITIES            )
14   LITIGATION                              )   CLASS ACTION
                                             )
15   ——————————————————————                  )   CONSOLIDATED AND AMENDED CLASS
                                             )   ACTION COMPLAINT FOR:
16   This Document Relates To:               )
                                             )   1. Violations of the Racketeer Influenced and
17       All Actions                         )      Corrupt Organizations Act;
     ——————————————————————                  )
18                                               2. Financial Elder Abuse, Welf. & Instit. Code
                                                    §15600, et seq;
19
                                                 3. Violation of Cal. Bus. & Prof. Code
20                                                  §17200, et seq.;

21                                               4. Violation of Cal. Bus. & Prof. Code
                                                    §17500, et seq.;
22
                                                 5. Breach of Fiduciary Duty;
23
                                                 6. Aiding and Abetting Breach of Fiduciary
24                                                  Duty;

25                                               7. Fraudulent Concealment, Cal. Civ. Code
                                                    §1710, et seq.;
26
                                                 8. Breach of the Duty of Good Faith and Fair
27                                                  Dealing; and

28                                               9. Unjust Enrichment and Imposition of
                                                    Constructive Trust

                                                 DEMAND FOR JURY TRIAL

1    Plaintiffs Marie N. Sweeney, Warren B. Petry, Peter J. and Mary S. Glenane and George J.

2    Miller ("plaintiffs") , by and through their attorneys, bring this action against National Western Life

3    Insurance Company ("NWL"), Centre Point Advisors, Inc. d/b/a CPA Financial & Insurance

4    Services ("Centre Point"), and Advanced Business Strategies Institute ("ABSI") (collectively

5    referred to herein as "defendants"), on behalf of themselves and all other similarly situated senior

6    citizens.  Plaintiffs, upon information and belief, as well as the investigation of counsel, allege as

7    follows:

8                                    **INTRODUCTION**

9         1.        This class action challenges defendants' unlawful and unethical scheme to

10   fraudulently solicit, market, sell, and issue deferred annuity policies to senior citizens. Defendants

11   target the elderly, including 84-year-old Mr. Petry, 72-year old Mr. Glenane, 68-year old

12   Ms. Sweeney, and 81-year old Mr. Miller as prospective purchasers of deferred annuities by

13   uniformly failing to properly disclose key risks and adverse material information. Defendants fail to

14   adequately explain or otherwise disclose the terms of these products, leaving many class members

15   financially trapped, unable to pay for healthcare and other necessities.  The deferred annuities that

16   defendants foist on class members force them to incur massive "surrender charges" and/or penalties

17   to access their funds within the first 10-15 years, which often means that they will not live to see the

18   benefit of their investment.  Through misleading marketing and sales gimmicks, defendants induce

19   seniors into purchasing these unsuitable deferred annuities often by convincing them to surrender or

20   borrow against other investments to fund the purchase.

21        2.        Pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), plaintiffs bring this nationwide

22   class action on behalf of themselves and all other senior citizens (persons age 65 and older) who

23   within the applicable statute of limitations of the date of the commencement of this action, purchased

24   one or more NWL deferred annuities either directly, or through the surrender (in whole or part) of an

25   existing permanent life insurance policy or annuity, or by borrowing against an existing permanent

26   life insurance policy.

27        3.        NWL sells deferred annuity products on a national basis primarily through a network

28   of marketing and Sales Agents and/or organizations.  These affiliated sales agents, including Centre

1    Point, ABSI, independent marketing organizations ("IMOs") and duly appointed individual

2    insurance agents, such as Robert Mikhail ("Mikhail"), Galen Maddy ("Maddy"), Victoria L. Larson

3    ("Larson") and Stephen Strope ("Strope") (collectively the "Sales Agents"), systematically solicit,

4    market and sell deferred annuities to seniors, using deceptive sales tactics and methods in the sale of

5    deferred annuities.  Through its "financial planning seminars," NWL and its sales organization seek

6    to gain the trust of seniors, obtain personal financial information, and persuade them to convert their

7    savings and other investments such as CD's, stock portfolios, and life insurance policies into

8    deferred annuities.  Defendants profit from this scheme by collecting premiums, inadequately

9    disclosed commissions and exclusive surrender charges from annuity sales that would not occur but

10    for the deceptive, fraudulent, and illegal conduct of defendants described herein.

11        4.      NWL and its Sales Agents fail to disclose, in the standard form annuity contracts,

12    related marketing materials or otherwise material facts necessary for senior citizens to understand

13    and appreciate the true risks and costs of these products.  NWL and its Sales Agents also fail to

14    disclose the hefty commissions, sales loads and expenses, accurate historical or projected investment

15    yields, and other material information about these investment products.  Because defendants conceal

16    this information, no senior investor can even begin to appreciate the true costs and risks of these

17    investment products, determine the realistic return expectations of the product, or meaningfully

18    compare the NWL deferred annuity products with competing investment products.  In fact, due to

19    the exorbitant costs and sales commissions of its deferred annuities, NWL's deferred annuities

20    deliver as little as $68 in present value at the time of purchase for each $100 dollars in premium

21    paid.  As discussed below, seniors are particularly vulnerable to NWL's and Sales Agents' scheme

22    because they have difficulty understanding complex financial products and transactions.

23        5.      NWL routinely issues age exceptions for deferred annuity products and pays Sales

24    Agents high commissions for selling deferred annuities to senior citizens, even though it is aware of

25    the unsavory tactics used by the Sales Agents (e.g., financial seminars, estate planning and living

26    trust mills), to coerce vulnerable elderly victims into buying deferred annuities.  NWL through its

27    headquarters, prepares, disseminates and approves uniform sales materials to Sales Agents for

28    marketing and selling its deferred annuities to unsuspecting senior citizens.  And, in concert with

Sales Agents, NWL uniformly fails to disclose risks and features of its products necessary for seniors to evaluate the attractiveness of NWL's deferred annuities, in violation of California disclosure requirements and consumer protection laws.

6.   Defendants' sales practices alleged herein violate the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, *et seq.*, and California elder abuse and consumer protection statutes. *See* Cal. Welf. & Inst. Code §15600, *et seq.*; Cal. Bus. & Prof. Code §§17200, *et seq.*, and 17500, *et seq.* Defendants' practices also constitute fraudulent concealment, a breach of defendants' fiduciary duties and duties of good faith and fair dealing to plaintiffs, and unjust enrichment warranting a constructive trust.

7.   This action seeks to enjoin defendants from engaging in their unethical and unconscionable sales practices, including the form and substance of such disclosures. It also seeks to compensate the elderly victims of their scheme and penalize defendants for their knowingly wrongful practices.

**JURISDICTION AND VENUE**

8.   This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 18 U.S.C. §1964. This Court has personal jurisdiction over defendants pursuant to 18 U.S.C. §1965(b) and (d). The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367. The amount in controversy exceeds $75,000 for plaintiffs, exclusive of costs and interest. Classwide the amount in controversy exceeds $5 million. *See* Class Action Fairness Act ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005).

9.   Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in this District. Venue is also proper under 18 U.S.C. §1965(a) because all defendants transact substantial business in this District.

**PARTIES**

10.   Plaintiff Warren B. Petry lives in El Cajon, California. Mr. Petry is 84 years old and therefore an "elder" within the meaning of Cal. Welf. & Instit. Code §15610.27. After attending a "Seniors Asset Protection Workshop" sponsored by defendant Centre Point and hosted by Sales

1 | Agent Robert J. Mikhail, Mr. Petry purchased an NWL "Liberty Champion Annuity," an equity-
2 | indexed deferred annuity underwritten by NWL.  The maturity date for the annuity policy is
3 | August 13, 2020, which requires Mr. Petry to live to be 102 years old.

4 | 　　　　11.　　Plaintiffs Mr. and Mrs. Glenane reside in a senior community in Vista, California.
5 | Mr. Peter J. Glenane is 72 years old, and Mrs. Mary S. Glenane is 69 years old; both are "elders"
6 | within the meaning of Cal. Welf. & Inst. Code §15610.27.  After attending a "financial planning"
7 | dinner hosted by Sales Agent Galen Maddy, Mr. and Mrs. Glenane met with Mr. Maddy in his home
8 | for a financial consultation.  There, Mr. Maddy persuaded them to convert their long-term stocks and
9 | life insurance policies into an NWL equity-indexed deferred annuity in the amount of $117,296.00,
10 | with Mr. Glenane as the annuitant and Mrs. Glenane as the named beneficiary in the annuity
11 | application.  The annuity does not mature until July 11, 2032, requiring Mr. Glenane to be 99 years
12 | old and Mrs. Glenane to be 96 years old to receive payments on this investment.

13 | 　　　　12.　　Plaintiff Marie N. Sweeney is, and at all times mentioned herein was, a resident and
14 | citizen of the State of California, County of San Diego.  In or about July 2003, a duly authorized
15 | NWL sales agent solicited, offered and sold Ms. Sweeney a deferred annuity underwritten and issued
16 | by defendant NWL.  The NWL annuity sold to Ms. Sweeney had a maturity date of July 10, 2034.
17 | At the time of the annuity purchase, Ms. Sweeney was 68 years old.

18 | 　　　　13.　　Plaintiff George J. Miller, a Pennsylvania resident who resides at 146 E. Walnut
19 | Street, Apt. 202, Kingston, Pennsylvania 18704, was born in 1924.  In or around June through
20 | August 1999, Miller purchased a living trust from Sales Agent Larson and a long-term deferred
21 | annuity underwritten by American Equity Investments Life Insurance Company ("American
22 | Equity").  In 2003, Miller surrendered his American Equity policy, incurring a substantial surrender
23 | charge in excess of $21,000, and to purchase a long-term, deferred annuity from NW.

24 | 　　　　14.　　Defendant NWL is a Colorado corporation with its headquarters in Austin, Texas.
25 | NWL underwrites life insurance and annuity products in 48 states, including California, and the
26 | District of Columbia.  NWL sells deferred annuities through affiliates and sales agents across the
27 | United States, including in California.  According to its Web site, NWL markets and sells annuity
28 |

1   policies through independent agents, brokers, and IMOs, whose "annuity sales are much more

2   significant than life insurance sales and are the primary focus of their business operations."

3       15.     Defendant Centre Point is a Nevada corporation with its headquarters at 800 S.

4   Sanderson Ave., Suite 100, Hemet, California 92545. Centre Point's license to sell insurance in

5   California (No. OB80828) is currently inactive, and its status was forfeited by the Nevada Secretary

6   of State in November 2004. Centre Point has advertised itself as providing "planned asset stability

7   in a dynamic world." In fact, Centre Point improperly solicits, markets, and steers senior citizens

8   towards consolidating their assets and other investments into deferred annuity policies.

9       16.     Defendant ABSI is a California corporation with its headquarters at 800 S. Sanderson

10  Ave., Suite 100, Hemet, California 92545, a community heavily populated by senior citizens. ABSI

11  is currently suspended from doing business in California by the California Franchise Tax Board.

12  ABSI's self-proclaimed mission is to offer "access to fresh and proven strategies for business

13  development and enhanced profitability." ABSI offers a "rigorous" Certified Wealth Smart

14  Specialist curriculum, which purportedly requires an annual completion of 200 hours of continuing

15  education credits, in which Sales Agent Mikhail was purportedly enrolled. Upon information and

16  belief, the ABSI curriculum is a sham program which teaches individual agents to target senior

17  citizens to purchase deferred annuity policies which will not reach maturity until well after the

18  annuitant's actuarial life expectancy.

19                          **FACTUAL ALLEGATIONS**

20  **Deferred Annuity Policies**

21      17.     An annuity is a contract between an annuity owner (or "annuitant") and an insurance

22  company pursuant to which the annuity owner makes an upfront lump-sum payment or a series of

23  payments to the insurance company. The insurance company, in turn, agrees to make payments to

24  the annuity owner over a period of time. With a standard or "immediate" annuity, the annuitant has

25  a right to a stream of income via payments from the insurance company that is usually guaranteed to

26  last for as long as the annuitant is alive. This provides security to annuitants who are concerned they

27  may outlive their assets.

28

18.     With a deferred annuity, the annuitant foregoes payment until some point in the future. During this deferral period, the earnings on the annuity owner's premium payments grow tax-deferred. Thus, deferred annuities are very different from immediate annuities and provide a long-term investment vehicle, not an up front income stream. The annuities at issue in this complaint are deferred annuities.

19.     There are at least two kinds of deferred annuities: a "fixed" deferred annuity and an "equity-indexed" deferred annuity.[1]

(a)     A "fixed" annuity is an annuity in which the insurance company offers a guaranteed interest rate for a set period of time on the annuity owner premium payments; and

(b)     An "equity-indexed" annuity is an annuity in which the rate of interest the company provides to the policyholder fluctuates depending upon the performance of a stock market index such as the S&P 500. The amount credited to an equity-indexed annuity also depends on several other factors, including the term (the period over which the annuity interest is calculated), participation rate (amount of the increase in the index that will be used to calculate the interest), cap rate (an agreed-upon rate which limits the maximum interest rate), floor rate (minimum interest rate), whether the annuity utilizes averaging (determining the interest rate by averaging the index's performance over the term of the annuity), and whether the annuity utilizes compound or simple interest. Unbeknownst to the senior, NWL reserves the right to change certain of these features to the detriment of the senior. In the case of NWL's equity-indexed deferred annuities, NWL permits the consumer to choose to invest in a fixed account guaranteeing a minimal rate of interest return, an account whose rate of return is dictated by the S&P 500, or a combination of both fixed and indexed options.

20.     Both types of deferred annuities are complex financial investment products for which future performance is dependent on a maze of interrelated terms and internal assumptions involving product costs, rates of return and other factors. Thus, for an investor to make decisions about

---

[1]     In addition, there are "variable" annuities, but these are not at issue in this case.

1    deferred annuities and their attractiveness in relation to other investment products, the investor must

2    be adequately informed about all material features of the deferred annuity.

3        21.    With a deferred annuity, the annuity owner cannot withdraw his or her investment or

4    the earned interest until the deferred annuity matures, which is usually between 10 and 20 years.

5        22.    The penalty for early withdrawal of either the principal or earnings is called a

6    "surrender charge." The percentage of the surrender charge, which can start as high as 20% or more,

7    declines after a period of five to eight years, and then diminishes further with each passing year for a

8    specified number of years. The surrender charge is often a hefty penalty discouraging early withdrawal

9    of principal from an annuity.  As a result, the terms of deferred annuities severely limit senior

10   citizens' access to their funds for emergencies or cash flow purposes.

11       23.    Defendants represent that their deferred annuities are beneficial because the principal

12   and the interest they accrue is tax-deferred prior to withdrawal. After that deferral period, it is taxed

13   at ordinary income tax rates, not at favorable capital gains rates. This may be beneficial to an annuity

14   owner who is currently working and, therefore, paying income tax.  A deferred annuity does not

15   typically benefit a senior citizen, however, because they are already retired and, therefore, not paying

16   as much in income taxes, if at all.

17       24.    Moreover, the deferred annuity is not appropriate for senior citizens who often need

18   to have access to the principal prior to the maturity date, due to medical expenses, assisted living

19   cost, and otherwise.  Most importantly, deferred annuities are inappropriate for senior citizens

20   because the investment does not mature within the senior citizen's lifetime. Defendants know this is

21   the case and initially target the elderly, like plaintiffs and the class, in order to reap massive

22   surrender charges prior to policy maturity.

23   **California Law and Regulators Warn Against Selling Deferred Annuities to the Elderly**

24       25.    Governmental regulators, insurance regulations, industry standards, and internal

25   corporate policies all expressly recognize the unsuitability of deferred annuities as investments for

26   persons aged 65 and older.

27       26.    For example, the California legislature has enacted senior protection statutes relating

28   specifically to the types of policies at issue here, due to the lack of flexibility inherent in deferred

1   annuities, coupled with the diminishing resources of the elderly. These provisions (codified at Cal.

2   Ins. Code §785, *et seq.*) impose a duty of honesty, good faith and fair dealing for insurers when

3   selling deferred annuity products to senior citizens, prohibit "churning" and similar sales practices,

4   and dictate strict disclosure requirements to ensure the suitability of deferred annuity products for the

5   senior citizen's needs.

6          27.     Further, under Cal. Ins. Code §1631, only licensed insurance agents may solicit, offer

7   and sell deferred annuities.   This licensing requirement guarantees that consumers receive

8   appropriate guidance when purchasing a deferred annuity and a level of integrity and accountability.

9   It also attempts to guarantee that only persons who are required to refrain from misleading the

10  vulnerable consumer will sell these complex products to seniors, subject to regulations and legal

11  duties requiring him or her to disclose all facts and information within the agent's knowledge

12  regarding a marketed insurance product which may be "material" to a prospective annuitant's

13  decision to purchase such products. *See, e.g.,* Cal. Ins. Code §§330, 331, 332, 334.

14         28.     Recently, current California Insurance Commissioner John Garamendi issued a notice

15  to all insurers and insurance agents regarding the use of "unfair marketing and sales tactics designed

16  to accomplish the sale of annuities principally to senior citizens." As Commissioner Garamendi

17  noted, insurers and insurance agents often utilize misleading marketing and deceptive sales schemes,

18  such as portraying themselves as expert financial planners who are acting in the senior's best

19  interests, to lure seniors into purchasing annuities that do not fulfill the senior's retirement needs. In

20  reality (and unbeknownst to the senior), just the opposite is true. He explained:

21            Seniors characteristically perceive the agent as a legal advisor or estate planner and
              not as an insurance agent because the representatives misrepresent themselves as
22            experts in the initial subject area. They gain the trust and confidence of the senior.
              [sic] and then misuse that trust to sell an annuity that is oftentimes unsuitable for the
23            senior.

24                  Because of this perception that the salesperson has their best interests in
              mind, seniors may conclude that they need not totally understand what the pros and
25            cons of an annuity are for their specific situation. They may not be told, or if told
              they may not understand, the impact of surrender penalties on their net worth, or far-
26            off annuitization dates on their liquidity, or the sale of an annuity or other investment
              to buy the annuity offered on the taxes they will owe.

27  Cal. Ins. Commissioner John Garamendi, *Notice* (Nov. 18, 2005) at 3.

28

                                        - 8 -                    05-CV-1018-JM(LSP)

29.     In 2002, former California Insurance Commissioner Harry Low issued a Notice to all insurers and insurance agents about using a ruse to "accomplish the sale of annuities that is principally used in the solicitation of senior citizens." The Department of Insurance ("DOI") Notice and warning went unheeded by defendants.

30.     Because annuity sales are extremely lucrative (to the tune of *$115.6 billion annually*), NWL ignored warnings from the California Department of Insurance and continues to use Sales Agents to do the dirty work of marketing and selling deferred annuities to senior citizens. As a result, California Insurance Commissioner John Garamendi has intervened in *Clark v. Nat'l. W. Life Ins. Co.*, Case No. BC 321681 (L.A. Super. Ct., filed September 17, 2004), in an effort "to stop licensees from selling unsuitable annuities to seniors and using trust mills to do so." Similar to this action, the *Clark* action alleges that NWL has engaged in an unlawful and deceptive scheme and course of conduct in targeting seniors in the marketing and sale of deferred annuity products.

31.     Even before Commissioner Harry Low's warning, the Pennsylvania Attorney General drew attention to living trust mill scams in July 2001, saying:

> Unfortunately, when it comes to living trusts, unscrupulous con artists are ready to play on consumers' fears of the unknown. In some cases, consumers – mostly elderly – are solicited by phone or mail to attend seminars or to set up in-home appointments to discuss living trusts. Living trusts are then marketed through high-pressure sales pitches which prey on the fear that assets will be tied up indefinitely or that estates are prone to heavy taxes and fees if a living trust is not in place. Con artists often rely on unfamiliar terms such as "probate" and "executor" to convince consumers that a living trust is right for them even though many of the complex rules and fees that can complicate estate distributions do not exist in Pennsylvania.
>
> Sometimes victims are sold worthless "kits", costing several thousand dollars, which are nothing more than standard forms that may or may not be valid, as laws concerning living trusts vary from state to state. In other cases, false promoters simply want to gain access to consumers' financial information so they can sell them other products like insurance annuities.

32.     On March 23, 2006, the Delaware Department of Insurance wrapped up an investigation of NWL's conduct in connection with the sale of a deferred annuity to a senior couple. The Delaware Department of Insurance initiated the investigation after an elderly couple's niece and attorney discovered that NWL had improperly sold them a deferred annuity. The elderly couple, who are both in their 80's (and the wife suffers from Alzheimer's Disease), purchased the NWL deferred annuity after attending a financial planning seminar held by an insurance agent at a Masonic Home. The deferred annuity had a

raft of complex terms and features, including surrender charges of 25% and an extended maturity date. As a result of the investigation, NWL agreed to refund the couple's $264,000 annuity premium and the insurance agent was fined. In announcing the investigation and resulting penalties, Delaware's Insurance Commissioner Matt Denn warned seniors about the danger of such investments:

> "First, annuities are almost always an unwise investment for seniors because the purpose of annuity is to grow tax-deferred for an extended period of time. . . . Second, annuities often have exorbitant charges for early withdrawal of money as well as charges for many features. Anyone considering an annuity should ask about all fees and charges as well as be sure that they will not need access to that money for a long time – even in an emergency."

Del. Ins. Commissioner Matt Denn, Notice (March 16, 2006). Commissioner Matt Denn has also established a website and issued notices aimed at increasing seniors' awareness and combating insurance companies' exploitation of seniors through the sale of annuities, which, according to Commissioner Matt Denn, is "one of the top ten investment scams in the country." See http://www.state.de.us/inscom/departments/ consumer/annuities.shtml; Del. Ins. Commissioner Matt Denn, "Protecting Seniors: Part II" (October 19, 2005).

33.     In 2000, the National Association of Insurance Commissioners ("NAIC"), an organization of insurance regulators from the 50 states, called for the development of suitability standards for unregistered annuity products such as the deferred annuities sold by defendants. During a two-year study, the NAIC found extensive evidence that life insurers and their agents often sold annuities without disclosing the risks associated with the annuity and/or without an objective determination as to whether the annuity was an appropriate investment for the purchaser. The two-year study also revealed an alarming number of "inappropriate sales of annuities to persons over the age of 65" – an area subsequently dubbed by the NAIC as the area "subject to the greatest abuse." To combat this abuse, the NAIC adopted the "Senior Annuity Transactions Model Regulation." The model regulation requires, *inter alia*, that recommendations of annuity sales to consumers ages 65 and older be based on information concerning the senior's financial situation, and that an insurer have in place a system to supervise and review those recommendations. Many states have followed suit, adopting the NAIC's suitability or similar suitability standards and enacting other laws aimed at preventing elder financial abuse.

34.     It is not only the policymakers and the regulators, but the industry itself that recognizes problems in marketing and selling deferred annuities to senior citizens.  On March 27, 2003, the National Association of Securities Dealers ("NASD") – the security industry's self-regulatory body – issued an alert about the marketing and sale of deferred annuities, especially to the elderly. "The marketing efforts used by some variable annuity sellers deserve scrutiny – *especially when seniors are the targeted investors*." (Emphasis added.)  In its alert, the NASD acknowledged: "The variety of features offered by variable annuity products can be confusing.  For this reason, it can be difficult for investors to understand what's being recommended for them to buy – especially when facing a hard-charging salesperson."  Although the alert focused on variable annuities, it applies equally to other deferred annuities.

35.     Not only have defendants been put on notice by general industry regulations and warnings, but Sales Agent Mikhail has previously been ordered to cease and desist from the same practices alleged in this Complaint in the State of Washington.  Nevertheless, he continues these practices in California, and the other defendants continue to collude with him as described herein.

36.     In 2002, the Washington Department of Financial Institutions brought an action against Sales Agent Mikhail to stop his "scheme to defraud elderly victims" by "pretending to give them expert legal and estate planning advice and by recommending the sale of their securities in order to earn high commissions on the sale of annuities."  There, Sales Agent Mikhail mass mailed postcards to senior citizens, and followed up with a phone call and in-home visit.  Sales Agent Mikhail initially peddled annual memberships in group legal services plans and living trusts.  However, he then used his contacts with the elderly to collect personal financial information and sell them deferred annuity policies on which he earned nearly 10% in commissions for all premium dollars invested.

**Defendants' Scheme to Sell Deferred Annuities to Senior Citizens**

37.     Despite these warnings, defendants continue to solicit, market, sell and underwrite deferred annuity policies targeting the elderly, including plaintiffs and the class.  Unbeknownst to plaintiffs, NWL offers sales incentives, commissions and other promotions to the Sales Agents for

1    selling them NWL deferred annuity products. NWL, in turn, receives immense profits and maintains
2    or increases market share from the sale of deferred annuities to seniors.

3         38.    Defendant NWL ignores California policy and regulatory warnings as a business
4    practice, turns a "blind eye" toward the unscrupulous tactics used by its IMO's, such as Centre Point,
5    ABSI, Fidelity Insured Deposits, the Patriot Group, Estate Planning Advisors Corp., and the Sales
6    Agents to sell NWL products, and routinely issues age limit exceptions to generate tremendous
7    profits. On information and belief, NWL also approves or ratifies their misleading and deceptive
8    marketing plans and ruses designed to target senior citizens. They do so despite numerous warnings
9    and actions by governmental entities showing that this is an unlawful and unacceptable business
10   practice, because of the massive profits and commissions earned by defendants.

11        39.    Defendants' common course of conduct and scheme includes garnering the trust of
12   seniors and obtaining their confidential and personal financial information, to in turn manipulate
13   them into buying a deferred annuity.

14        40.    For example, defendants target seniors in advertisements for financial, retirement,
15   long-term care, and estate planning seminars and workshops that are publicized in mass mailings and
16   an array of newspapers. These meetings are hosted by the Sales Agents and held in seniors' homes,
17   hotels, senior centers, and other locations.

18        41.    For example, Sales Agent Mikhail, a resident of El Cajon, California, is a duly
19   appointed agent for NWL, who improperly solicited and sold deferred annuities issued by NWL to
20   Mr. Petry and other senior citizens. Mikhail describes himself as a "Senior Client Strategies
21   Specialist" and purports to help seniors "protect their assets and achieve their retirement goals."
22   Mikhail hosted a Senior Asset Protection Workshop in 2003, in which he described his qualifications
23   as a "Certified Wealth Smart Specialist" from the Advanced Business Strategies Institute. Mikhail
24   holds himself out as a Certified Financial Planner ("CFP"); however, according to the Institute of
25   Financial Planning and the CFP, he is not.

26        42.    Defendants train individual sales agents to target senior citizens by offering such
27   financial or estate planning at community service events for the elderly. Upon information and
28   belief, defendants also instruct sales agents to use these meetings to lure seniors into providing

1   confidential financial information.  Defendants provide standardized or approved forms to Sales

2   Agents for eliciting information about the victims' assets.

3       43.     Defendants collude in targeting the elderly and coordinate the exchange of private

4   financial and personal information of intended victims. Defendants developed profiles of particular

5   individuals based on age, available assets, and predicted vulnerability. Defendants arrange to share

6   information, documentation, advertising and promotional materials to other co-conspirators so that

7   they, in turn, could provide it to targets for inducing reliance and trust based on the name and

8   reputation of NWL.

9       44.     The Sales Agents enter into agreements with the NWL whereby NWL agrees to

10  formally appoint the agents as licensed sales agents and, in return, the sales agents agree to sell NWL

11  deferred annuities and adhere to the sales procedures, protocols and materials dictated, prepared

12  and/or approved by NWL.  These sale protocols and procedures include the use of standard annuity

13  marketing materials, illustrations and form contracts created and/or authorized by NWL.  NWL

14  instructs the Sales Agents not to elaborate on the information presented in its form annuity contracts,

15  the form "Notice to California Residents Age 65 or Older," and uniform pre-printed sales

16  illustrations and marketing materials when making a sales presentation to prospective customers.

17      45.     Upon information and belief, NWL has also entered into agreements with IMOs

18  whereby the IMOs agree to recruit Sales Agents to market and sell NWL deferred annuity products.

19  In return, NWL pays the IMOs a percentage of all premiums collected from the sale of NWL

20  deferred annuities by sales agents recruited by the IMO.  Under the agreements, the IMOs are also

21  required to submit all marketing, sales and training materials to NWL for approval before utilizing

22  the materials.

23      46.     Upon information and belief, NWL routinely sends its marketing and sales executives

24  to lecture at annuity seminars and workshops operated by the IMOs.  At the seminars and

25  workshops, NWL's executives provide training to IMOs and agents concerning the features and

26  characteristics of its deferred annuity products.

27      47.     Upon information and belief, NWL has changed its agent training protocols and agent

28  supervision and reporting practices in recent years such that it no longer adheres to statutory

1   obligations in selling deferred annuities to seniors. At the same time, NWL has increasingly relied

2   on independent agents/brokers, such as Mikhail and Maddy, and IMOs to market and sell its equity-

3   indexed deferred annuities. This has undercut NWL's ability to properly train and supervise its

4   brokers and agents such that it no longer ensures Sales Agents disclose all material information

5   about its deferred annuity products to consumers at the point of sale. Further, upon information and

6   belief, NWL turns a blind eye to complaints about its Sales Agents and fails to take appropriate

7   corrective and/or disciplinary action.

8        48.    NWL fails to make any review or good faith effort to ascertain or verify the suitability

9   of its deferred annuity products for senior citizens. NWL fails to require sales agents to issue an age

10  exception prior to issuing a policy to senior citizens. Thus, NWL fails to do its due diligence to

11  prevent misleading or incomplete sales presentations to seniors about the deferred annuity products.

12       49.    NWL pays the Sales Agents, including Mikhail and Maddy, bonuses and unusually

13  high commissions for targeting and selling deferred annuities to senior citizens. By doing so, NWL

14  induces, condones, and encourages Sales Agents to engage in aggressive and predatory marketing

15  tactics, including targeting and exploiting the vulnerability and concerns of senior citizens. For

16  example, with the knowledge and at least tacit approval of the NWL, the Sales Agents persuade

17  senior citizens to convert or liquidate other annuities or retirement investments to purchase NWL

18  policies, often resulting in surrender charges incurred for accessing the senior's money after

19  purchasing NWL's products.

20       50.    Defendants engage in various deceptive sales techniques designed to mislead senior

21. citizens regarding the purported benefits and advantages of annuities compared to other forms of

22  investments, and have uniformly concealed or downplayed the disadvantages of purchasing a

23  deferred annuity in later stages of life. Defendants' marketing materials mislead seniors by not

24  adequately disclosing the hefty surrender charges that remain in effect for the first 10 to 15 years of

25  the annuity and by not adequately disclosing that the maturity date is beyond the actuarial life

26  expectancy of the annuitant. Other provisions within defendants' annuities include a maze of

27  defined terms and vague provisions that operate to deceptively impose additional charges on class

28  members who need early access to all but a small portion of their funds.

51.     Because the surrender charges are often misunderstood by consumers, insurance companies are required under Cal. Ins. Code §10127.13 to disclose all the terms of the surrender provisions in bold 12-point font on the cover page of the annuity policy, or on a sticker affixed in conjunction with the cover page or policy jacket.  However, defendants fail to comply.

52.     Defendants' deferred annuity products set forth guaranteed minimum interest rates. However, NWL maintains almost complete discretion to adjust the interest crediting rate to the detriment of the insured.  Unbeknownst to the seniors, the participation rates set and paid by NWL are not supported by its current experience.  Thus, even if prevailing interest rates remain constant throughout the life of the annuity, NWL must nevertheless ratchet down its interest crediting rates to earn its desired margin on its deferred annuity products and to recoup the bonuses offered to annuitants and commissions paid to sales agents.  As a result, in the later years of the deferred annuity, the annuitant may only realize a 0% rate of return on their investment.

53.     Defendants also mislead seniors by promising an interest rate bonus on premiums paid into the annuity.  However, this so-called bonus is illusory, as the interest rate bonuses are forfeited upon early surrender or withdrawal of funds.  Forfeiture occurs at an alarming frequency with seniors because of their advanced ages and frequent need for access to their principal.  In the rare instance where the senior holds the annuity to maturity, NWL erodes any benefit of the bonus by ratcheting down the interest crediting rates.

54.     NWL also erodes returns on its deferred annuities by adjusting other "nonguaranteed" elements such as expense charges, mortality charges and asset fees.  Like interest crediting rates, expense charges, mortality charges and asset fees are major factors in calculating the amount credited to the annuitant's account.  Rather than using objective criteria to determine the amount of these adjustments, NWL adjusts them based on its own subjective profit expectations with absolutely no guarantee to the senior that NWL will maintain the same charges or fees that were applicable at the time of purchase.

55.     Defendants' marketing materials also mislead seniors by disguising the fact that purchasers of indexed deferred annuities can have 0% returns in a given year.  Instead, defendants' marketing materials falsely proclaim that indexed deferred annuities are a risk-free investment

1  because the deferred annuity contract provides for a guaranteed minimum account value.
2  Defendants' marketing materials do not disclose, however, that the guaranteed minimum account
3  value does not exceed the premiums paid for many years, and that a policyholder must not surrender
4  the policy for a significant period of time before the guaranteed minimum account value will protect
5  against the risk of losing money.

6       56.    Senior citizens are an ideal target for defendants' scheme and are particularly
7  susceptible to these deceptive and misleading practices. Many seniors have a diminished ability to
8  understand complex investment transactions, harbor concerns about risky investments, and fear
9  outliving their assets. This is particularly true with respect to seniors over the age of 75, as their
10  health and financial concerns intensify. Defendants pursue senior citizens with sales tactics designed
11  to scare, deceive, coerce, harass and/or force them into converting their assets and investments into
12  deferred annuities.

13       57.    Seniors treasure their financial independence and ability to remain self-sufficient, so
14  they are reluctant to consult with family or friends about investment decisions or purchases. In
15  addition, seniors are often ashamed to admit that they were "duped" by promises and claims of huge
16  profits, guaranteed returns, and the safety of their investments, fearing others will think they are
17  mentally incompetent (and thereby jeopardizing their independence). As a consequence,
18  unscrupulous marketers can easily exploit seniors with impunity.

19       58.    NWL's contracts are intentionally drafted with confusing, technically-laden language
20  so that the average person, let alone an elderly person, cannot readily understand the terms and
21  complex features. The annuity contracts, in particular, obfuscate how index credits are calculated
22  and fail to explain that the policy could have 0% growth in a given year. In addition, Sales Agents
23  attempt to conceal the provisions that render the deferred annuity inherently unsuitable for seniors,
24  *e.g.*, harsh surrender penalties and limits on withdrawals.

25  **Mr. Petry Buys a NWL Deferred Annuity from Sales Agent Mikhail**

26       59.    In spring of 2003, Mr. Petry, who was 82-years old at the time, saw an advertisement
27  for a financial planning seminar in the *San Diego Union-Tribune*. The advertisement was for a
28  "Seniors Asset Protection Workshop" sponsored by Centre Point, and hosted by Sales Agent Mikhail

in El Cajon, California. In April 2003, he and his wife attended the workshop, along with 50 or so other seniors. At the workshop, Mikhail gave pointers on how seniors can protect their money from the government and how to get Medicaid even if the senior had money.

60.   After attending this seminar, Mr. Petry called Mikhail for further consultation on how to assure that he and his wife could afford long-term care, as well as grow money so that they would have sufficient funds as they got older. Mikhail subsequently met with him in the Petry home. At the meeting, Mikhail pushed an NWL deferred annuity on Mr. Petry saying that it was better than a long-term care investment because the annuity policy could grow 2% a month, with a possible increase of 24% in the first year.

61.   Based upon Mikhail's representations, Mr. Petry purchased a deferred annuity issued by NWL in August 2003. Mr. Petry purchased an NWL "Liberty Champion Annuity," an equity-indexed deferred annuity, which earns interest partially based on a formula linked to the S&P 500 index. The certificate number is 01010XXXXX,[2] and its certificate date is August 13, 2003. Mr. Petry made an initial premium payment of $20,000.00 on July 24, 2003.

62.   At the time Mr. Petry purchased the deferred annuity he was 82 years old. The policy he purchased will not mature until August 13, 2020, requiring Mr. Petry to live to be 102 years old before his deferred annuity matures. According to national vital statistics records, only 2.3% of white males are expected to reach 100. The average life expectancy for a U.S. male is approximately 77 years. Thus, Mr. Petry had already lived out his life expectancy. Unfortunately, if Mr. Petry needed access to his money prior to age 102, he would pay some amount of surrender charges.

63.   At no point either prior, during or after the seminar or the meeting in the Petry home, did Mikhail explain the difference between deferred and immediate annuities to Mr. Petry. Nor did Mikhail explain that the deferred annuity policy would not mature until 2020, and thus was not an appropriate investment for the long-term care of him and his wife.

---

[2]   "X's" are inserted for privacy purposes.

64.   Mr. Petry's deferred annuity policy carries stiff surrender penalties, including a 20% charge for withdrawals occurring in the first 6 years after the annuity is issued.  However, Mikhail failed to tell Mr. Petry about the 20% surrender charges that would apply for the first six years if he wanted or needed access to some or all of the moneys.

65.   Mikhail also failed to tell Mr. Petry that he is an insurance agent appointed to sell insurance on behalf of NWL in California, that his true objective in meeting with him was to sell him a deferred annuity from NWL, and that he would receive commissions from NWL for the sale.

66.   To the contrary, Mikhail represented that he provides objective financial planning advice to seniors as an experienced financial planner who knows how to advise them in selecting options that serve their best interests.  Based on these representations, Mr. Petry believed that Mikhail was giving him objective financial advice, and he relied on that advice to his detriment.   Upon information and belief, however, Mikhail is not a certified financial planner.

67.   As a result of the NWL deferred annuity he purchased, Mr. Petry has suffered damages in lost access to needed funds; paying unnecessary fees and charges to Sales Agent Mikhail; and foregoing other investments that would have faired better.

**The Glenanes Buy a NWL Deferred Annuity from Defendant Maddy**

68.   In or about April of 2003, the Glenanes heard from friends in their senior community about a "financial planning" seminar hosted by Maddy.  Maddy advertised his expertise in a newsletter entitled "the Senior Advisor," stating that he was "nationally recognized for his expertise and accomplishments in tax planning and retirement planning for seniors" and that he had been a "financial planner, author, speaker and columnist for over 32 years." Maddy promised he could help seniors reduce their tax liability, save on social security income tax, "reduce a surviving spouse's tax bracket," and "[c]reate a retirement plan that eliminates withdrawals ... and lets you take the money when you need it." Nowhere in the newsletter did Maddy disclose or even allude to the fact that he is an insurance broker or agent appointed by NWL to sell deferred annuities.

69.   Thereafter, the Glenanes attended a dinner hosted by Maddy, during which he made a presentation about family trusts and how seniors can protect their assets for long-term care.  After

1  the meeting, the Glenanes made an appointment for personalized financial planning, and arranged to
2  meet with Maddy in his Carlsbad home.

3       70.    On or about April 15, 2003, the Glenanes went to Maddy's home to receive financial
4  consultation from some one whom they could trust.  Maddy further earned their trust by saying that
5  he was better than others because he was a small company, had a lot of success in the past, and
6  understood seniors' concerns.  Maddy asked them about their assets, mortgage, bank account
7  information, stocks, insurance policies, family trust, and IRAs.  After expressing their concerns
8  about tax liabilities and a steady stream of income for Mrs. Glenane if Mr. Glenane were to pass
9  away, Maddy said "this is your answer," referring to an NWL deferred annuity.

10       71.    Based upon Maddy's representations, Mr. Glenane purchased a deferred annuity
11  issued by NWL, naming in his application Mrs. Glenane as the named beneficiary.  Mr. Glenane's
12  deferred annuity is a "flexible premium" equity-indexed annuity, which is partially linked to the
13  S&P 500 index.  The certificate number is 01010XXXXX,[3] and its certificate date is July 11, 2003.
14  Mr. Glenane paid an initial premium of $117,296.00.  The policy itself states that the issue age is
15  "70." The annuity does not mature until July 11, 2032.

16       72.    Maddy persuaded Mr. Glenane to sell his long-term stock in Beckman Coulter, Inc.,
17  where he worked for many years before his retirement.  Mr. Glenane resisted initially because of his
18  loyalty to his former employer and because of his wife's disagreement.  But Maddy convinced him
19  by telling him "your loyalty is to yourself, you're your employer," and sowing the seeds of marital
20  discord by saying, "the stocks are yours, not your wife's."  Mr. Glenane reluctantly agreed and sold
21  1,000 shares at $34 per share.  This stock would have now been worth $56 per share; thus, he has
22  lost over $20 per share in this converted stock alone.

23       73.    Maddy also persuaded the Glenanes into canceling a portion of their life insurance
24  policies.  Mr. Glenane cancelled two policies (one with his employer Beckman and one with IOF

25

26

27  [3]    "X's" are inserted for privacy purposes.

28

1   Foresters) worth a total of $100,000, and Mrs. Glenane cancelled a $50,000 policy with IOF

2   Foresters.

3         74.      At no point during, before or after the meeting did Maddy explain the differences

4   between a deferred and immediate annuity to the Glenanes.  Nor did Maddy explain that the deferred

5   annuity would not mature until July 11, 2032, and thus would not provide an income stream for them

6   within their lifetimes.

7         75.      Maddy also failed to have Mr. Glenane sign a "Notice to California Residents Age 65

8   or Older" to give them any notice that a deferred annuity may not be appropriate for them, given the

9   lack of flexibility in accessing their funds and the lengthy deferral period.

10        76.      Moreover, neither Maddy nor NWL (in its policy materials) adequately explained the

11  steep surrender charges that apply.  In fact, Mr. Glenane's policy carries a 25% withdrawal charge

12  for the first six years, down to 15% after 10 years, and 2.50% at year 15.  The policy fails to comply

13  with Cal. Ins. Code §10127.13's requirement that all policy materials and the policy itself explain

14  the surrender charges in bold 12-point font, instead listing these rates with no explanation in a

15  confusing table included in the policy.

16        77.      Mr. Glenane's policy was also deficient in several other respects, including failing to

17  provide a 30-day right of cancellation pursuant to Cal. Ins. Code §10127.10.  Also, it failed to

18  adequately explain that after the first year only 75% of their deferred annuity would be earning the

19  high percentage of interest that Maddy had promised them.

20        78.      Maddy failed to disclose at any time during, before, or after their meeting that he is an

21  insurance agent appointed to sell insurance on behalf of NWL in California, that his true objective in

22  meeting with them was to sell them a deferred annuity underwritten by NWL, and that he would

23  receive commissions from NWL as a result of the sale.

24        79.      To the contrary, as aforementioned, Maddy represented that he provides objective and

25  expert financial planning advice specially tailored to meet the needs of seniors.  He represented that

26  he had the experience and qualifications necessary to provide this advice and to serve their best

27  interests.  Based on these representations, the Glenanes believed Maddy was giving them objective

28  financial advise, and they relied on that advice to their detriment.

80.     As a result of the NWL deferred annuity that Mr. Glenane purchased, the Glenanes have suffered damages in lost assets, diminished stock values, lost life insurance policies, lost access to needed funds, paying unnecessary fees and charges and foregoing other investments that would have faired better.

**George J. Miller Buys a NWL Deferred Annuity from Sales Agent Larson**

81.     At the time in 1999 when he responded by mail to a newspaper advertisement concerning Weinstein living trusts, Miller was 74 years old.  At this time, Miller:

       (a)     owned his home, worth approximately $116,000.00;

       (b)     maintained total assets of approximately $400,000.00;

       (c)     paid federal income in the 15-20% bracket; and

       (d)     had assets that were under the unified credit against estate tax as specified in 26 U.S.C. §2010.

82.     Sales Agent Larson held herself out as experienced and experts in the area of estate planning, and informed Mr. Miller that she could provide estate planning services that would benefit him.

83.     After George Miller responded by mail to the newspaper advertisement for a living trust offered by an attorney Brett Weinstein ("Weinstein"), Larson telephoned Mr. Miller and arranged to meet with him at his home in Pennsylvania.

84.     On or about June 22, 1999, Sales Agent Larson came to the home of Mr. Miller, and had an in-depth interview with Mr. Miller, ostensibly concerning estate planning.  Sales Agent Strope then had subsequent meetings with Mr. Miller, also at his home, ostensibly regarding the same topic.  After Larson's initial visit with Miller, Strope was the sales agent who had all subsequent meetings with Miller.

85.     During the initial in-home interview, and during the subsequent in-home meetings with Mr. Miller, Larson and Strope made representations to Mr. Miller about the purported advantages that a living trust had over wills and probate and his current estate plan.

86.     Specifically, Larson and Strope told Miller that a living trust would avoid probate, would avoid probate fees, would save attorneys fees and other fees of professional who would be involved in the probate process, and would avoid or save taxes for Miller.

87.     At no time either prior, during or after her in-home interview, or during or after his meetings with Mr. Miller, did Larson or Strope tell Miller that Larson and Strope were insurance agents and that their true objective in meeting with him was to solicit him to purchase a living trust and to purchase annuities from NWL, or that they would receive a commission payment from their sale to him of a living trust prepared by attorney Weinstein, or that they would receive commission payments from their sales of annuities issued by NWL.

88.     In fact, and to the contrary, Larson, and later Strope, led Miller to believe that they were qualified, experienced estate planners who were working with Attorney Weinstein and acting in Miller's best interests.

89.     On June 22, 1999, Miller gave Larson a check for $1,995.00 payable to "Brett Weinstein" for the purchase of a living trust.

90.     During the same time period in 1999 that Miller purchased a living trust through attorney Weinstein, Miller liquidated $215,000.00 from his investment portfolio – which investments were predominantly blue chip investments – to purchase an equity-indexed, annuity from American Equity.

91.     Following Larson's visit with Miller, attorney Weinstein appointed Strope as Weinstein's delivery agent, with respect to the living trust and related legal documents.   On August 5, 1999, Strope again visited Miller, and delivered to him the loose leaf Living Trust Kit, containing the legal documents ostensibly prepared by attorney Weinstein.

92.     During the August 5, 1999 meeting, Strope went through the legal documents in the living trust kit with Miller and explained the various provisions of the legal documents.  Strope also showed Miller the places in the legal documents where he had to sign, and Strope notarized several of the legal documents that Miller signed.

93.     At no time did Miller ever speak to or meet with attorney Weinstein, let alone consult with him or any attorney from Weinstein's office on or on his behalf, regarding Miller's estate plan, or living trust kit.

94.     Later, Miller surrendered the $215,000.00 American Equity annuity and incurred a surrender charge of $21,093.35. Strope convinced Miller to use the proceeds from the liquidation of the AILIC annuity to purchase an annuity from NWL. Strope guaranteed Miller that the rate of return would never be less than 12%, a rate that would make up for the substantial surrender charges Miller incurred when he liquidated the American Equity annuity, and that would provide Miller with a rate of return substantially higher than the rate of return on the American Equity annuity. Miller liquidated the first annuity, incurring the $21,1000 early surrender charge, and used the proceeds to purchase a Flexible Premium Deferred Annuity (policy no. 0101045492), form $210,724.14, issued June 18, 2003, by NWL.

95.     Unbeknownst to Miller, who was 79 at the time, the NWL annuity was a 20-year, deferred annuity, whose payments would not start until 2023, when Miller would be 99 years of age. Strope also failed to disclose to Miller that the National Western annuity had substantial surrender charges associated with early withdrawal of the principal invested.

96.     Neither Larson nor Strope offered Miller any choice of type of living trust, or any choice of type of different annuity products or annuity companies. Strope did not disclose to Miller that any of the annuities Miller purchased were subject to substantial surrender charges for the early withdrawal of principal.

97.     Since Miller purchased the NWL annuity, Strope has failed to respond to Miller's attempts to contact him.

**Plaintiff Sweeney Buys a NWL Deferred Annuity From Sales Agent Phillips**

98.     At all times relevant to this action, plaintiff Marie N. Sweeney was over the age of 65.

99.     On or about June 2003, Larry Phillips, a duly appointed NWL sales agent and member of Fidelity Insured Deposits, Inc. (one of NWL's IMOs operating in California) met with plaintiff Sweeney ostensibly for the purpose of providing financial planning advice. During this meeting Mr. Phillips never inquired about or sought information concerning plaintiff's financial or

- 23 -                                    05-CV-1018-JM(LSP)

insurance advice. Instead, the agent's focus was ascertaining the degree and extent of Ms. Sweeney's liquid assets and at the conclusion of the meeting the sales agent recommended that plaintiff purchase a NWL deferred annuity and, as a result, plaintiff purchased a $10,000 single premium "Flex 85" deferred annuity issued by NWL under policy no. F0598.

100. At no time during the meeting did NWL's sales agent disclose that the deferred annuity had a maturity date of 2034 and thus would not begin to distribute payments to plaintiff until long after her actuarial life expectancy, imposed high surrender charges (25% graduated) over the first 15 years of the annuity and was further subject to a potentially negative Market Value Adjustment Factor, and/or that the sales agent was receiving substantial commissions from its sale to plaintiff.

101. Plaintiff Sweeney was harmed by her purchase of the NWL deferred annuity because it was an unsuitable financial product in light of the maturity date and surrender charges as known to NWL at the time it approved plaintiff's application. In addition to a maturity date of 2034, the annuity provided that plaintiff would only be permitted minimal access to her principal investment for the first 15 years of the annuity unless she paid substantial surrender charges to NWL. The annuity also provided that surrender charges will apply to the annuity's death benefit in the event Ms. Sweeney were to die during the 15 year Surrender Period.

102. Aside from the minimal guaranteed interest (3%) on the annuity's account balance, the only benefit from plaintiff' s transaction accrued to NWL and its sales agent who collected premiums, fees, and commissions from the sale of the annuity which required the plaintiff to relinquish any rights to the money paid into the deferred annuity.

## RICO ALLEGATIONS

103. Defendants have engaged in a fraudulent scheme, common course of conduct and conspiracy to increase or maintain market share and premium revenue for NWL and revenues for the Sales Agents from extremely lucrative commissions.

104. To achieve these goals, defendants entered into agreements to sell deferred annuity policies to senior citizens, used and disseminated virtually uniform marketing materials to solicit and sell such policies, and paid commissions and other fees for accomplishing a sale. As a direct result

1  of their conspiracy and fraudulent scheme, defendants were able to extract premiums, fees, early

2  withdrawal penalties, and other revenues from Ms. Sweeney, Mr. Petry, Mr. and Mrs. Glenane, Mr.

3  Miller, and the class.

4  **Elder Abuse Annuity Enterprise**

5       105.    Based upon plaintiffs' current knowledge, the following constitute one or more

6  groups of persons and entities associated in fact, hereinafter referred to in this Complaint as the

7  "Elder Abuse Annuity Enterprise" or "the EAA Enterprise":

8            (a)    Defendants;

9            (b)    Sales Agents that have earned or received commissions for selling a deferred

10  annuity to a senior citizen; and

11            (c)    any others that have facilitated the sale or sold a deferred annuity to a senior.

12       106.    The EAA Enterprise is an ongoing and continuing organization consisting of both

13  corporations and individuals associated for the common or shared purpose of selling, promoting

14  and/or marketing deferred annuity policies to plaintiffs and the class through deceptive and

15  misleading sales tactics or materials, and deriving profits from those activities.

16       107.    The EAA Enterprise functions by providing financial, long-term care, or estate

17  planning, consultation, advice and related services, as well as insurance products.  Many of these

18  services and products are legitimate and non-fraudulent.  However, defendants, through the EAA

19  Enterprise, have engaged in a pattern of racketeering activity which also involves a fraudulent

20  scheme to increase premium revenue for NWL, and additional revenue for the Sales Agents from

21  commissions, through the sale of deferred annuities to senior citizens.

22       108.    The EAA Enterprise engages in and affects interstate commerce because it involves

23  activities across state boundaries, such as the marketing, promotion, advertisement and sale of

24  inappropriate deferred annuity products to seniors, and the receipt of premiums, commissions, and

25  surrender charges from the sale of inappropriate deferred annuity products to senior citizens.

26       109.    Within the EAA Enterprise, there is a common communication network by which co-

27  conspirators share information on a regular basis.  The EAA Enterprise uses this common

28

1   communication network for the purpose of marketing, soliciting and selling annuity products to the

2   general public, including senior citizens.

3       110.    Each participant in the EAA Enterprise has a systematic linkage because there are

4   contractual relationships, financial ties, and continuing coordination of activities.  Through the EAA

5   Enterprise, defendants engage in consensual decisionmaking to implement their fraudulent scheme

6   and to function as a continuing unit for the common purpose of exacting payments, surrender

7   charges and premium dollars.  Furthermore, the EAA Enterprise functions as a continuing unit with

8   the purpose of assisting with, perfecting and furthering their wrongful scheme to market and sell

9   NWL's deferred annuity products to senior citizens.

10      111.    While defendants participate in and are members of the EAA Enterprise, they also

11  have a separate and distinct existence.

12      112.    Defendants fail to disclose key risks and negative features of their deferred annuities

13  to market and sell this inappropriate investment to senior citizens, who are highly unlikely to survive

14  until the annuity matures.  To limit the substantive information that prospective purchasers receive,

15  defendants have to maintain control over information prospective purchasers get at the point of sale.

16  Each defendant exercises substantial control over the direction of the EAA Enterprise by:

17          (a)    designing and distributing marketing and sales materials that do not disclose

18  the adverse material features and inherent risks of deferred annuities;

19          (b)    designing and issuing deferred annuity products with extended maturity dates,

20  high surrender charges and other similar provisions to senior citizens;

21          (c)    developing and disseminating uniform materials advertising long-term care,

22  asset protection, and living trust financial planning advice;

23          (d)    developing uniform sales and marketing materials, standardized annuity

24  contracts, high-pressure sales techniques and scripted sales presentations including but not limited to

25  those materials developed by defendants for use by the Sales Agents;

26          (e)    developing uniform sales techniques to "churn" senior citizens into purchasing

27  deferred annuities from NWL by baiting them to convert current investments to deferred annuities

28  by extolling the high interest rate without disclosing the associated penalties;

1       (f)     instructing and requiring sales agents to use standardized sales materials,

2 uniform sales techniques and presentations developed and/or authorized by defendants to market and

3 sell unsuitable deferred annuities to senior citizens;

4       (g)     rewarding sales agents with perks and high commissions for selling a deferred

5 annuity product to a senior citizen;

6       (h)     accepting applications for and issuing deferred annuities that mature after the

7 actuarial life expectancy of the annuitant; and

8       (i)     imposing and/or collecting charges from the class for withdrawing some or all

9 of the annuity and/or dying prior to the maturity date.

10     113.    Although defendants sell immediate annuities or other policies appropriate for senior

11 citizens, the EAA Enterprise has targeted senior citizens specifically for deferred annuity products.

12     114.    At all relevant times, each participant in the EAA Enterprise was aware of the scheme

13 to induce seniors to purchase inappropriate deferred annuity products, was a knowing and willing

14 participant in the scheme, and reaped profits there from.

15     115.    The EAA Enterprise has an ascertainable structure separate and apart from the pattern

16 of racketeering activity in which defendants have engaged.

17     116.    Defendants have directed and controlled the ongoing organization necessary to

18 implement their scheme and illicit business practices at meetings and through communications of

19 which plaintiffs cannot now know because all such information lies in defendants' hands.

20 **RICO Conspiracy**

21     117.    Defendants have not undertaken the practices described herein in isolation but as part

22 of a common scheme and conspiracy.

23     118.    Defendants have engaged in a conspiracy to increase or maintain market share and

24 premium revenue for NWL and to generate additional revenue for Sales Agents through high

25 commissions and incentives paid by NWL for selling deferred annuities to senior citizens.

26     119.    The objects of the conspiracy are: (a) to sell NWL's deferred annuity policies; (b) to

27 maximize annuity sales for NWL; (c) to maximize commissions for Sales Agents; and (d) to

28 maximize the revenues of all defendants.

120.    To achieve these goals, NWL has issued age exceptions for deferred annuities, issued virtually uniform information to the Sales Agents for marketing and selling such policies and paid high commissions for the sale of deferred annuities to seniors by any means. The Sales Agents have agreed to sell deferred annuities to seniors, even though they are inappropriate investments for them, and they have used deceptive and unconscionable methods to secure such sales and commissions. Defendants have also agreed to participate in other illicit and fraudulent practices, all in exchange for agreement to and participation in the conspiracy.

121.    Each defendant and member of the conspiracy, with knowledge and intent, has agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in obtaining the trust of elderly citizens, to persuade them to consolidate their assets in a deferred annuity, and to solicit, market, and sell such policies to persons for whom the investment will provide no benefit, but rather, will cause them harm through steep penalties, complications for loved ones upon their death, tax liability, and other costs and expenses.

122.    Indeed, for the conspiracy to succeed, each defendant and co-conspirator had to agree to implement and use the similar devices and fraudulent tactics against their intended targets.

123.    Many instances of common conduct, activity, and similar facts evidence the presence of a conspiracy and exist among all defendants and co-conspirators, including but not limited to:

(a)    similar advertisements and marketing materials with vague, misleading, and incomplete language about the adverse material features and key risks of deferred annuities;

(b)    similar plans and methods for sales agents to solicit, market, refer, and sell NWL's deferred annuities under the guise of providing financial and estate planning for seniors;

(c)    similar tactics for steering the class to NWL deferred annuity policies; and

(d)    similar agreements between and among defendants and co-conspirators to sell deferred annuity products to seniors, despite industry standards and governmental warnings.

124.    As a result of the conspiracy, Ms. Sweeney, Mr. Petry, the Glenanes, Mr. Miller, and the class made payments for deferred annuity products and other "services" beyond what they would have otherwise.

**Use of the Mails and Wires**

125.   Defendants used thousands of mail and interstate wire communications to create and manage their fraudulent scheme through virtually uniform misrepresentations, concealments and material omissions.   Defendants' scheme includes, but is not limited to: false and misleading marketing materials, mass mailings, phone calls, advertisements, agreements, insurance contracts, correspondence, policy materials, websites, and commission payments to Sales Agents.

126.   Defendants' fraudulent use of the mails and wires included the following communications sent by defendants to each other, plaintiffs and third parties via U.S. mail, commercial carrier, wire, or other interstate electronic media:

(a)   omissions about the risks and features of NWL deferred annuities;

(b)   omissions about the significant commissions, sales loads and expenses, and historical and investment yields;

(c)   false or misleading representations that Sales Agents provide objective financial advice to assist the class in crafting their financial and estate plan;

(d)   omissions about the inappropriateness of deferred annuity policies for seniors, as well as the drawbacks of such policies, such as steep penalties for withdrawal prior to the maturity date;

(e)   materials failing to disclose the existence and effect of commissions paid to Sales Agents by NWL, including the conflicts of interest created by the payments and as part of the conspiracy;

(f)   omissions aimed at inducing plaintiffs and the class to purchase NWL deferred annuities; and

(g)   invoices and payments related to defendants' improper scheme.

127.   Defendants' corporate headquarters have communicated by U.S. mail and by facsimile with various regional offices and subsidiaries, divisions and other insurance entities in furtherance of their schemes.

128.   Defendants' uniform acts of concealment and omissions were knowing and intentional and made for the purpose of deceiving the class, selling lucrative deferred annuity policies, and entitling Sales Agents to high commissions from NWL.

129.   Defendants either knew or recklessly disregarded that their misrepresentations and omissions were material and were relied upon by plaintiffs and the class as shown by their payment for deferred annuity policies placed with NWL, as well as other fees for financial and estate planning advice.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

130.   Defendants have affirmatively and fraudulently concealed their unlawful scheme, conspiracy and course of conduct from plaintiffs.  Plaintiffs and other class members did not know and could not reasonably have known of defendants' fraudulent scheme and could not have reasonably discovered the falsity of defendants' representations, advertising and similar documents, nor could plaintiffs and the class reasonably have known the concealed information until shortly before the filing of this Complaint.

131.   To this day, defendants continue to fraudulently conceal their practices from the class and public alike.  Throughout this time period, defendants refused to release or provide information about their practices in a way that plaintiffs and/or the class could have discovered their fraudulent scheme and practices.  Although the initial decisions to engage in these practices were made years ago, defendants have repeatedly decided since to continue concealing their fraudulent practices.

132.   Defendants have uniformly trained their sales force and other representatives not to disclose their fraudulent practices described herein.  Defendants did not disclose their practices in any of their policies or sales and marketing materials provided to plaintiffs and the class.

133.   As a result of the foregoing, plaintiffs and the class could not reasonably discover the unlawful and unethical practices described herein and did not do so until just recently.  The vast majority of class members still do not know that they have been injured by defendants' conduct.

134.   Defendants' conduct is continuing in nature.  There is a substantial nexus between the fraudulent conduct that has occurred within the statute of limitations and the misconduct prior to that time.  The acts involve the same type of illicit practices and are recurring, continuous events.

135.  The statute of limitations applicable to any claims brought by plaintiffs or other class members as a result of the conduct alleged herein has been tolled as a result of defendants' fraudulent concealment.

## CLASS ACTION ALLEGATIONS

136.  Pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), plaintiffs bring this nationwide class action on behalf of themselves and all other senior citizens (persons age 65 and older) who within the applicable statute of limitations of the date of the commencement of this action, purchased one or more National Western Life Insurance Company deferred annuities either directly, or through the surrender (in whole or part) of an existing permanent life insurance policy or annuity, or by borrowing against an existing permanent life insurance policy.

137.  Excluded from the class are defendants and their directors, officers, predecessors, successors, affiliates, agents, co-conspirator and employees, as well as the immediate family members of such persons.

138.  All class members have suffered injury to their property by reason of defendants' scheme and unlawful course of conduct, in that they paid for annuities that were worth only a fraction of their represented value and lost value in traditional investments such as stock, mutual funds, bond funds, and money market funds.

139.  The class is reasonably estimated to be in the thousands or tens of thousands and is thus so numerous that joinder of all its members is impracticable.  The precise number of class members and their addresses are unknown to plaintiffs, but can be ascertained through appropriate discovery of defendants' records. Class members may be notified of the pendency of this action by publication and/or other notice.

140.  There is a well-defined community of interest in the relevant questions of law and fact affecting putative class members.  Common questions of law and fact predominate over any individual questions affecting class members, including, but not limited to the following:

(a)  whether defendants uniformly omitted key risks and material information from plaintiffs and the class;

1        (b)    whether defendants were aware that deferred annuities were inferior
2  investment vehicles, particularly for senior citizens;

3        (c)    whether defendants improperly solicited, referred, marketed, issued, or sold
4  deferred annuities to senior citizens, including plaintiffs and the class;

5        (d)    whether defendants engaged in mail and/or wire fraud;

6        (e)    whether defendants engaged in a pattern of racketeering activity;

7        (f)    whether the EAA Enterprise is an "enterprise" within the meaning of 18
8  U.S.C. §1961(4);

9        (g)    whether defendants conducted or participated in the affairs of the EAA
10  Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

11        (h)    whether defendants conspired to commit violations of the racketeering laws in
12  violation of 18 U.S.C. §1962(d);

13        (i)    whether defendants committed elder abuse as defined in Cal. Welf. & Inst.
14  Code §15600, *et seq.*;

15        (j)    whether defendants committed unfair, unlawful and/or fraudulent business
16  practices, in violation of Cal. Bus. & Prof. Code §17200, in their marketing, promotion, solicitation,
17  sales and issuance of deferred annuities to plaintiffs and class members;

18        (k)    whether defendants engaged in false and misleading advertising in violation of
19  Cal. Bus. & Prof. Code §17500, *et seq.*;

20        (l)    whether defendants fraudulently concealed information about deferred
21  annuities from plaintiffs and the class in violation of California law;

22        (m)    whether defendants breached their obligation of good faith to plaintiffs and the
23  class;

24        (n)    whether defendants have been unjustly enriched at the expense of the class;

25        (o)    whether plaintiffs and the class are entitled to damages; and

26        (p)    whether the class is entitled to injunctive, declaratory, and/or other relief.

27

28

141.   The claims of plaintiffs and the other class members have a common origin and share a common basis.  The claims originate from the same illegal, fraudulent conspiracy on the part of defendants and their acts in furtherance thereof, as well as the conduct of their co-conspirators.

142.   Plaintiffs' claims are typical of those of the absent class members.  If brought and prosecuted individually, the claims of each class member would require proof of many of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

143.   Plaintiffs will fairly and adequately protect the interests of the class and have no interests adverse to or that directly and irrevocably conflict with the interests of other class members.  Plaintiffs are willing and prepared to serve the Court and the putative class in a representative capacity with all of the obligations and duties material thereto.

144.   Plaintiffs have retained the services of counsel, identified below, who are experienced in complex class-action litigation and in particular class actions involving insurance matters.  Plaintiffs' counsel will adequately prosecute this action, and will otherwise assert, protect and fairly and adequately represent plaintiffs and all absent class members.

145.   The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the parties opposing the class.  Such incompatible standards of conduct and varying adjudications on the same essential facts, proof, and legal theories would also create and allow the existence of inconsistent and incompatible rights within the class.

146.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) in that defendants have acted or refused to act on grounds generally applicable to the class, making final declaratory or injunctive relief appropriate.

147.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) in that common questions of law and fact predominate over any questions affecting only individual class members.

148.   Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

(a)      individual claims by the class members would be impracticable as the costs of pursuit would far exceed what any one class member has at stake;

(b)      little individual litigation has been commenced over the controversies alleged in this Complaint, and individual class members are unlikely to have an interest in separately prosecuting and controlling individual actions;

(c)      the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and

(d)      the proposed class action is manageable.

## FIRST CLAIM FOR RELIEF

### Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(a)-(d) (Against All Defendants)

149.   Plaintiffs and the class repeat and reallege all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

150.   This claim arises under 18 U.S.C. §1962(a)-(d), which provides in relevant part:

(a)      It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code [18 USCS § 2], to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(b)      It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c)      It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

(d)      It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

151.   As a direct and indirect result of defendants' conduct as described above, substantial income was generated, received by and came under the control of defendants. Defendants used that income to establish and/or operate the EAA Enterprise, which was engaged in interstate and foreign commerce. Therefore, defendants have violated 18 U.S.C. §1962(a).

05-CV-1018-JM(LSP)

152.    Defendants, through the conduct described above, acquired, maintained and exercised control over the EAA Enterprise, which was engaged in or affected interstate and foreign commerce. Therefore, defendants have violated 18 U.S.C. §1962(b).

153.    In violation of 18 U.S.C. §1962(c), defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of the EAA Enterprise through a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5).

154.    At all relevant times, defendants were "persons" within the meaning of 18 U.S.C. §1961(3), because each was "capable of holding a legal or beneficial interest in property."

155.    The EAA Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961(4), as individuals and other entities associated-in-fact for the common purpose of engaging in defendants' profit-making scheme.

156.    The EAA Enterprise was created and/or used as a tool to carry out the elements of defendants' illicit scheme and pattern of racketeering activity.  The EAA Enterprise has ascertainable structures and purposes beyond the scope and commission of defendants' predicate acts and conspiracy to commit such acts.  The enterprise is separate and distinct from defendants.

157.    The EAA Enterprise has engaged in, and its activities affected, interstate and foreign commerce by soliciting, marketing, referring, selling and issuing deferred annuity policies to thousands, if not tens of thousands, of persons within and without the United States.

158.    The EAA Enterprise actively disguised the nature of defendants' wrongdoing and concealed or misrepresented defendants' participation in the conduct of the EAA Enterprise to maximize profits while minimizing their exposure to criminal and civil penalties.

159.    Each defendant exerted substantial control over the EAA Enterprise, and participated in the operation and managed the affairs of the EAA Enterprise as described herein.

160.    Defendants have committed or aided and abetted the commission of at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity which defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

161.    Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. §1961(1) include, but are not limited to:

(a)    **Mail Fraud**: Defendants have violated 18 U.S.C. §1341 by sending or receiving materials via U.S. mail or commercial interstate carriers for the purpose of executing their scheme to market and sell deferred annuities to seniors by means of false pretenses, misrepresentations, promises, and/or omissions. The materials include, but are not limited to: advertisements, deferred annuity marketing brochures, performance illustrations, applications, contracts, sales presentation scripts, living trust kits, training manuals, videotapes, correspondence, annuitant lead lists, premium and commission payments, reports, data, summaries, statements, and other materials relating to the marketing and sale of NWL's deferred annuities.

(b)    **Wire Fraud**: Defendants have violated 18 U.S.C. §1343 by transmitting and receiving materials by wire for the purpose of executing their scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and/or omissions. The materials transmitted and/or received include, but are not limited to those mentioned in subsection (a) above.

162.    Many of the precise dates of defendants' fraudulent uses of the U.S. mail and wire facilities have been deliberately hidden and cannot be alleged without access to the defendants' books and records. Indeed, the success of defendants' scheme depends upon secrecy, and defendants have withheld details of the scheme from plaintiffs and class members. Generally, however, plaintiffs can describe the occasions on which the predicate acts of mail and wire fraud would have occurred, and how those acts were in furtherance of a scheme. They include thousands of communications to perpetuate and maintain the scheme, including, among other things:

(a)    transmitting and receiving misleading marketing and sales materials about defendants' deferred annuities;

(b)    processing applications for deferred annuity products;

(c)    issuing age waivers for applicants over the age of 65 or, alternatively, issuing policies to applicants over the age of 65 without an age waiver;

(d)    processing premium payments from senior citizens;

1          (e)    paying and receiving commissions for the marketing, referral and sale of

2  deferred annuity products to a senior;

3          (f)    transmitting and receiving materials about defendants' financial, long-term

4  care, and estate planning seminars, workshops and other similar events for senior citizens;

5          (g)    disseminating training materials for selling deferred annuities;

6          (h)    sharing information about prospective purchasers of deferred annuities; and

7          (i)    imposing and processing penalties and surrender charges for early access to

8  funds trapped in the deferred annuity products.

9      163.    The materials sent or received by defendants via the U.S. mail, commercial carrier,

10  wire or other interstate electronic media, contained, *inter alia*:

11          (a)    omissions concerning the key risks and features of NWL's deferred annuity

12  products;

13          (b)    omissions about defendants' unlawful sales techniques, misleading sales

14  materials and annuity contracts to sell deferred annuities to the Class;

15          (c)    omissions about the nature of the relationship between the Sales Agents and

16  NWL; and

17          (d)    omissions that Sales Agents are not "independent" estate and financial

18  planning services or insurance advisors because they are paid extremely high commissions from

19  NWL for selling deferred annuities.

20      164.    Defendants knowingly and intentionally made these misrepresentations, acts of

21  concealment and failures to disclose so as to deceive plaintiffs and the class. Defendants either knew

22  or recklessly disregarded that these were material misrepresentations and omissions, and plaintiffs

23  and the class relied on the misrepresentations and omissions as set forth herein.

24      165.    Defendants have obtained money and property belonging to plaintiffs and the class as

25  a result of these statutory violations. Plaintiffs and other class members have been injured in their

26  business or property by defendants' overt acts or mail and wire fraud, and by their aiding and

27  abetting each others' acts of mail and wire fraud.

28

166.   In violation of 18 U.S.C. §1962(d), defendants conspired to violate 18 U.S.C. §1962(c) as described herein.   Various other persons, firms and corporations, not named as defendants in this Complaint, have participated as co-conspirators with defendants in these offenses and have performed acts in furtherance of the conspiracy.

167.   Each defendant aided and abetted violations of the above laws, thereby rendering them indictable as a principal in the 18 U.S.C. §§1341 and 1343 offenses pursuant to 18 U.S.C. §2.

168.   Plaintiffs and the class have been injured in their property by reason of defendants' violations of 18 U.S.C. §1962(a) and (d), including lost access to needed funds; unnecessary and concealed fees, charges and penalties that they would not have otherwise incurred; expenses to hire a financial planner and/or attorney; deferred annuities worth a fraction of their represented value; and lost value in previous investments that they would not have otherwise incurred.   In the absence of defendants' violations of 18 U.S.C. §1962(a) and (d), plaintiffs and the class would not have incurred these costs and expenses, or they would have incurred less.

169.   Plaintiffs and the class relied, to their detriment, on defendants' fraudulent misrepresentations and omissions, which were made by means of Web sites, mass mailings, newspaper advertisements, telephone calls, marketing materials and virtually uniform representations or omissions.   Plaintiffs' and the class's reliance is evidenced by their payments made for services and for insurance products to defendants.

170.   Plaintiffs' and the class's injuries were directly and proximately caused by defendants' racketeering activity.

171.   Defendants knew plaintiffs and the class relied on their representations and omissions about the pricing and advantages or disadvantages about certain insurance policies and/or insurance carriers.   Defendants knew that policyholders would incur substantial costs as a result.

172.   Under the provisions of 18 U.S.C. §1964(c), plaintiffs are entitled to bring this action and to recover treble damages, the costs of bringing this suit and reasonable attorneys' fees.

173.   Defendants are accordingly liable to plaintiffs for three times their actual damages as proved at trial plus interest and attorneys' fees.

## SECOND CLAIM FOR RELIEF

### Financial Elder Abuse, California Welfare & Institutions Code §15600, *et seq.*
### (Against All Defendants)

174.   Plaintiffs and the class repeat and reallege all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

175.   Defendants' conduct constitutes financial abuse under Cal. Welf. & Inst. §15657.5, *et seq.*, as defined in Cal. Welf. & Inst. Code §15610.30.  California Welf. & Inst. Code §15610.30(a) provides in relevant part:

> (a)   "Financial abuse" of an elder or dependent adult occurs when a person or entity does any of the following:
>
>> (1)   Takes, secretes, appropriates, or retains real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both.
>>
>> (2)   Assists in taking, secreting, appropriating, or retaining real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both.

176.   At all relevant times, defendants took and/or assisted in the taking of property from Mr. Petry, Ms. Sweeney, the Glenanes, Mr. Miller and the class (who are all age 65 or older) for their own wrongful use and/or with intent to defraud.  Plaintiffs and the class trusted and relied on defendants.

177.   Defendants manipulated plaintiffs and the class into purchasing deferred annuities.

178.   Defendants aided and abetted each other in accomplishing the wrongful acts.  In doing so, defendants acted with an awareness of their wrongdoing and realized that their conduct would substantially assist the accomplishment of the wrongful conduct.

179.   In performing these acts, each defendant either acted as an agent of NWL, or NWL ratified such acts, or both.

180.   Defendants' wrongful acts were done maliciously, oppressively, and with the intent to mislead or defraud, thereby warranting punitive and exemplary damages appropriate in an amount to be ascertained according to proof pursuant to Cal. Civ. Code §3294 *et seq.*

181.   Under Cal. Welf. & Inst. Code §15657.5, *et seq.*, defendants are liable for reasonable attorneys' fees and costs for investigating and litigating this claim.

182.     Under Cal. Civ. Code §3345, defendants are liable for treble damages and penalties because: (a) defendants knew or should have known their conduct was directed as to a senior citizen; (b) their conduct caused a senior citizen to suffer substantial loss of property set aside for retirement, and assets essential to their health and welfare; (c) plaintiffs and the class are senior citizens who are more vulnerable than others to defendants' conduct because of their age, impaired understanding, impaired health or restricted mobility; and (d) plaintiffs and the class actually suffered substantial physical, emotional and economic damages resulting from defendants' conduct.

183.     Under Cal. Welf. & Inst. Code §15657, *et seq.*, defendants are liable to plaintiffs and the class for their pain and suffering.

## THIRD CLAIM FOR RELIEF

### Violation of California Business & Professions Code §17200, *et seq.*
### (Against All Defendants)

184.     Plaintiffs and the class repeat and reallege all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

185.     California Bus. & Prof. Code §17200 prohibits any "unlawful . . . business act or practice."  Defendants have violated §17200's prohibition against engaging in an unlawful act or practice by, *inter alia*, the following:

(a)     violating the statutes prohibiting defendants' conduct, as described herein, including violations of RICO, 18 U.S.C. §1962;

(b)     violating the Cal. Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750, *et seq.*;

(c)     violating Cal. Bus. & Prof. Code §17500, *et seq.*;

(d)     violating Cal. Ins. Code §§330-334; 762; 780; 781; 785; 787(a), (i), (k); 789.8, *et seq.*; 790, *et seq.*; 791.03, *et seq.*; 10127.10; 10127.13; and 10509, *et seq.*;

(e)     violating Cal. Welf. & Inst. Code §15610.30;

(f)     violating Cal. Civil Code §§1709, 1710, 1572, 1573 and 1575; and

(g)     violating or aiding and abetting a violation of Cal. Corp. Code §§25230 and 25235; and

186.   Plaintiffs reserve the right to allege other violations of law which constitute other unlawful business acts or practices.  Such conduct is ongoing and continues to this date.

187.   California Bus. & Prof. Code §17200 also prohibits any "unfair . . . business act or practice." As detailed in the preceding paragraphs, defendants engage in a systematic scheme to sell deferred annuities to plaintiffs and the class, in violation of federal and state law, and the fundamental policies delineated in statutory provisions.  Defendants gained the trust of plaintiffs and the class, had access to their financial information, and induced them into purchasing deferred annuities by uniformly omitting a host of key risks and features of their deferred annuities.  As a result, defendants engage in unfair business practices prohibited by Cal. Bus. & Prof. Code §17200, *et seq.*

188.   California Bus. & Prof. Code §17200 also prohibits any "fraudulent . . . business act or practice." As detailed in the preceding paragraphs, defendants' conduct was likely to deceive plaintiffs, the class and the public by, *inter alia*, representing that they were providing objective financial or estate planning, failing to disclose the drawbacks of a deferred annuity, and failing to disclose the disadvantages of purchasing a deferred annuity as a senior citizen, including the steep surrender charges and lengthy maturation periods that exceed their life expectancy.

189.   Defendants aided and abetted each other in accomplishing the wrongful acts.  In doing so, defendants acted with an awareness of their wrongdoing and realized that their conduct substantially assisted in the accomplishment of the wrongful conduct.

190.   As a result of defendants' practices, plaintiffs and other class members have incurred financial losses, including access to needed funds; unnecessary and concealed fees, charges and penalties that they would not have otherwise incurred; expenses to hire a financial planner and/or attorney; and the lost value in previous investments that they would not have otherwise incurred.

191.   Unless defendants are enjoined from continuing to engage in the unlawful, fraudulent and unfair business practices described above, members of the general public residing within the United States, including California, will continue to be damaged.

192.   Pursuant to Cal. Bus. & Prof. Code §17203, plaintiffs seek an order requiring defendants to immediately cease such acts of unlawful, unfair and fraudulent business practices and

1   requiring them to return the full amount of money improperly collected – including, but not limited

2   to, commissions and profits from the sale of annuities and income derived from penalties and fees –

3   to all those who have paid them, plus interest and attorneys' fees.

### FOURTH CLAIM FOR RELIEF

**Violation of California Business & Professions Code §17500, *et seq*.**
**(Against All Defendants)**

193.   Plaintiffs and the class repeat and reallege all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

194.   Defendants have intentionally issued false or misleading advertisements to directly or indirectly induce seniors into purchasing deferred annuity products.  Letters, postcards, marketing materials, and advertising Web sites prepared by defendants are tailored to attract retired individuals (aged 65 and older), who have assets and are relatively unsophisticated in investing.  The marketing materials are designed to exploit their insecurity about their finances and their estates after they die.

195.   Defendants have intentionally issued false or misleading advertisements soliciting seniors to attend seminars and workshops and other events for financial, long-term care, and estate planning, without adequately disclosing that defendants intend to sell them insurance policies.

196.   Defendants have intentionally issued false or misleading advertisements representing that they are certified financial and estate planners and other bona fide service providers, without also disclosing that they are insurance agents and brokers who sell insurance for NWL and receive compensation therefore.

197.   Defendants have intentionally issued false or misleading advertisements that falsely represent their credentials, status, character, or representative capacity.

198.   Defendants have intentionally issued false or misleading advertisements about the services they purport to provide.

199.   Defendants have intentionally issued false or misleading marketing materials and advertisements about the deferred annuity policies that they sell.

200.   Defendants failed to disclose to plaintiffs, the class, or the general public that deferred annuities are inappropriate investments for seniors, instead providing virtually uniform messages

that annuities are perfect investments for seniors.  Defendants failed to disclose that deferred annuities may be inappropriate because of life expectancies and seniors' need for liquidity in the event of health care emergencies, sudden need to reside in a nursing home, or other financial crises.

201.   In making and disseminating these statements and advertisements, defendants knew or should have known that they were untrue or misleading.

202.   NWL has or should have approved all of the Sales Agents' advertisements and marketing materials pursuant to Cal. Ins. Code §787(l), and is, therefore, liable for such false or misleading advertisements even if it did not issue them directly.

203.   Defendants aided and abetted each other in accomplishing the wrongful acts.  In doing so, defendants acted with awareness of their misconduct and knew that their conduct would substantially further the wrongful conduct.

204.   As a result of defendants' misconduct as alleged herein, plaintiffs and the class have incurred actual financial losses and damages, including but not limited to: penalties, fees, charges, and deductions as a result of following the advice and recommendations of defendants; fees and charges for the purchase of inappropriate financial and living trust products; deferred annuities worth only a fraction of their represented value; and taxes, assessments, and penalties that would not have otherwise been incurred but for reliance on defendants' advice and recommendations.

205.   As a direct and proximate result of defendants' wrongful conduct, plaintiffs, the class, and the general public have suffered monetary and non-monetary damages.

206.   Unless defendants are enjoined from continuing to engage in such wrongful actions and conduct, members of the general public will continue to be damaged by defendants' false and misleading advertising.

207.   So as not to be unjustly enriched by their own wrongful actions and conduct, defendants should be required to disgorge and restore to plaintiffs, members of the class, and the general public all monies wrongfully obtained by defendants as a result of their false and misleading advertising, along with interest.

## FIFTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty
### (Against All Defendants)

208.    Plaintiffs and the class repeat and reallege all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

209.    By virtue of their purported positions as financial advisors with access to plaintiffs' personal and confidential information, and because of their superior knowledge and ability to manipulate and control senior citizens' finances and legal status, defendants assumed fiduciary duties to plaintiffs and the class.

210.    These entities and defendants owed to plaintiffs and members of the class the highest duties of loyalty, honesty, fidelity, trust, and due care in their fiduciary obligations, and were required to use their utmost ability to provide estate planning and investment advice in a fair, just and equitable manner, and to act in furtherance of the best interests of plaintiffs and the class so as to benefit their clients, and not themselves.

211.    As set forth above, defendants and IMO's breached their obligations and fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision, by *inter alia*:

(a)    Failing to disclose the true characteristics of the deferred annuities sold to senior citizens, including the material costs, risks and potential returns related to the deferred annuities;

(b)    Unreasonably, and in bad faith, refusing to give sufficient consideration to plaintiffs' welfare rather than their own financial interests;

(c)    Ignoring NWL's protocols and standards in order to further their own financial interests;

(d)    Churning existing senior citizen life insurance and/or annuity policyholders, and using deceptive and misleading standardized marketing materials in violation of Cal. Ins. Code §§781 and 10509.8;

(e)    Failing to competently supervise and monitor their employees;

- 44 -

05-CV-1018-JM(LSP)

(f)     Unreasonably and in bad faith issuing an age exemption without performing a full and complete investigation of whether or not such an exception would be suitable for their customers;

(g)     Making material omissions of fact that the IMOs who marketed and sold NWL's annuities were "independent;" and

(h)     Maintaining an illegal marketing scheme and conspiracy in violation of §1961(1)(B) of RICO to sell annuity products to senior citizens.

212.    As described herein, defendants and IMOs owned, operated and/or controlled by NWL recklessly or knowingly breached their fiduciary duties by orchestrating, devising, carrying out, participating in, and/or failing to prevent, terminate, or timely correct the wrongdoing alleged herein.

213.    Each of these violations was achieved because defendants willingly, knowingly, and/or recklessness sought to gain their own financial advantage to the disadvantage of plaintiffs and the class.

214.    As a direct and proximate result of defendants' violations of their fiduciary duties, plaintiffs and the class have been injured, and suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

215.    In light of the foregoing, plaintiffs request that the Court deem this a constructive fraud, and require defendants to immediately rescind the annuity contracts to which plaintiffs and the class are subject.

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Breach of Fiduciary Duty
### (Against All Defendants)

216.    Plaintiffs and the class repeat and reallege all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

217.    Defendants and the IMOs owned, operated, and/or controlled by NWL aided and abetted, encouraged, and rendered substantial assistance to one another in order to accomplish the wrongful acts complained of herein.   In aiding and abetting and substantially assisting the

- 45 -

05-CV-1018-JM(LSP)

commission of the acts complained of, defendants and IMOs acted with an awareness of their wrongdoing and realized that their conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein. In performing these acts, each such IMO either acted as agents of NWL, or NWL ratified such acts, or both, and benefited financially from their scheme.

218.   As a result of the wrongful conduct of NWL and its IMOs, and each of them, plaintiffs and the class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

219.   In addition, the wrongful acts of NWL and IMOs, and each of them, were done maliciously, oppressively, and with the intent to mislead and defraud, and plaintiffs and the class are entitled to punitive and exemplary damages to be ascertained according to proof, which is appropriate to punish and set an example of NWL.

### SEVENTH CLAIM FOR RELIEF

### Fraudulent Concealment, Cal. Civ. Code §1710, *et seq.*
### (Against All Defendants)

220.   Plaintiffs and the class repeat and reallege all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

221.   Defendants intentionally concealed the following material information from plaintiffs and the class:

(a)   Material information concerning their expense ratios, commissions paid and other sales charges, costs of insurance, interest rate spreads and other underwriting assumptions;

(b)   The disadvantages of buying a deferred annuity, including tax and estate consequences and penalties, and lack of access to their annuity investments within their lifetime; and

(c)   The surrender charges, penalties and other fees and expenses incurred upon early withdrawal or death by obscuring and hiding references thereto.

222.   Plaintiffs and the class relied on these omissions, as shown by their purchase of the deferred annuities and payment of premiums and other charges and fees.

223.   Defendants performed the wrongful acts with the intent of gaining their own financial advantage to the disadvantage of plaintiffs and the class.

224.    Defendants aided and abetted each other in accomplishing the wrongful acts.  In doing so, defendants acted with an awareness of their wrongdoing and realized that their conduct would substantially assist the accomplishment of the wrongful conduct.

225.    In performing these acts, each Sales Agent either acted as an agent of NWL, or NWL ratified such acts, or both.

226.    As a result of defendants' wrongful conduct, plaintiffs and the class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined at trial.

227.    The wrongful acts of defendants were done maliciously, oppressively, and with the intent to mislead and defraud.  Plaintiffs and the class are entitled to punitive and exemplary damages in an amount appropriate to punish and set an example of defendants pursuant to Cal. Civil Code §3294, *et seq.*

## EIGHTH CLAIM FOR RELIEF

### Breach of the Duty of Good Faith and Fair Dealing
### (Against All Defendants)

228.    Plaintiffs and the class repeat and reallege all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

229.    As alleged above, the relationship of insurer and insured exists between NWL and plaintiffs and the other members of the class.  The relationship of insurer and insured creates a duty, implied in law, extending from NWL to plaintiffs and the class to deal fairly with them and in good faith.  As a result, there is an implied obligation of good faith and fair dealing in each insurance policy.  The insurance company must not do anything to injure the right of the insured to receive the full benefits of the agreement.

230.    In addition, all defendants have a duty of honesty, good faith and fair dealing arising from Cal. Ins. Code §785(a), which provides: "All insurers, brokers, agents, and others engaged in the transaction of insurance owe a prospective insured who is 65 years of age or older, a duty of honesty, good faith, and fair dealing."

231.    To fulfill their duty of good faith and fair dealing, the insurer and broker/agent must give at least as much consideration to the interests of the insured as they give to their own interests.

Defendants breached that duty of good faith and fair dealing in several ways, including but not limited to:

        (a)    Using deceptive and misleading materials, which failed to disclose the expense ratios, insurance costs, interest rate spreads and other material information about NWL's deferred annuities;

        (b)    using deceptive and misleading materials, which failed to adequately disclose the disadvantages of buying a deferred annuity, including penalties, and lack of access to their annuity investments within their lifetime;

        (c)    failing to disclose the significant commissions that Sales Agents earn from the sale of annuities to plaintiffs;

        (d)    obscuring and hiding references to the surrender charges, penalties and/or other fees incurred upon early withdrawal or death;

        (e)    drafting and using form annuity contracts that fail to properly apprise seniors of required information and in the required format about the surrender period and associated surrender penalties in violation of Cal. Ins. Code §10127.13;

        (f)    failing to consider plaintiffs' and the class' welfare above their own;

        (g)    failing to comply with state law, industry standards and/or internal policies and by selling deferred annuities to seniors issuing age exceptions without performing full and complete investigations as to appropriateness of the annuities sold to plaintiffs; and

        (h)    failing to competently train and supervise their Sales Agents and/or employees.

232.    As a proximate result of the aforementioned acts and omissions of defendants, plaintiffs and the class have suffered damages in a sum to be proven at the time of trial. It has also become reasonably necessary for plaintiffs to retain counsel to recover amounts due under the contracts.

233.    The aforementioned acts were performed maliciously, fraudulently and oppressively, thereby entitling plaintiffs and the class members to punitive damages in an amount appropriate to punish defendants.

## NINTH CLAIM FOR RELIEF

### Unjust Enrichment and Imposition of Constructive Trust
(Against All Defendants)

234.    Plaintiffs and the class repeat and reallege all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

235.    Defendants owed various duties to plaintiffs and the class as a result of their insurer/insured and/or fiduciary relationship.

236.    By engaging in the elder deferred annuity scheme, defendants extracted payments from plaintiffs and class members, including, but not limited to, annuity premiums, commissions, service charges, surrender charges, and other fees, expenses and charges based upon misleading and fraudulent uniform sales presentations, marketing materials, and annuity illustrations.

237.    As a result of the relationships between and among the parties and the facts stated above, defendants will be unjustly enriched if they are permitted to retain such funds; therefore, a constructive trust should be established over the monies that plaintiffs and the class members paid to defendants.  These monies are traceable to defendants.

238.    The victims of the unsuitable deferred annuity sales scheme described above have no adequate remedy at law and have been damaged in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the class, pray for judgment against defendants as follows:

A.    For a temporary, preliminary and permanent order for injunctive relief enjoining defendants from pursuing the practices complained of above;

B.    For a temporary, preliminary and permanent order for injunctive relief requiring defendants to undertake an immediate public information campaign to inform members of the general public as to their prior practices and notifying the members of the putative class of the potential for restitutionary relief;

1   C.   For an order requiring disgorgement and restitution of defendants' ill-gotten gains and

2   payment of restitution to plaintiffs and the class all funds acquired by means of any practice declared

3   by this Court to be unlawful, fraudulent or unfair;

4   D.   An order certifying the class as defined herein;

5   E.   Distribution of any monies recovered on behalf of plaintiffs or the class, via fluid

6   recovery or *cy pres* recovery where necessary to prevent defendants from retaining any of the profits

7   or benefits of their wrongful conduct;

8   F.   Imposition of a constructive trust;

9   G.   For reasonable attorneys' fees and costs of investigation and litigation under

10  18 U.S.C. §1964(c); Cal. Welf. & Inst. Code §15657.5, *et seq.*; and the common fund doctrine;

11  H.   For compensatory, special and general damages according to proof;

12  I.   For punitive and exemplary damages under Cal. Civ. Code §3294;

13  J.   For treble damages and penalties pursuant to 18 U.S.C. §1964(c); Cal. Civil Code

14  §3345; Cal. Bus. & Prof. Code §17206.1; and Cal. Ins. Code §789;

15  K.   For double damages under Cal. Probate Code §859;

16  L.   For transfer of the wrongfully obtained monies and/or property under Cal. Probate

17  Code §§850-859, *et seq.*;

18  M.   For costs of suit, pre-judgment, and post-judgment interest; and

19  N.   Such other and further relief as the Court may deem necessary or appropriate.

20  **JURY DEMAND**

21  Plaintiffs demand a trial by jury.

22  DATED: June 12, 2006            LERACH COUGHLIN STOIA GELLER
                                    RUDMAN & ROBBINS LLP
23                                  JOHN J. STOIA, JR.
                                    THEODORE J. PINTAR
24                                  HELEN I. ZELDES
                                    RACHEL L. JENSEN
25

26

27                                      RACHEL L. JENSEN

28

1

2      655 West Broadway, Suite 1900
       San Diego, CA 92101
       Telephone: 619/231-1058
3      619/231-7423 (fax)

4      BARRACK, RODOS & BACINE
       STEPHEN R. BASSER
5      JOHN L. HAEUSSLER

6

7      _____
                STEPHEN R. BASSER

8

9      402 West Broadway, Suite 850
       San Diego, CA 92101
       Telephone: 619/230-0800
10     619/230-1874 (fax)

11     Co-Lead and Interim Class Counsel

12     RENNE SLOAN HOLTZMAN & SAKAI, LLP
       LOUISE H. RENNE
13     INGRID M. EVANS
       50 California Street, Suite 2100
14     San Francisco, CA 94111-4624
       Telephone: 415/678-3800
15     415/678-3838 (fax)

16     JAMES, HOYER, NEWCOMER
         & SMILJANICH, P.A.
17     CHRISTA L. COLLINS
       JOHN YANCHUNIS
18     J. ANDREW MEYER
       4830 West Kennedy Blvd.
19     Urban Centre One, Suite 550
       Tampa, FL 33609
20     Telephone: 813/286-4100
       813/286-4174 (fax)

21     Attorneys for Plaintiffs Warren B. Petry and
22     Peter J. and Mary S. Glenane

23     BONNETT, FAIRBOURN, FRIEDMAN
         & BALINT, P.C.
24     ANDREW S. FRIEDMAN
       ELAINE A. RYAN
25     PATRICIA N. SYVERSON
       2901 N. Central Avenue, Suite 1000
26     Phoenix, AZ 85012
       Telephone: 602/274-1100
27     602/274-1199 (fax)

28

1

2      SHERNOFF, BIDART & DARRAS
       WILLIAM M. SHERNOFF
       EVANGELINE F. GARRIS
3      600 South Indian Hill Blvd.
       Claremont, CA  91711
4      Telephone:  909/621-4936
       909/625-6915 (fax)

5
       FINKELSTEIN & KRINSK
6      HOWARD D. FINKELSTEIN
       MARK L. KNUTSON
7      501 West Broadway, Suite 1250
       San Diego, CA  92101
8      Telephone: 619/238-1333
       619/238-5425 (fax)

9
       Attorneys for Plaintiff Marie N. Sweeney
10
       S:\CasesSD\Nat'l Western Annuity\CPT 00031034.doc
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF SERVICE

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.     That on June 12, 2006, declarant served the CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT via electronic mail to the following party:

> Kent R. Keller
> kkeller@barwol.com
> Larry M. Golub
> Vivian L. Orlando
> Barger & Wolen LLP
> 633 West Fifth Street, Suite 4700
> Los Angeles, CA  90071
> 213/680-2800
> 213./614-7399 (Fax)

3..     That on June 12, 2006, declarant served the CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

4.     That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 12th day of June, 2006, at San Diego, California.

_____
ANGELA E. MUELLER

NATIONAL WESTERN ANNUITY
Service List - 6/12/2006   (05-0244)
Page 1 of 2

**Counsel For Defendant(s)**

Kent R. Keller
Larry M. Golub
Vivian L. Orlando
Barger & Wolen LLP***
633 West Fifth Street, Suite 4700
Los Angeles, CA 90071
   213/680-2800
   213/614-7399 (Fax)

**Counsel For Plaintiff(s)**

Leonard Barrack
Daniel E. Bacine
William J. Ban
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
   215/963-0600
   215/963-0838 (Fax)

Jonathan Auerbach
Jerome M. Marcus
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
   215/875-3000
   215/875-4604 (Fax)

Andrew S. Friedman
Elaine A. Ryan
Bonnett, Fairbourn, Friedman & Balint, P.C.
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
   602/274-1100
   602/274-1199 (Fax)

Stephen R. Basser
John L. Haeussler
Barrack, Rodos & Bacine
402 West Broadway, Suite 850
San Diego, CA 92101
   619/230-0800
   619/230-1874 (Fax)

David S. Senoff
Billet & Connor P.C.
2000 Market Street, Suite 2803
Philadelphia, PA 19103-3201
   215/496-7500
   215/496-7505 (Fax)

Howard D. Finkelstein
Mark L. Knutson
Finkelstein & Krinsk LLP
501 West Broadway, Suite 1250
San Diego, CA 92101
   619/238-1333
   619/238-5425 (Fax)

*** Denotes service via electronic mail & U.S. Mail.

NATIONAL WESTERN ANNUITY
Service List - 6/12/2006   (05-0244)
Page 2 of 2

Christa  Collins
John A. Yanchunis
J. Andrew Meyer
James, Hoyer, Newcomer & Smiljanich, P.A.
4830 W. Kennedy Blvd., Suite 550
Tampa, FL  33609-2589
   813/286-4100
   813/286-4174 (Fax)

John J. Stoia, Jr.
Theodore J. Pintar
Helen I. Zeldes
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
   619/231-1058
   619/231-7423 (Fax)

Gary P. Lightman
Glenn A. Manochi
Lightman, Manochi & Christensen
1520 Locust Street, 12th Floor
Philadelphia, PA  19102-4401
   215/545-3000
   215/545-3001 (Fax)

Louise H. Renne
Ingrid M. Evans
Renne Sloan Holtzman & Sakai, LLP
50 California Street, Suite 2100
San Francisco, CA  94111
   415/678-3800
   415/678-3838 (Fax)

William M. Shernoff
Evangeline F. Garris
Joel A. Cohen
Shernoff, Bidart & Darras LLP
600 South Indian Hill Blvd.
Claremont, CA  91711-5948
   909/621-4935
   909/625-6915 (Fax)