















TKL   7/28/06   10:44
3:05-CV-01018   NATIONAL WESTERN V.
*60*
*P/A.*

1  Kent R. Keller (043463) kkeller@barwol.com
   Larry M. Golub (110545) lgolub@barwol.com
2  Michael A.S. Newman (205299) mnewman@barwol.com
   Vivian I. Orlando (213833) vorlando@barwol.com
3  Peter S. Sindhuphak (235164) psindhuphak@barwol.com
   BARGER & WOLEN LLP
4  633 West Fifth Street, 47th Floor
   Los Angeles, California 90071
5  Telephone: (213) 680-2800
   Facsimile: (213) 614-7399

6

7  Attorneys for Defendant
   National Western Life Insurance Company

8



FILED

JUL 2 7 2006

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

ORIGINAL

9        UNITED STATES DISTRICT COURT

10       SOUTHERN DISTRICT OF CALIFORNIA

11                                              _ BY FAX

12  In re NATIONAL WESTERN LIFE        )  CASE NO.: 05 CV 1018 JM (LSP)
    INSURANCE DEFERRED ANNUITIES       )
13  LITIGATION                         )  (Honorable Jeffrey T. Miller)
                                       )
14                                     )  DEFENDANT NATIONAL WESTERN
                                       )  LIFE INSURANCE COMPANY'S
15  _____)  MEMORANDUM OF POINTS AND
                                       )  AUTHORITIES IN SUPPORT OF
16  This Document Relates To:          )  MOTION TO DISMISS AND MOTION TO
                                       )  STRIKE PLAINTIFFS' CONSOLIDATED
17     All Actions                     )  AND AMENDED CLASS ACTION
                                       )  COMPLAINT
18                                     )
                                       )  [Filed Concurrently With: (1) Notice of
19                                     )  Motion and Motion; (2) Proposed Order]
                                       )
20                                     )  Date:        September 1, 2006
                                       )  Time:        11:00 a.m.
21                                     )  Courtroom:   6
                                       )
22                                     )  Complaint Filed:  December 22, 2005
                                       )

23

24

25

26

27

28

BARGER & WOLEN LLP
633 WEST FIFTH STREET
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

i:\office6\6326\010\06pleadings\mtn2dismissp&as consol final.doc

05 CV 1018 JM (LSP)

# TABLE OF CONTENTS

**PAGE**

1. INTRODUCTION ........................................................................... 1

2. FACTS ALLEGED IN THE COMPLANT ......................................... 2

   A.   The Parties ........................................................................ 2

   B.   General Allegations Of Wrongdoing ...................................... 2

   C.   Individual Allegations ........................................................ 3

   D.   RICO Allegations ............................................................... 6

3. PLAINTIFFS' RICO CLAIM FAILS ............................................... 6

   A.   The RICO Claims of All Four Named Plaintiffs are Barred ........ 7

      (1)   The McCarran-Ferguson Act Bars the California Plaintiffs Claims ......... 7

      (2)   Miller's Claim is Barred Because National Western Could Not Have Operated or Managed the Alleged RICO Enterprise ......... 11

   B.   Plaintiffs Fail to Satisfy the Requirements for Asserting a RICO Claim ......... 12

      (1)   The Necessary Elements of a RICO Claim ......... 12

      (2)   National Western is Not Distinct from the RICO "Enterprise" ......... 12

      (3)   Plaintiffs Fail to Allege the Existence of a RICO "Enterprise" ......... 14

      (4)   Plaintiffs Fail to Establish a Racketeering Activity by Defendants ......... 16

      (5)   The Use of the Mail and Wire is Not Sufficiently Connected to the Alleged Fraud ......... 20

      (6)   Plaintiffs' RICO Claim Also Fails Because They Have Not Established a Pattern of Racketeering Activity ......... 20

      (7)   Plaintiffs Have Not Alleged a Violation of Section 1962(a) ......... 21

      (8)   Plaintiffs Fail to Allege a Violation of Section 1962(b) ......... 22

4. THE BREACH OF FIDUCIARY DUTY CLAIM FAILS AS THERE IS NO FIDUCIARY RELATIONSHIP WITH NATIONAL WESTERN ......... 22

5. PLAINTIFFS' BAD FAITH CLAIM FAILS BECAUSE THEY HAVE NOT ALLEGED A CORRESPONDING BREACH OF CONTRACT ......... 23

6. PLAINTIFFS' RELIANCE ON CALIFORNIA INSURANCE CODE SECTIONS 785-790.10 SHOULD BE STRICKEN ......... 24

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

7. THE CLAIMS OF MILLER (AND EFFECTIVELY ALL NON-CALIFORNIA CLASS MEMBERS) FOR VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE SECTIONS 17200 AND 17500 ARE BARRED ... 25

8. CONCLUSION ... 25

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

05 CV 1018 JM (LSP)

## TABLE OF AUTHORITIES

PAGE

### Cases

*Alan Neuman Productions, Inc. v. Albright*, 862 F.2d 1388 (9th Cir. 1989) .................................. 17

*Allwaste, Inc. v. Hecht*, 65 F.3d 1523 (9th Cir. 1995) ....................................................................... 17

*Almon v. State Farm Fire & Casualty Co.*, 724 F. Supp. 765 (S.D. Cal. 1989) ........................... 23

*American Chiropractic Ass'n. v. Trigon Healthcare, Inc.*, 151 F. Supp. 2d 723 (W.D. Va. 2001) ....................................................................................................................................................... 10

*American International Group, Inc. v. Superior Court*, 234 Cal. App. 3d 749 (1991), ........passim

*American Med. Int'l. v. National Union Fire Ins. Co.*, 244 F.3d 715 (9th Cir. 2001). .................. 23

*Annulli v. Panikkar*, 200 F.3d 189 (3d Cir. 1999) ................................................................................. 17

*Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993). ............................................................................. 11, 12

*Brown v. Protective Life Ins. Co.*, 353 F.3d 405 (5th Cir. 2003) .................................................. 19

*Camp v. Pacific Fin. Group*, 956 F. Supp. 1541 (C.D. Cal. 1997) ................................................ 18

*Cedric Kushner Promotions, Ltd., v. Don King*, 533 U.S. 158 (2001) ......................................... 12

*Chang v. Chen*, 80 F.3d 1293 (9th Cir. 1996) ................................................................... 14, 15, 16

*Chaset v. Fleet/Skybox Int'l*, 300 F.3d 1083 (9th Cir. 2002) ........................................................ 12

*Comwest, Inc. v. American Operator Services, Inc.*, 765 F. Supp. 1467 (C.D. Cal. 1991) .......... 17

*Continental Ins. Co. v. Bahan*, 216 F. 3d 150 (1st Cir. 2000) ........................................................ 11

*Crossley v. Allstate Insurance Co.*, 155 Mich. App. 694 (1986); ................................................... 11

*Dalrymple v. United Services Auto. Ass'n*, 40 Cal. App. 4th 497 (1995) ....................................... 24

*During v. Citibank Int'l.*, 990 F. 2d 1133 (9th Cir. 1993) ................................................................. 21

*Edwards v. Marin Park, Inc.*, 356 F.3d 1058 (9th Cir. 2004) ......................................................... 17

*Fireman's Fund Ins. Co. v. Stites*, 258 F.3d 1016 (9th Cir. 2001) ................................................ 12

*Gotham Print, Inc. v. American Speedy Printing Centers, Inc.*, 863 F. Supp. 447 (E.D. Mich. 1994) ....................................................................................................................................................... 19

*Gucciardo v. Reliance Ins. Co.*, 84 F. Supp. 2d 399 (E.D.N.Y. 2000) ......................................... 11

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989). .......................................... 21

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

05 CV 1018 JM (LSP)

1    *Hassard v. Bonnington, Roger & Huber v. Home Ins. Co.*, 740 F. Supp. 789 (S.D. Cal. 1990) ..23

2    *Henry v. Associated Indemnity Corp.*, 217 Cal. App. 3d 1405 (1990) .........................................23

3    *Howard v. America Online, Inc.*, 208 F.3d 741 (9th Cir. 2000) ...............................................18

4    *Humana Inc. v. Forsyth*, 525 U.S. 299 (1999) .............................................................8, 9, 10

5    *In Re Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541 (9th Cir. 1994) ..............................................18

6    *In re Managed Care Litig.*, 185 F. Supp. 2d 1310 (S.D. Fla. 2002) ...........................................10

7    *Jonathan Neil & Assoc., Inc. v. Jones*, 33 Cal. 4th 917 (2004)..............................................24

8    *Kann v. United States*, 323 U.S. 88 (1944). ...............................................................20

9    *Lewis v. Sporck*, 612 F. Supp. 1316 (N.D. Cal. 1985) ......................................................18

10   *Love v. Fire Ins. Exchange*, 221 Cal. App. 3d 1136 (1990)................................................22, 23

11   *Merchants Home Delivery Service, Inc. v. Reliance Group Holdings, Inc.*, 50 F. 3d 1486 (9th
         Cir. 1995.)..........................................................................................9

12   *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531 (9th Cir. 1989)................................12, 17

13   *Moradi-Shalal v. Fireman's Fund Ins. Cos.*, 46 Cal.3d 287 (1988),.........................................8, 9

14   *Neurological Resources, P.C. v. Anthem Ins. Cos.*, 62 F. Supp. 2d 840 (S.D. Ind. 1999)............11

15   *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214 (1999). ...................................25

16   *Nugget Hydroelectric L.P. v. Pacific Gas & Elec. Co.*, 981 F.2d 429 (9th Cir. 1992) .................21

17   *Occupational-Urgent Care Health Systems, Inc. v. Sutro & Co.*, 711 F. Supp. 1016 (E.D.
         Cal. 1989) .........................................................................................18

18

19   *Old Republic Ins. Co. v. FSR Brokerage, Inc.*, 80 Cal. App. 4th 666 (2000) ...............................23

20   *Parrino v. FHP, Inc.*, 146 F.3d 699 (9th Cir. 1998)..........................................................3

21   *People for Ethical Treatment of Animals, Inc. v. California Milk Producers Advisory Board*,
         125 Cal. App. 4th 871 (2005). .....................................................................25

22   *Progressive West Ins. Co. v. Superior Court*, 135 Cal. App. 4th 263 (2005) ...............................24

23   *Rattan v. United Services Auto Ass'n*, 84 Cal. App. 4th 715 (2000) ........................................23

24   *Reves v. Ernst & Young*, 507 U.S. 170 (1993) ..............................................................11

25   *River City Markets, Inc. v. Fleming Foods West, Inc.*, 960 F.2d 1458 (9th Cir. 1992) ................13

26   *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339 (2d Cir. 1994)........13

27   *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644 (3d Cir. 1998) ...............................19

28

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800
                                            -iv-                            05 CV 1018 JM (LSP)

1  *Sabo v. Metropolitan Life Ins. Co.*, 137 F. 3d 185 (3d Cir. 1998) .................................................. 10

2  *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393 (9th Cir. 1986)........... 16, 17, 18

3  *Schwartz v. State Farm*, 88 Cal. App. 4th 1329 (2001) ........................................................... 24

4  *Sebastian Int'l, Inc. v. Russolilo*, 186 F.Supp.2d 1055 (C.D. Cal 2000)....................................... 22

5  *SEC v. National Securities, Inc.*, 393 U.S. 453 (1969) ......................................................... 7

6  *Semegen v. Weidner*, 780 F.2d 727 (9th Cir. 1985) ............................................................... 18

7  *Simon v. Value Behaviorial Health, Inc.*, 208 F.3d 1073 (9th Cir. 2000)................................. 15, 16

8  *Smith v. Ayres*, 845 F.2d 1360 (5th Cir. 1998).......................................................................... 17

9  *Solomon v. North Am. Life & Cas. Ins. Co.*, 151 F.3d 1132 (9th Cir. 1998) .............................. 23

10  *Stewart v. Wachowski*, 2004 U.S. Dist. LEXIS 26608 (C.D. Cal. 2004)...................................... 19

11  *Sun Savings and Loan Ass'n v. Dierdorff*, 825 F.2d 187 (9th Cir. 1987)...................................... 12

12  *U.S. Concord, Inc. v. Harris Graphics, Corp.*, 757 F.Supp. 1053 (N.D. Cal. 1991).................... 22

13  *United States v. Green*, 745 F.2d 1205 (9th Cir. 1984)................................................................. 17

14  *United States v. Lo*, 231 F. 3d 471 (9th Cir. 2000). ................................................................. 20

15  *United States v. Louderman*, 576 F.2d 1383 (9th Cir. 1978). ................................................... 17

16  *United States v. Manarite*, 44 F.3d 1407 (9th Cir. 1995)............................................................. 20

17  *United States v. Maze*, 414 U.S. 395 (1974) ................................................................................. 20

18  *United States v. Riccobene*, 709 F.2d 214 (3d Cir. 1983) ............................................................ 14

19  *University of Md. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534 (3d Cir. 1993) ....................... 12

20  *Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285 (S.D. Cal. 2003)............................................... 16

21  *Vu v. Prudential Property & Casualty Ins. Co.*, 26 Cal. 4th 1142 (2001) .................................... 22

22  *Wagh v. Metris Direct, Inc.*, 348 F.3d 1102 (9th Cir. 2003) .......................................... 14, 16, 21, 22

23  *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1 (1995) ........................................................... 23

24  *Wanetick v. Mel's of Modesto, Inc.*, 811 F. Supp. 1402 (N.D. Cal. 1992) .................................... 18

25  *Webster v. Omnitriton*, 79 F.3d 776 (9th Cir. 1996) .................................................................... 14

26  *Weiss v. First Unum Life Ins. Co.*, 2005 U.S. Dist. LEXIS 29268 (D.N.J. Nov. 22, 2005) ......... 10

27

28

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

-v-

05 CV 1018 JM (LSP)

## Statutes

15 U.S.C. §§ 1011-15 ..................................................................................................... 7

15 U.S.C. § 1012 .......................................................................................................... 7

18 U.S.C. § 1341 ......................................................................................................... 16

18 U.S.C. § 1343 ......................................................................................................... 16

18 U.S.C. § 1961 *et seq* .............................................................................................. 1

18 U.S.C. § 1961 (1)(B) .............................................................................................. 16

18 U.S.C. § 1961(3) ...................................................................................................... 6

18 U.S.C. § 1961(4) .................................................................................................... 14

18 U.S.C. § 1961(5) .................................................................................................... 21

18 U.S.C. § 1962 ........................................................................................................ 21

18 U.S.C. § 1962(a) .................................................................................................... 21

18 U.S.C. § 1962(b) .................................................................................................... 22

18 U.S.C. § 1962(c) ................................................................... 11, 12, 14, 18, 21

18 U.S.C. § 1962(d) ............................................................................................... 18, 21

18 U.S.C. § 1964(c) ............................................................................................... 12, 21

California Business & Professions Code sections 17200 *et seq.* ................................. 2, 25

California Business & Professions Code sections 17500 *et seq.* ................................. 2, 25

California Insurance Code section 101 ......................................................................... 8

California Insurance Code sections 785 *et seq.* ............................................. 2, 9, 24, 25

California Insurance Code section 789.3 ..................................................................... 25

California Insurance Code sections 790 *et seq.*, ......................................................... 8

## Rules

Federal Rule of Civil Procedure 9 ...................................................................... 1, 17, 21

Federal Rule of Civil Procedure 9(b) ................................................................. 17, 18, 19

Federal Rule of Civil Procedure 12(b)(6) ................................................................ 3, 11

Federal Rule of Evidence 201 ..................................................................................... 5

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

-vi-

05 CV 1018 JM (LSP)

# 1.  INTRODUCTION

Plaintiffs' Consolidated and Amended Class Action Complaint ("Complaint") alleges that Defendants have violated federal law and California state law in their sale of annuities to seniors. The centerpiece of the Complaint – the First Cause of Action – is the allegation that Defendants' marketing and sale of annuities violated the Racketeering Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*.  Despite such allegations, it is clear that at least three of the named Plaintiffs, Sweeney, Petry and the Glenanes, being California residents, are precluded from bringing their RICO action by the McCarran-Ferguson Act (15 U.S.C. § 1011 *et seq*.).  As the California Court of Appeal determined in *American International Group, Inc. v. Superior Court*, 234 Cal. App. 3d 749, 752 (1991) ("*AIG*"), the McCarran-Ferguson Act precludes any RICO claim in this case:  *"[A] civil RICO cause of action cannot be asserted by an insured in California against an insurer for alleged misrepresentations made in the course of the marketing, sale or performance of an insurance policy contract."*  (Emphasis added.)

As for Plaintiff Miller, his RICO claim also fails since National Western did not operate or manage the alleged RICO enterprise that led to the sale of his National Western annuity.  Moreover, this is Miller's "second bite" at the RICO "apple."  He tried to allege a RICO claim in a class action in Pennsylvania, which claim the district court dismissed in June 2006.  While Miller voluntarily dismissed his claims against National Western in that action prior to the court's ruling so he could come here, at least one federal court judge has rejected Miller's claim of any RICO enterprise.

All Plaintiffs have also failed to properly plead the requisite elements of their RICO claim. In particular, Plaintiffs have not established the existence of a RICO "enterprise," failed to plead mail and wire fraud with sufficient particularity under Federal Rule of Civil Procedure 9, failed to establish a "pattern" of racketeering activity, and failed to allege claims under sections 1962(a) and 1962 (b).  For these reasons, the RICO allegations fail and the RICO claim should be dismissed.

Plaintiffs' claim for breach of fiduciary duty must also fail because, under California law, an insurer like National Western does not owe a fiduciary duty to its insured.

Additionally, Plaintiffs' claim for bad faith fails for two separate reasons.  First, since there is no corresponding and requisite *breach* of contract alleged, no bad faith claim will lie.  Second,

even if a "common law" bad faith claim were alleged, Plaintiffs' bad faith claim is premised on California Insurance Code sections 785 *et seq.*, but those provisions must be stricken from the Complaint because they are not enforceable through a private right of action.

California Business & Professions Code sections 17200 and 17500 cannot be invoked by non-California residents for claims originating outside of California. Therefore, Miller's section 17200/17500 claims (and those of all non-California class members) must be dismissed.

## 2. FACTS ALLEGED IN THE COMPLANT

### A. <u>The Parties</u>

The named plaintiffs, Marie N. Sweeney ("Sweeney"), Warren B. Petry ("Petry"), Peter J. and Mary S. Glenane ("the Glenanes"), and George J. Miller ("Miller") (collectively, "Plaintiffs"), are residents and citizens of California or Pennsylvania, and are over the age of 65. (Complaint, ¶¶ 10-13.)[1] Plaintiffs name as Defendants National Western Life Insurance Company ("National Western"), Centre Point Advisors, Inc. d/b/a CPA Financial and Insurance Services ("Centre Point"), and Advanced Businesses Strategies Institute ("ABSI"). (¶¶ 14-16.)[2]

### B. <u>General Allegations Of Wrongdoing</u>

While Plaintiffs spend many pages purporting to describe (in a wholly conclusory manner) Defendants' bad acts, the essence of the Complaint can be summarized as follows. Plaintiffs allege that Defendants marketed and sold annuities to senior citizens that were "not appropriate" because they contained maturity dates beyond the life expectancies of the purchasers. Plaintiffs further allege that the marketing and sale of such annuities constituted a "scheme" involving fraud. The "fraud" is essentially Defendants' alleged failure to disclose penalties associated with the annuities, the "failure" to disclose the fact that the annuities were unsuitable, false and misleading representations that Sales Agents provide objective financial advice, and failing to disclose commissions paid to sales agents. (*See* ¶¶ 42-58.) Plaintiffs wholly ignore the fact that the

---

[1] Since all references are to the Complaint, National Western will simply use the ¶ symbol.

[2] On June 8, 2006, this Court entered defaults against Centre Point and ABSI. Other than a single brief reference to a Centre Point advertisement in ¶ 59 in connection with Plaintiff Petry, the Complaint contains no specific allegations of wrongdoing by Centre Point (or ABSI).

1 │ penalties (*i.e.*, the surrender charges) were in fact set forth in the annuities themselves, and that the

2 │ suitability of an annuity depends upon the goals and financial situation of the individual purchaser.[3]

3 │ **C.    Individual Allegations**

4 │     The only non-general allegations in the Complaint are those pertaining to the named

5 │ Plaintiffs. These allegations are summarized below.

6 │     **Petry.** In 2003, Petry, an 82 year-old, responded to an advertisement for a "Seniors Asset

7 │ Protection Workshop" sponsored by Centre Point, which he saw in his local newspaper. (¶ 59.)

8 │ Sales agent (and non-party) Robert Mikhail ran the workshop. After attending the workshop, Petry

9 │ called Mikhail (presumably by telephone) for further consultation at Petry's home. At the meeting,

10 │ Mikhail allegedly "pushed" a National Western deferred annuity, saying that it was "better than a

11 │ long-term care investment because the annuity could grow 2% a month, with a possible increase of

12 │ 24% in the first year." (¶ 60.) "Based upon Mikhail's representations," Petry purchased a deferred

13 │ annuity, which would not mature until 2020. (¶¶ 61-62.)[4] Mikhail allegedly did not explain the

14 │

15 │ [3] On its web site, the California Department of Insurance provides guidance to consumers
considering annuities, and specifically emphasizes whether the annuity is suitable for a particular

16 │ person: "**Suitability.** The suitability of a purchase of an annuity should be determined by reference
to the totality of the particular customer's circumstances. For example, the customer's income, the

17 │ need for annuity, the age, the values, benefits, and costs of the existing annuity program, if any,
when compared to the values, benefits, and costs of the recommended annuity contract or

18 │ contracts." *See* http://www.insurance.ca.gov/0100-consumers/0100-insurance-guides/0200-life-
series/annuities.cfm#deferred.

19 │ [4] Throughout the Complaint, Plaintiffs assert the existence of "annuity dates" without explaining

20 │ what that term means. Plaintiffs purport to reference the annuities sold to the named Plaintiffs, but
fail to attach them to the Complaint. National Western attaches as Exhibit "A" a copy of the annuity

21 │ sold to Plaintiff Peter Glenane, pursuant to the authority set forth in *Parrino v. FHP, Inc.*, 146 F.3d
699, 706 (9th Cir. 1998), *cert. denied*, 525 U.S. 1001 (1998) (when a document is heavily relied

22 │ upon in making the allegations of a complaint, even if that document is not attached to the
complaint, the court may rely on that document in adjudging the validity of a motion to dismiss

23 │ under Rule 12(b)(6).) Plaintiffs create the impression that the National Western annuities cannot
begin to pay out until the "annuity date," but that is untrue. In the context of the annuities

24 │ referenced in this action, the annuity date is the *very last date* on which the policyholder can elect to
have the annuity begin to pay out. Thus, it is meaningless that the annuity date of, for example,

25 │ Glenane's annuity would occur 29 years after issuance, or when he was 99. He could elect to begin
the annuity pay-out on a much earlier date. That is, Glenane's National Western annuity (and those

26 │ of the other named Plaintiffs) provides that "[t]he Annuity Date stated in this certificate may be
changed. You must write to us and request the change. However, you may not choose an Annuity

27 │ Date that occurs before the 5th Certificate Anniversary." (*See* Exhibit "A," at p. 41, § 2.13.)
Moreover, the National Western annuity allows the annuitant the option of having the annuity pay

28 │ out over a five-year period. (Exhibit "A," at p. 42.) *Thus, over a 10-year period, the entire
annuity accumulated value could be paid out with no surrender charge.* Furthermore, the

difference between deferred and immediate annuities, that the deferred annuity would not mature until 2020, or the existence of surrender charges. (¶ 63.) Mikhail also did not explain that he was an insurance agent, that his true objective was to sell the annuity to Petry, or that he would receive commissions for the sale. (¶ 65.) Petry was allegedly damaged in that he lost access to needed funds, paid unnecessary fees and charges to Mikhail, and had to forego better investments. (¶ 67.)[5]

**The Glenanes.** In April 2003, the Glenanes heard from friends in their senior community about a "financial planning" seminar hosted by (non-party) Galen Maddy. In his advertisements in a newsletter, Maddy promoted himself as a financial planner, and did not disclose that he was an insurance broker or agent appointed by National Western to sell deferred annuities. (¶ 68.) The Glenanes attended a dinner hosted by Maddy, during which he made a presentation about family trusts and how seniors could protect their assets for long-term care. (¶ 69.) Subsequently, the Glenanes went to Maddy's home for "financial consultation from some one whom they could trust." (¶ 70.) Based upon Maddy's representations, Mr. Glenane purchased a deferred annuity (¶ 71), but no trust. The policy, which showed that Mr. Glenane was 70, was to mature in 2032.[6] Maddy persuaded Mr. Glenane to sell some of his assets, including long-term stock from his employer, the value of which subsequently increased. (¶ 72.) Maddy also persuaded the Glenanes to cancel a portion of their life insurance policies. (¶ 73.) Maddy did not explain the difference between a deferred and immediate annuity, that the annuity would not mature until 2032, or the nature of the surrender charges, and did not have Mr. Glenane sign a "Notice to California Residents Age 65 or Older." (¶¶ 74-76.)

---

National Western annuity allows for a penalty-free withdrawal of up to 10% of the Account Value each year after the first year (Exhibit "A," p. 44, § 3.6), such that, after five years, the annuitant could withdraw – with no penalty – a substantial portion of the Account Value of the annuity.

[5] In paragraph 183, all plaintiffs seek damages for pain and suffering; in paragraphs 214, 218 and 226, they seek both non-specific economic and non-economic damages; and in paragraph 232, they seek non-specific compensatory damages to be proven at trial.

[6] *See* footnote 2, *supra*. The Complaint names both Peter and Mary Glenane, even though Mary Glenane is not the annuitant, only the "primary beneficiary," as disclosed on the application for the Glenane annuity. (*See* Exhibit "A," p. 51.)

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

1    **Miller.**[7] Miller, a 74 year-old, responded by mail to a newspaper advertisement by Victoria

2    Larson ("Larson") regarding living trusts. (¶ 81.) Larson "held herself out" as experienced and an

3    expert in the area of estate planning. (¶ 82.) Larson thereafter called Miller by telephone to arrange

4    a meeting. Larson and another agent, Steven Strope ("Strope"), met with Miller at his home in June

5    1999. (¶¶ 83-84.) During subsequent in-home meetings, Larson and Strope told Miller about the

6    advantages of living trusts over wills. (¶¶ 85-86.) Larson and Strope did not tell Miller that they

7    were insurance agents "and that their true objective in meeting him was to solicit him to purchase a

8    living trust and to purchase annuities from National Western, or that they would receive a

9    commission payment from their sale to him of a living trust prepared by" an attorney. Miller gave a

10   check to Larson to purchase a living trust. (¶¶ 87-89.) During the same time, Larson and Strope

11   "induced" Miller to liquidate $215,000 from his investment portfolio, and instead purchase an

12   equity-indexed annuity from American Equity – not National Western. (¶ 90.)[8] Strope delivered

13   the trust documents to Miller personally and explained them to him. (¶ 91-92.) Miller did not meet

14   with the attorney directly. (¶ 93.) *Four years later in 2003*, Strope allegedly induced Miller to

15   surrender the $215,000 American Equity annuity, and incur a surrender charge of $21,093.35. In its

16   place, he allegedly induced Miller to purchase a *National Western* annuity, representing that the

17   rate of return would never be less than 12%. (¶ 94.) The National Western annuity would mature

18   when Miller was 99. (¶ 95.) (*See* footnote 2 *supra.*) Strope allegedly did not disclose the nature of

19   the maturity date or the surrender charges that would accrue for early withdrawal. (¶ 96.)

20   **Sweeney.** In 2003, Sweeney met with sales agent Larry Phillips for the purpose of

21   discussing financial planning. (¶¶ 98-99.) At the meeting, Phillips focused on "ascertaining the

22

23   [7] Miller, a Pennsylvania resident was not named in the original Complaint, but was only added to
     this action on February 15, 2006 for the sole purpose of avoiding having this action transferred to
24   the MDL 1712 proceedings pending in the Eastern District of Pennsylvania. Miller was previously
     the sole named plaintiff in a Pennsylvania class action alleging the improper marketing and sale of
25   annuities to senior citizens. He voluntarily dismissed his claims against National Western from that
     action after 18 months so he could become part of this California-based class action. On June 2,
26   2006, Judge Mary McLaughlin, the district court judge in that case, dismissed the RICO claim. A
     copy of Judge McLaughlin's Memorandum and Order is attached as Exhibit "B." National Western
27   requests the Court take judicial notice of this document under Federal Rule of Evidence 201.

28   [8] The Complaint's reference to National Western in paragraph 88 is, therefore, obviously a
     typographical error and/or untrue.

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

1  degree and extent of Ms. Sweeney's liquid assets" and recommended that Sweeney purchase a

2  National Western deferred annuity. (¶ 99.) As a result of the meeting, Sweeney purchased a

3  $10,000 deferred annuity. (¶ 99.) Phillips allegedly did not explain that the annuity had a maturity

4  date of 2034 and that he would receive "substantial commissions" from the sale. (¶ 100.) Sweeney

5  was allegedly harmed by her purchase in light of the maturity date of 2034, which only provided

6  Sweeney "minimal access to her principal investment" for the first 15 years unless she paid

7  surrender charges. (¶ 101.)

8  **D.   RICO Allegations**

9  Plaintiffs allege that "Defendants have engaged in a fraudulent scheme, common course of

10  conduct and conspiracy to increase or maintain market share and premium revenue for National

11  Western and revenues for the Sales Agents from extremely lucrative commissions." (¶ 103.) To

12  achieve these goals, Plaintiffs allege "defendants entered into agreements to sell deferred annuity

13  policies to senior citizens, used and disseminated virtually uniform marketing materials to solicit

14  and sell such policies, and paid commissions and other fees for accomplishing a sale." (¶ 104.)

15  Plaintiffs allege that Defendants and others that market and sell annuities constitute a RICO

16  "enterprise" under 18 U.S.C. § 1961(3). (¶¶ 105-116.) Plaintiffs allege, as predicate acts of

17  "racketeering," that Defendants used "thousands" of mail and interstate wire communications to

18  "create and manage their fraudulent scheme." These are alleged to include "false and misleading

19  marketing materials, mass mailings, phone calls, advertisements, agreements, insurance contracts,

20  correspondence, policy materials, web sites, and commission payments to Sales Agents." (¶ 125.)

21  Plaintiffs vaguely claim that Defendants have used the postal service and the wire to transmit

22  "fraudulent" materials, omissions about the risks of deferred annuities, representations that Sales

23  Agents provide objective financial advice, misrepresentations and omissions "aimed at inducing

24  plaintiffs and the class to purchase [National Western] deferred annuities," and invoices and

25  payments "related" to Defendants' "improper scheme." (¶¶ 126, 161-163.)

26  **3.   PLAINTIFFS' RICO CLAIM FAILS**

27  Plaintiffs' RICO Cause of Action fails for two reasons: First, since California's Insurance

28  Code contains a comprehensive statutory scheme designed to regulate the business of insurance, the

McCarran-Ferguson Act – which gives *the states* the right to regulate the business of insurance, not the federal government – precludes RICO's application to the California named Plaintiffs, while the Pennsylvania named Plaintiff, Miller, has failed to allege that National Western directed the alleged RICO enterprise. Second, all four named Plaintiffs have failed to plead facts to support an allegation of wire or mail fraud, or any of the other elements of a RICO claim.

## A. The RICO Claims of All Four Named Plaintiffs are Barred

### (1) The McCarran-Ferguson Act Bars the California Plaintiffs Claims

The RICO claim of Plaintiffs Petry, the Glenanes, and Sweeney ("California Plaintiffs"), should be dismissed and/or stricken because they are precluded under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-15. The McCarran-Ferguson Act provides, in relevant part, that:

> "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance."

15 U.S.C. § 1012. The McCarran-Ferguson Act was an attempt "to assure that the activities of insurance companies in dealing with their policyholders would remain subject to state regulation." *AIG, supra*, 234 Cal. App. 3d at 757-58 (*quoting SEC v. National Securities, Inc.*, 393 U.S. 453, 458-59 (1969). McCarran-Ferguson precludes the application of a federal statute where (1) the federal law at issue does not "specifically relate to the business of insurance," (2) the activities Plaintiffs seek to redress constitute the business of insurance, (3) state law has been enacted for the purpose of regulating such activity, and (4) an application of the federal statute would invalidate, impair or supersede such state law. *Id.*

In *AIG*, the plaintiff sought damages under RICO, allegedly arising from certain misrepresentations made to it by AIG with respect to a workers' compensation policy. AIG claimed the RICO claim was precluded by McCarran-Ferguson. The court, applying the four factors discussed above, concluded that McCarran-Ferguson indeed precluded a RICO claim. First, the court noted, RICO did not specifically relate to the business of insurance. Rather, RICO "is a general commerce clause statute which provides criminal penalties and civil remedies for defined 'racketeering activities.'" *Id.* at 758. Second, the court concluded that the activities for which the

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

plaintiff sought redress were indeed the business of insurance: "[P]etitioners' alleged conduct, which entirely related to the marketing, sale and performance of a policy of workers' compensation insurance, and representations made in connection therewith, were clearly within the meaning of the term 'business of insurance.'" *Id.* at 760-64. Third, the court concluded that, in enacting Insurance Code sections 790 *et seq.*, "California has enacted comprehensive legislation expressly designed to regulate the business of insurance." *Id.* at 765. Finally, the court noted that, under *Moradi-Shalal v. Fireman's Fund Ins. Cos.*, 46 Cal.3d 287, 304-05 (1988), California's statutory scheme "does not provide for a private right of action, but rather only administrative remedies." Thus, "[a]llow[ing] of a RICO action seeking civil damages (including treble damages and attorneys fees) for the very conduct which California has chosen to regulate administratively would subvert and subsume the existing statutory scheme." *Id.* at 764-65. In short, "a civil RICO cause of action cannot be asserted by an insured in California against an insurer for alleged misrepresentations made in the course of the marketing, sale or performance of an insurance policy contract." *Id.* at 752.

The conclusion of *AIG* is directly applicable here. California Plaintiffs, exactly like the plaintiff in *AIG*, are seeking to assert a RICO cause of action against "an insurer in California" for alleged misrepresentations and failures of disclosure "made in the course of the marketing, sale or performance of an insurance policy contract."[9] Thus, California Plaintiffs' RICO cause of action is preempted by McCarran-Ferguson and must be dismissed.

National Western anticipates Plaintiffs will rely on *Humana Inc. v. Forsyth*, 525 U.S. 299 (1999), to preserve their RICO claim. In *Humana*, the Supreme Court determined that a RICO claim in a Nevada case relating to insurance practices was not barred by McCarran-Ferguson. *Id.* at 308. Critically, Nevada, unlike California, *permits* a private right of action to enforce its insurance statutes. *Humana, supra* at 312 ("Victims of insurance fraud may also pursue private actions under Nevada law"). *Humana* concluded that applying RICO would not impair Nevada law, but would merely provide for remedies coextensive with those already available in Nevada. *Id.* at 308-10.

---

[9] Annuities are a class of life insurance, and thus are administratively regulated under California Insurance Code sections 790 *et seq.* Cal. Ins. Code, § 101 ("Life insurance includes insurance upon the lives of persons or appertaining thereto, and the granting, purchasing, or disposing of annuities."); Cal. Ins. Code, § 790 (regulates "the business of insurance").

In its ruling, *Humana* discussed a Ninth Circuit decision, *Merchants Home Delivery Service, Inc. v. Reliance Group Holdings, Inc.*, 50 F. 3d 1486 (9th Cir. 1995.) In *Merchants*, the plaintiff brought a RICO claim, alleging that the defendant insurance broker defrauded the plaintiff in three separate ways: it overbilled plaintiff for insurance premiums, it billed plaintiff for nonexistent policies, and it billed plaintiff for uninsured claims that were never paid to claimants. *Id.* at 1488. The Ninth Circuit found that the McCarran-Ferguson Act did not bar plaintiff's RICO claim because, of the three allegedly wrongful acts, only the overbilling of insurance premiums constituted the business of insurance. Further, the Ninth Circuit found that applying RICO did not invalidate, impair, or supersede California law, notwithstanding *Moradi-Shalal's* prohibition against private enforcement of the insurance statutes. The Ninth Circuit never mentions *AIG*.

While *Humana* approved the general principle asserted in *Merchants* that Congress had not intended "to cede the field of insurance regulation to the States," *Humana, supra* at 308, the reasoning of *Humana* is clearly at odds with *Merchants*, and supersedes it. Indeed, *Humana*, taking two lines of conflicting circuit precedent, synthesized a new rule. *Humana* expressly holds that a key reason RICO does not impair Nevada law is because Nevada allows for a private right of action. *Id.* at 310-11. Thus, the Court held, "[w]hen federal law . . . does not frustrate any ***declared*** state policy or disturb the State's administrative regime, the McCarran-Ferguson Act does not bar the federal action." *Id.* at 303 (emphasis added.) *Merchants* disregarded the declared state policy of California, as explicitly stated in *Moradi-Shalal* and *AIG*, that individuals cannot enforce California's statutes regulating insurance practices. For this reason, *Merchants* is not consistent with the new rule established by *Humana*. It is therefore no surprise that *Merchants* has never been relied on by any circuit or district court in the Ninth Circuit case for its McCarran-Ferguson reasoning in the seven years since the *Humana* ruling.

As emphasized above, California (unlike Nevada) has a declared policy precluding private actions to enforce the its Insurance Code. *AIG, supra* at 764-65.[10] This essential difference in the

---

[10] Indeed, Plaintiffs explicitly acknowledge such a policy in California at paragraphs 26 through 29 of the Complaint, citing statutes like Insurance Code section 785 *et seq.* ("the California legislature has enacted senior protection statutes relating specifically to the types of policies at issue here") and

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

1  statutory scheme means that *Humana*'s ruling does not compel a result different from *AIG*. Indeed,

2  many decisions subsequent to *Humana* have distinguished it precisely because of the "private right

3  of action" distinction. *See, e.g., In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1321 (S.D. Fla.

4  2002) (holding that *Humana* does not apply because, "unlike Nevada, the states of California,

5  Florida, New Jersey, and Virginia do not expressly provide for private causes of action to victims of

6  insurance fraud."); *American Chiropractic Ass'n. v. Trigon Healthcare, Inc.*, 151 F. Supp. 2d 723,

7  734-35 (W.D. Va. 2001) (*Humana* is inapplicable in Virginia because, unlike Nevada, "private

8  causes of action under Virginia's insurance laws are not the rule but rather the exception."); *Weiss v.*

9  *First Unum Life Ins. Co.*, 2005 U.S. Dist. LEXIS 29268, *13-14 (D.N.J. Nov. 22, 2005) ("[N]either

10  New Jersey case law nor statutory law permits a private right of action for nonpayment of benefits,

11  nor do they provide for an award of punitive damages. The differences in New Jersey's ITPA from

12  the Nevada statute thus distinguish this case from *Humana* . . . . As a result, application of the

13  federal RICO statute would frustrate the stated policies of New Jersey's ITPA and interfere with the

14  State's administrative regime"). In short, *AIG* is applicable here, and compels only one conclusion:

15  the California Plaintiffs' RICO claim is precluded under McCarran-Ferguson.

16      Moreover, Plaintiffs appear to be asking this Court to prohibit the marketing and sale of

17  annuities to all persons age 65 and older. (*See* ¶¶ 2, 7.) That relief goes far beyond anything

18  requested in *AIG* or *Humana*. It asks this Court to declare illegal the marketing and sale of

19  insurance policies where California insurance law, as well as the insurance laws in all the other

20  states where National Western sells annuities, permits their sale. Unquestionably, under any

21  standard, such a ruling is precluded by the McCarran-Ferguson Act.

22      Plaintiffs seek to allege a national class action but the determinations of *Humana* and *AIG*

23  demonstrate that class members in different states will inevitably be subject to different rules of

24  law. California Plaintiffs have no RICO claim, while whether Miller's RICO claim is precluded by

25  the McCarran-Ferguson Act in the present context is questionable.[11] What is clear is that a different

26

27  the notices and pronouncements of multiple California insurance commissioners.

28  [11] *See Sabo v. Metropolitan Life Ins. Co.*, 137 F. 3d 185 (3d Cir. 1998). The relief requested in the
Complaint may include the prohibition of deferred annuities sales to seniors. If so, since such sales

1 rule of law applies. Moreover, the vast majority of the other 48 states, like California, do not

2 provide for a private right of action to enforce their statutes involving unfair insurance practices.[12]

3 The absence of such a private right of action was critical in *AIG* and may mean that residents of

4 most states, as in California, are precluded by McCarran-Ferguson from asserting any RICO claim.

5        **(2)**    **Miller's Claim is Barred Because National Western Could Not Have**

6                **Operated or Managed the Alleged RICO Enterprise**

7       Under 18 U.S.C. section 1962(c), a RICO defendant cannot be liable unless he or she

8 "conduct[s] or participate[s], directly or indirectly, in the conduct of [the RICO] enterprise's affairs.

9 . . ." As the Supreme Court held in *Reves v. Ernst & Young*, 507 U.S. 170 (1993), this means that

10 one cannot be liable under RICO "unless one has participated in the operation or management of the

11 enterprise itself." *Id.* at 183. Failure to properly allege operation or management of the enterprise

12 in a complaint justifies dismissal pursuant to Rule 12(b)(6.) *Baumer v. Pachl*, 8 F.3d 1341, 1345

13 (9th Cir. 1993). Here, it is clear that National Western cannot have participated in the operation or

14 management of the purported enterprise that is alleged to have harmed Miller. Based on the

15 allegations of the Complaint, the enterprise existed *for years* before any involvement by National

16 Western. National Western obviously did not direct Larson or Strope to sell Miller a rival

17 company's annuity (*i.e.*, the American Equity annuity).[13] National Western's sole activity was

18 selling Miller a replacement annuity, four years after his initial purchase of the American Equity

19 annuity and a living trust through Larson and Strope. The allegation that National Western received

---

21 are allowed under Pennsylvania law, such relief would invalidate, impair or supersede Pennsylvania's regulation of insurance and render *Sabo* inapplicable.

22 [12] As noted in the treatise *Handbook on Insurance Coverage Disputes* (Aspen Law & Business 12th

23 ed.), at 12.03[b], "[a] majority of the states that have Unfair Insurance Practices Acts do not recognize a private right of action for breach of these statutes." *See, e.g., Crossley v. Allstate*

24 *Insurance Co.*, 155 Mich. App. 694, 696-97 (1986); *Continental Ins. Co. v. Bahan*, 216 F. 3d 150 (1st Cir. 2000) (Mass. law); *Gucciardo v. Reliance Ins. Co.*, 84 F. Supp. 2d 399, 403-04 (E.D.N.Y.

25 2000); *Neurological Resources, P.C. v. Anthem Ins. Cos.*, 62 F. Supp. 2d 840, 847 (S.D. Ind. 1999).

26 [13] The Complaint states that "At no time . . . did Larson or Strope tell Miller that . . . their true objective in meeting his was to solicit him to purchase a living trust and to purchase annuities from NWL . . . ." (¶ 87.) This reference to National Western appears to be a typographical error; it was

27 an American Equity policy that the agents allegedly persuaded Miller to purchase. National Western did not sell Miller a replacement annuity until four years later. This fact is borne out in

28 Judge McLaughlin's Order in Miller's Pennsylvania action. *See* Exhibit B, pp. 60-61.

1 financial benefit from the sale of its annuity in 2003, and that it paid commissions at that time to the

2 insurance agent that sold the annuity does not constitute operation or management. *Baumer v.*

3 *Pachl*, 8 F.3d 1341, 1345 (9th Cir. 1993) ("Simply because one provides goods or services that

4 ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result.")

5 (quoting *University of Md. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534 (3d Cir. 1993)).

6     In sum, it is clear that the RICO claims of all four Plaintiffs are barred for reasons particular

7 to those Plaintiffs. In the case of the California Plaintiffs, McCarran-Ferguson bars the RICO

8 claim; in the case of Miller, the Complaint fails to allege National Western's participation in the

9 operation or management of the enterprise.

10     **B.**    **Plaintiffs Fail to Satisfy the Requirements for Asserting a RICO Claim**

11     Even if California Plaintiffs' RICO claims were not precluded by McCarran-Ferguson, or if

12 Miller had properly pleaded that National Western participated in the operation of an enterprise, it is

13 clear that all Plaintiffs have failed to assert the other necessary elements of a RICO claim.

14     **(1)**    **The Necessary Elements of a RICO Claim**

15     To prevail on a RICO claim, a "plaintiff must prove that the defendant engaged in (1)

16 conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and, additionally, must

17 establish that (5) the defendant caused injury to plaintiff's business or property. 18 U.S.C. §§

18 1962(c), 1964(c.) The 'fifth element' includes two related components. First, a civil RICO

19 plaintiff must show that his injury was proximately caused by the [prohibited] conduct. Second, the

20 plaintiff must show that he has suffered a concrete financial loss." *Chaset v. Fleer/Skybox Int'l*, 300

21 F.3d 1083, 1087 (9th Cir. 2002) (quoting *Fireman's Fund Ins. Co. v. Stites*, 258 F.3d 1016, 1021 (9th

22 Cir. 2001)); *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989) ("Liability

23 under 18 U.S.C. § 1962(c) requires the conduct of an enterprise through a pattern of racketeering

24 activity.") (citing *Sun Savings and Loan Ass'n. v. Dierdorff*, 825 F.2d 187, 191 (9th Cir. 1987).

25     **(2)**    **National Western is Not Distinct from the RICO "Enterprise"**

26     Section 1962(c) requires "some distinctness between the RICO defendant and the RICO

27 enterprise." *Cedric Kushner Promotions, Ltd., v. Don King*, 533 U.S. 158, 162 (2001); *River City*

28

1 | *Markets, Inc. v. Fleming Foods West, Inc.*, 960 F.2d 1458, 1461 (9th Cir. 1992). The "distinctness"

2 | requirement "focuses the section on the culpable party and recognizes that the enterprise itself is

3 | often a passive instrument or victim of the racketeering activity." *Riverwoods Chappaqua Corp. v.*

4 | *Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994).

5 | "A corporate entity may not be both the RICO person and the RICO enterprise." *Id.*

6 | "Nevertheless, by alleging a RICO enterprise that consists merely of a corporate defendant

7 | *associated with its own employees or agents carrying on the regular affairs of the defendant*, the

8 | distinctness requirement may not be circumvented." *Id.* (emphasis added). "Because a *corporation*

9 | *can only function through its employees and agents*, any act of the corporation can be viewed as

10 | an act of such an enterprise, and the enterprise is in reality no more than the defendant itself." *Id.*

11 | (emphasis added).

12 | Plaintiffs allege that the RICO persons are: (1) National Western – a corporation that "sells

13 | deferred annuity products . . . through a network of marketing and Sales Agents and/or

14 | organizations." (2) Centre Point – a corporation, previously licensed to sell insurance in California,

15 | that "improperly solicits, markets, and steers senior citizens towards . . . deferred annuity products,"

16 | and (3) ABSI – a corporation offering "access to fresh and proven strategies for business

17 | development," and "teaches individual agents to target senior citizens to purchase deferred annuity

18 | policies." (¶¶ 3, 15, 16). Plaintiffs allege the RICO enterprise consists of "Defendants," "Sales

19 | Agents" and "any others that have facilitated the sale or sold a deferred annuity to a senior." (¶105).

20 | It is clear from the allegations in the Complaint that the RICO persons comprise, in one form

21 | or another, agents of defendant National Western. Centre Point is an organization that sells deferred

22 | annuities on behalf of National Western, while ABSI is an organization that allegedly trains Sales

23 | Agents to use misleading tactics on behalf of National Western. According to the allegations of the

24 | Complaint, both Centre Point and ABSI are agents of NWL for purposes of selling annuities. (¶ 3.)

25 | The alleged RICO enterprise really only consists of National Western and its agents. Therefore,

26 | National Western is both the RICO person and RICO enterprise. As a consequence, Plaintiffs have

27 | failed to sufficiently allege that the RICO person and RICO enterprise are "distinct."

28 |

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

### (3)  Plaintiffs Fail to Allege the Existence of a RICO "Enterprise"

In the alternative, if the Court finds that Plaintiffs sufficiently allege that the RICO persons are distinct from the RICO enterprise, Plaintiffs have failed to meet the foundational requirements for pleading the "enterprise" element."

In a RICO action arising under section 1962(c), Plaintiffs must allege that Defendants were associated with an "enterprise" within the meaning of RICO. The definition of "enterprise" includes groups with a formal legal structure, as well as those whose members merely associate in fact. 18 U.S.C. § 1961(4). Here, Plaintiffs have failed to do so.

As the Ninth Circuit has held, "'the predicate acts of racketeering activity, by themselves, do not satisfy the RICO enterprise element.' [Citations omitted.] A RICO plaintiff must allege a *structure for the making of decisions separate and apart from the alleged racketeering activities*, because 'the existence of an enterprise at all times remains a separate element which must be proved.'" *Wagh v. Metris Direct, Inc.*, 348 F.3d 1102, 1112 (9th Cir. 2003) (emphasis added). The system of making decisions in furtherance of the alleged scheme must be independent from the defendants' respective regular business practices. *Id.* Thus, "a group does not constitute an enterprise unless it exists independently from the racketeering activity in which it engages." *Id.*

There are two primary factors relevant in determining whether an organization is a RICO "enterprise": (1) an organization must exhibit "some sort of structure . . . for the making of decisions, whether it be hierarchical or consensual," and (2) the organization must have "an existence beyond that which is merely necessary to commit the predicate acts of racketeering." *Chang v. Chen*, 80 F.3d 1293, 1299 (9th Cir. 1996), citing *United States v. Riccobene*, 709 F.2d 214, 222-24 (3d Cir. 1983).[14]

---

[14] National Western notes that Plaintiffs have cited to *Webster v. Omnitriton*, 79 F.3d 776, 786 (9th Cir. 1996), in prior briefs for the proposition that "[t]he participation of a corporation in a racketeering scheme is sufficient, of itself, to give the enterprise a structure separate from the racketeering activity." *Webster*, however, is no longer controlling on this point. It predates the Ninth Circuit's adoption, in *Chang, supra,* at 1295, of the requirement that a RICO plaintiff must allege that the "enterprise" is a structure *separate* from the racketeering activity. Although principles from *Webster* are discussed in *Chang,* all Ninth Circuit cases subsequent to *Chang* have utilized the framework explained above to determine if a RICO "enterprise" is adequately alleged.

BARGER & WOLEN LLP
655 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

With respect to the first factor, the organization must have a decision-making structure and be more than simply a collection of individuals performing their respective roles in a fraudulent scheme: "The structure should provide 'some mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis.'" *Chang, supra,* at 1299. In *Chang,* the court held that the plaintiffs did not sufficiently plead the existence of a RICO "enterprise" because the plaintiffs "did not allege the existence of a system of authority that guided the operation of the alleged enterprise." *Chang, supra,* at 1300. Significantly, "there was no decision-making apparatus that limited or guided [the RICO defendants] in the performance of their respective duties. Each [defendant] conducted his or her role in the alleged fraudulent real estate transactions *autonomously.*" *Id.* (emphasis added). Although defendants agreed to perform their respective roles and entered into a conspiracy to commit the predicate acts of racketeering activity, "[a] conspiracy . . . is not an enterprise for purposes of RICO." *Id.; Simon v. Value Behaviorial Health, Inc.,* 208 F.3d 1073, 1083 (9th Cir. 2000) ("A group whose members collectively engage in an illegal act, in-and-of-itself, does not constitute an 'enterprise' for the purposes of RICO").

Here, the membership of the alleged "enterprise" is monumental in size, and includes an association-in-fact between "Defendants," "Sales Agents" and "any others that have facilitated the sale or sold a deferred annuity to a senior." (¶ 105.) Plaintiffs allege that National Western provided marketing materials for the Sales Agents to sell deferred annuities to seniors. (¶¶ 42, 44.) "Sales Agents" utilized misleading tactics to sell the deferred annuities and National Western was aware of such tactics; *e.g.,* "NWL also approves or ratifies [the Sales Agents'] misleading and deceptive marketing plans and ruses designed to target senior citizens" (¶ 38), and "with the knowledge and at least tacit approval of the NWL, the Sales Agents persuade senior citizens to convert or liquidate other annuities or retirement investments to purchase NWL policies." (¶ 49). Additionally, the Complaint vaguely alleges that "Defendants have directed and controlled the ongoing organization necessary to implement their scheme and illicit business practices." (¶ 116.)

It is apparent such allegations merely indicate that each member of the alleged "enterprise" autonomously operated and performed their role to facilitate the sale of annuities without a centralized decision-making apparatus. National Western's awareness and "tacit approval" of the

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

practices of Sales Agents may conceivably constitute a conspiracy to commit the predicate racketeering activities, but a conspiracy is not an "enterprise" for RICO purposes. *Chang, supra,* at 1300; *Simon, supra,* at 1083. After all, participants in any alleged conspiracy will have certain roles and some knowledge of the other co-conspirators' roles. What is being alleged here is merely a collection of people who operate autonomously to sell, supply, or facilitate the sale of annuities.[15]

With respect to the second factor, the Plaintiffs must show that the existence of the "enterprise" is separate and apart from the racketeering activities. *Wagh, supra,* at 112; *Von Grabe v. Sprint PCS,* 312 F. Supp. 2d 1285, 1310 (S.D. Cal. 2003) ("[A]n enterprise must exist for some purpose other than for the racketeering activity alleged."). Here, it is clear that the alleged "enterprise" exists for one purpose and one purpose only: to sell annuities. The alleged enterprise, consisting of "Defendants," "Sales Agents," and "any others that have facilitated the sale or sold a deferred annuity to a senior" (¶ 105), is so amorphous, and so inclusive, as to preclude any claim that it had a decision-making structure separate and apart from the alleged racketeering activities. That some of the annuities are sold to seniors and some to non-seniors does not change the fact that the enterprise as alleged has *only one function and purpose*, and that purpose is identical with the alleged racketeering activity. These parties have only one thing in common: They participate in the sale of annuities to senior citizens.

Therefore, it is clear that Plaintiffs have not met their burden of establishing an enterprise separate and apart from the purported racketeering activity.

### (4) Plaintiffs Fail to Establish a Racketeering Activity by Defendants

"'Racketeering activity' is defined in 18 U.S.C. § 1961 (1)(B) as including any act 'indictable' under certain enumerated federal criminal statutes, including 18 U.S.C. § 1341, which makes mail fraud a criminal offense, and 18 U.S.C. § 1343, which makes wire fraud a crime." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1399 (9th Cir. 1986). Here, Plaintiffs allege that Defendants are liable under the RICO statute because of their violations of sections 1341 and 1343. (¶ 161.)

---

[15] Judge McLaughlin also found that Plaintiff Miller failed to sufficiently allege "any organizational structure for the enterprise," and dismissed his RICO claim. Exhibit B, pp. 53, 73, 77, 85.

As the Ninth Circuit has held:

> "To allege a violation of the mail fraud statute, it is necessary to show that (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud."

*Schreiber, supra* at 1399-1400 (citing *United States v. Green*, 745 F.2d 1205, 1207-08 (9th Cir. 1984). Likewise, "wire fraud violations consists of (1) the formation of a scheme or artifice to defraud (2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to deceive or defraud." *Schreiber, supra* at 1400 (citing *United States v. Louderman*, 576 F.2d 1383, 1387-88 & n.3 (9th Cir. 1978)). The wire fraud act applies only to telephone conversations across state lines, not to intrastate telephone conversations. *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1530 (9th Cir. 1995) (wire fraud must involve an interstate communication); *Annulli v. Panikkar*, 200 F.3d 189, 200 n.9 (3d Cir. 1999); *Smith v. Ayres*, 845 F.2d 1360, 1366 (5th Cir. 1998).

Because acts giving rise to RICO liability are inherently fraudulent, the heightened standards for pleading fraud are applied to fraud allegations in RICO claims. In other words, the Ninth Circuit applies "the particularity requirements of rule 9(b) to RICO claims." *Moore, supra*, 885 F.2d at 541; *Schreiber, supra* at 1400-01; *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004) ("[T]he requirement that 'in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity' applies to civil RICO fraud claims."); *Alan Neuman Productions, Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1989) (accord).

Federal Rule of Civil Procedure 9(b) "requires that the pleader state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Moore, supra* at 541. The "mere recitation of the content of alleged misrepresentations and the context in which they were made" is not "sufficient to satisfy Rule 9(b)." *Comwest, Inc. v. American Operator Services, Inc.*, 765 F. Supp. 1467, 1470-71 (C.D. Cal. 1991); *see also Alan Neuman Productions, supra* at 1392 (RICO allegations failed under Rule 9 where they provided "no specifics of time, place, or nature of the alleged communications . . . .");

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

1   *Schreiber, supra* at 1401 (noting that allegations of mail fraud "must identify the time, place, and

2   manner of each fraud plus the role of each defendant in each scheme") (quoting *Lewis v. Sporck,*

3   612 F. Supp. 1316, 1325 (N.D. Cal. 1985)); *Occupational-Urgent Care Health Systems, Inc. v.*

4   *Sutro & Co.,* 711 F. Supp. 1016, 1021 (E.D. Cal. 1989) ("Rule 9(b) requires that the persons making

5   any fraudulent statements must be identified") *(citing Schreiber, supra* at 1401). Moreover, "[t]o

6   allege fraud with particularity, a plaintiff must set forth . . . what is false or misleading about a

7   statement, and why it is false." *In Re Glenfed, Inc. Sec. Litig.,* 42 F.3d 1541, 1547-48 (9th Cir.

8   1994) (superseded by statute on other grounds); *Camp v. Pacific Fin. Group,* 956 F. Supp. 1541,

9   1551 (C.D. Cal. 1997) ("Because Rule 9(b) requires a plaintiff to plead the circumstances

10   constituting fraud, the plaintiff must set forth the circumstances indicating falseness").

11       Not only must fraud (such as the predicate acts under 18 U.S.C. § 1962(c)) be alleged with

12   particularity, but allegations of conspiracy to commit violations of RICO (*i.e.,* section 1962(d))

13   must also be alleged with particularity. *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir. 1985)

14   ("Plaintiffs have done nothing more than set forth conclusory allegations of fraud, conspiracy to

15   commit securities fraud, and aiding and abetting in securities fraud, punctuated by a handful of

16   neutral facts. The absence of particularity . . . is contrary to the fundamental purposes of Rule

17   9(b)"); *Wanetick v. Mel's of Modesto, Inc.,* 811 F. Supp. 1402, 1406 (N.D. Cal. 1992) ("Rule 9(b)

18   requires that a conspiracy to commit fraud be pleaded with the same particularity as the fraud

19   itself"). Likewise, failure to satisfy the requirements of section 1962 (c) requires dismissal of a

20   section 1962(d) claim, as the Ninth Circuit has concluded. *Howard v. America Online, Inc.,* 208

21   F.3d 741, 751 (9th Cir. 2000) (failure to prove a violation of section 1962(c) precludes plaintiffs'

22   conspiracy claim under § 1962(d)).

23       In addition to alleging the underlying fraud with particularity, where the use of the mails and

24   wires are alleged to have furthered the fraudulent scheme, the allegations pertaining to the mailing

25   and/or wires must also be alleged with particularity. "Courts have been particularly sensitive to

26   Fed. R. Civ. Pro. 9(b)'s pleading requirements in RICO cases in which the predicate acts are mail

27   fraud and wire fraud, and have further required specific allegations as to which defendant caused

28   what to be mailed (or made which telephone calls), and when and how each mailing (or telephone

1 call) furthered the fraudulent scheme." *Stewart v. Wachowski*, 2004 U.S. Dist. LEXIS 26608 (C.D.

2 Cal. 2004) (quoting *Gotham Print, Inc. v. American Speedy Printing Centers, Inc.*, 863 F. Supp.

3 447, 457 (E.D. Mich. 1994)).

4       Here, Plaintiffs allege that the use of the mails and wire furthered a fraudulent scheme. (¶¶

5 125-127.) However, Plaintiffs have not satisfied standards for so alleging under Rule 9(b). Instead,

6 Plaintiffs vaguely claim that the Defendants have used the postal service and the wire to "create and

7 manage their fraudulent scheme." (¶¶ 125-127, 161-163.) Such general allegations do not provide

8 the specificity necessary to satisfy Rule 9(b). Furthermore, these general class allegations are

9 insufficient for another reason. The elements of RICO must be *entirely satisfied* with respect to the

10 individual Plaintiffs; general allegations relating to the class are insufficient. *Brown v. Protective*

11 *Life Ins. Co.*, 353 F.3d 405, 407 (5th Cir. 2003) ("Until the putative class is certified, the action is

12 one between the [named plaintiffs] and the defendants.") (quoting *Rolo v. City Investing Co.*

13 *Liquidating Trust*, 155 F.3d 644, 659 (3d Cir. 1998)).

14       As to the individual Plaintiffs, the Complaint fails to allege facts sufficient to invoke the

15 mail or wire fraud statutes. With respect to Petry, Plaintiffs allege that there was a single telephone

16 call, but do not allege that the telephone call was across state lines; indeed, it is clear that the call

17 did not cross state lines, since Mikhail, the agent, was an El Cajon, California resident. (¶ 41.)

18 There is no allegation of the use of the mails. With respect to the Glenanes, Maddy is alleged to

19 have advertised in a "newsletter," but it is unclear whether that newsletter was transferred by mail

20 or some other means (*e.g.*, it might have been simply posted in a public place, handed out manually

21 at events where Maddy spoke, or given to the Glenanes by a friend, etc.). Moreover, as Maddy was

22 a resident of Carlsbad, California (¶ 11), it is clear that any phone calls would not have been across

23 state lines. With respect to Miller, the Complaint mentions a single telephone call, but it is not

24 alleged that the call crossed state lines. (¶ 83.) The Complaint also alleges that Miller responded to

25 the newspaper advertisement "by mail." (¶ 81.) However, it is clear that such mailing cannot

26 implicate National Western, as the mailing (as well as most of the telephone conversations

27 referenced therein) occurred years before any alleged involvement of National Western with Miller.

28

1    With respect to Sweeney, there are no allegations regarding any telephone calls or mailings. In

2    sum, *none* of the alleged mailings or telephone calls can be deemed to constitute mail or wire fraud.

3         In sum, Plaintiffs fail to allege any predicates that would permit the invocation of RICO;

4    they have not alleged a "racketeering activity." Thus, on this basis, the RICO claim must fail.

5              (5)    **The Use of the Mail and Wire is Not Sufficiently Connected to the**

6                     **Alleged Fraud**

7         Plaintiffs also have not adequately alleged a connection between the alleged fraud and the

8    alleged mailing or use of the wires such as to give rise to mail or wire fraud. "The federal mail

9    fraud statute does not purport to reach all frauds, but only those limited instances in which the use

10   of the mails is part of the execution of a fraud, leaving all other cases to be dealt with by appropriate

11   state law." *Kann v. United States*, 323 U.S. 88, 95 (1944). The mailing must occur "in the

12   execution of the scheme" – that is, it must be "a 'step in [the] plot.'" *United States v. Lo*, 231 F. 3d

13   471, 478 (9th Cir. 2000). To "accept attenuated circumstantial facts" regarding alleged mail fraud

14   "would, as a practical matter, eradicate the significance of the distinctive consideration that governs

15   which fraud crimes may be prosecuted in the federal judicial system and which are to remain solely

16   state matters." *Lo, supra*, at 477; *United States v. Maze*, 414 U.S. 395, 405 (1974) ("Congress could

17   have drafted the mail fraud statute so as to require that the mails be in fact used as a result of the

18   fraudulent scheme. But it did not do this; instead, it required that the use of the mails be 'for the

19   purpose of executing such scheme or artifice . . . .'") (Citations omitted). The same law applies to

20   the wire fraud statute. *United States v. Manarite*, 44 F.3d 1407, 1412 n.5 (9th Cir. 1995) ("The mail

21   fraud and wire fraud statutes 'share identical language' regarding the scheme requirements, so the

22   wire fraud statute is read in light of the case law on mail fraud"). Again, here, because there is no

23   proper allegation of mail or wire fraud, no mail or wire transaction could have occurred that formed

24   part of the "execution" of a fraud.

25             (6)    **Plaintiffs' RICO Claim Also Fails Because They Have Not Established a**

26                    **Pattern of Racketeering Activity**

27        To properly plead a RICO claim, Plaintiffs must establish a "pattern of racketeering

28   activity." To do this, they must sufficiently plead *two predicate acts* of racketeering activity that

occurred in a ten-year period. 18 U.S.C. § 1961(5); *During v. Citibank Int'l.*, 990 F. 2d 1133, 1138-39 (9th Cir. 1993) (holding that one predicate act is not sufficient to establish a "pattern" under the RICO statute). These acts must be related and must amount to, or threaten the continued likelihood of, continued criminal activity. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 106 L. Ed. 2d 195, 109 S. Ct. 2893, 2899 (1989). To satisfy the "pattern" requirement, Plaintiffs must sufficiently plead two acts of fraud under Rule 9. Here, Plaintiffs have not properly pled *even one* predicate act of mail or wire fraud. Thus, Plaintiffs have failed to establish a "pattern of racketeering activity." For this reason as well, Plaintiffs' RICO claim fails.

### (7)   Plaintiffs Have Not Alleged a Violation of Section 1962(a)

Section 1962(a) provides in relevant part: "It shall be unlawful for any person who has received any income derived, . . . from a pattern of racketeering activity or through collection of an unlawful debt . . . to use or invest . . . any part of such income . . . in acquisition of any interest in, or the establishment or operation of, any enterprise." 18 U.S.C. § 1962(a). Section 1964(c) confers standing to bring civil RICO claims only upon those persons "injured in [their] business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). "Read together, these two provisions require that 'a plaintiff seeking civil damages for a violation of § 1962(a) must allege facts tending to show that he or she was injured by the use or investment of racketeering income.'" *Wagh v. Metris Direct, Inc.*, 348 F.3d 1102, 1109 (9th Cir. 2003) (citing *Nugget Hydroelectric L.P. v. Pacific Gas & Elec. Co.*, 981 F.2d 429, 437 (9th Cir. 1992)). "Several courts, applying an *investment injury requirement*, have held that 'the acquisition and reinvestment of the proceeds of racketeering activity in the general affairs of an enterprise' does not qualify as investment injury." *Id.* at 1110 (emphasis added).

Here, Plaintiffs have not alleged any "investment injury." Rather, Plaintiffs' allegations of injury resulting from National Western's violation of section 1962(a) all arise from the alleged predicate acts of racketeering and not National Western's investment of racketeering income. Thus, Plaintiffs' inadequate allegations of injury fail to satisfy the requirements of section 1962(a).

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

1       (8)     **Plaintiffs Fail to Allege a Violation of Section 1962(b)**

2       Section 1962(b) provides: "It shall be unlawful for any person through a pattern of

3 racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of

4 any enterprise which is engaged in, or the activities of which, affect, interstate or foreign

5 commerce." 18 U.S.C. § 1962(b). "In order to state a claim under § 1962(b), a plaintiff must allege

6 that '1) the defendant's activity led to its control or acquisition over a RICO enterprise, and 2) an

7 injury to plaintiff resulting from defendant's control or acquisition of a RICO enterprise.'" *Wagh,*

8 *supra* at 1111, quoting *Sebastian Int'l, Inc. v. Russolilo,* 186 F.Supp.2d 1055, 1068 (C.D. Cal 2000).

9 Thus, plaintiffs "must allege injury from the defendant's acquisition or control of an interest in a

10 RICO enterprise." *U.S. Concord, Inc. v. Harris Graphics, Corp.,* 757 F.Supp. 1053, 1060 (N.D.

11 Cal. 1991). "For example, an owner of an enterprise infiltrated as a result of racketeering activity

12 would have standing to sue because he was injured by the defendant's acquisition of control over

13 his enterprise." Id. at 1060 n.12.

14       Plaintiffs have not alleged any injury caused by National Western's alleged "acquisition or

15 control" of an enterprise. Rather, Plaintiffs' allegations of injury arise from the underlying

16 predicate acts of racketeering, not the actual acquisition or control of the enterprise. Thus, as with

17 the other sections of RICO, Plaintiffs fail to state a claim under section 1962(b).

18     **4.   THE BREACH OF FIDUCIARY DUTY CLAIM FAILS AS THERE IS NO**

19           **FIDUCIARY RELATIONSHIP WITH NATIONAL WESTERN**

20       A claim for breach of fiduciary duty *requires* the an actual fiduciary relationship. If there

21 are no fiduciary duties, there can be no breach thereof. While Plaintiffs attempt to characterize the

22 relationship between themselves and the defendants as a fiduciary one, California has squarely held

23 that an insurer is not a fiduciary. *Vu v. Prudential Property & Casualty Ins. Co.,* 26 Cal. 4th 1142,

24 1150-51 (2001), citing *Love v. Fire Ins. Exchange,* 221 Cal. App. 3d 1136, 1148 (1990).

25       In *Love,* the court found that an insurer is not a true fiduciary because the unique obligations

26 imposed upon true fiduciaries are not found in the insurance relationship. *Love, supra* at 1148.

27 "Because of these differences [between insurers and true fiduciaries], and in the absence of

28 Supreme Court precedent declaring an insurer to be a *true* fiduciary, *we decline to import*

*uncritically the entire cargo of fiduciary obligations into the port of insurance law."* *Id.*
(emphasis added). *See also Henry v. Associated Indemnity Corp.*, 217 Cal. App. 3d 1405, 1418-19
(1990); *Solomon v. North Am. Life & Cas. Ins. Co.*, 151 F.3d 1132, 1138 (9th Cir. 1998); *Almon v.
State Farm Fire & Casualty Co.*, 724 F. Supp. 765, 766 (S.D. Cal. 1989); *Hassard v. Bonnington,
Roger & Huber v. Home Ins. Co.*, 740 F. Supp. 789, 791 (S.D. Cal. 1990).

Plaintiffs have no cause of action for breach of fiduciary duty against National Western.

### 5. PLAINTIFFS' BAD FAITH CLAIM FAILS BECAUSE THEY HAVE NOT ALLEGED A CORRESPONDING BREACH OF CONTRACT

Plaintiffs' claim for the breach of the duty of good faith and fair dealing requires the
pleading of a breach of the contract. Despite Plaintiffs' list of alleged bad acts by National Western,
none of these allegations include a breach of the annuity agreement. This is because Plaintiff
cannot identify any instance where National Western has violated the *express terms of the
agreement*. As a result, Plaintiffs have not and cannot allege a claim for bad faith.

Plaintiffs generally allege that National Western has breached its duty of good faith and fair
dealing by failing to disclose surrender charges, commissions received by agents, and so forth. (¶
202.) However, a claim for "bad faith" under the contract *requires* the pleading of an underlying
claim for breach of the contract with respect to policy benefits allegedly due. *See Waller v. Truck
Ins. Exchange, Inc.*, 11 Cal. 4th 1, 35 (1995); *Love, supra*, at 1151. In *Waller*, the court noted that
"because a contractual obligation is the underpinning of a bad faith claim, such a claim cannot be
maintained *unless policy benefits are due under the contract*." *Waller, supra* at 35 (emphasis
added); *American Med. Int'l. v. National Union Fire Ins. Co.*, 244 F.3d 715, 720 (9th Cir. 2001).

Furthermore, within the insurance context, courts have limited tort damages to claims-
related breaches of the insurance contract. *See Old Republic Ins. Co. v. FSR Brokerage, Inc.*, 80
Cal. App. 4th 666, 687-88 (2000) (finding that insured could not sue for bad faith merely because
the insurer had sued the insured for fraud, because insured must show unreasonable conduct in
connection with a claim); *Rattan v. United Services Auto Ass'n*, 84 Cal. App. 4th 715, 721-23 (2000)
(bad faith not available for an insurer's breach of duties under a collateral contract.) The California
Supreme Court recently upheld this limitation, holding that an insurer could not be liable for bad

1  faith in overcharging post-policy premiums. *Jonathan Neil & Assoc., Inc. v. Jones*, 33 Cal. 4th 917,

2  941 (2004).

3        Here, Plaintiffs' bad faith claim fails for two reasons. First, in direct violation of established

4  case law, Plaintiffs are seeking damages for tortious bad faith when no benefits are due under the

5  annuity contract. Plaintiffs never allege that National Western wrongfully withheld benefits, or that

6  they are seeking enforcement of contractual rights. Plaintiffs can cite to no instance where National

7  Western violated its obligations under the annuity contracts.

8        National Western anticipates Plaintiffs will argue that *Schwartz v. State Farm*, 88 Cal. App.

9  4th 1329, 1339 (2001), and *Dalrymple v. United Services Auto. Ass'n*, 40 Cal. App. 4th 497 (1995),

10  suggest that there can be a claim for bad faith even if there is no breach of an express contractual

11  provision. However, this contention entirely misreads *Schwartz* and *Dalrymple*. *Schwartz* dealt

12  with a unique factual situation wherein the insurer paid out the full benefits of the policy in a

13  manner that favored one insured to the detriment of a second insured for the same benefits. In this

14  unique context, the court held that "even an insurer that pays the full limits of its policy may be

15  liable for breach of the implied covenant, if improper claims handling causes detriment to the

16  insured." *Id.* at 1399. In short, the insurer could still be liable for bad faith because it has failed to

17  provide the insureds benefits due under the contract. The *Schwartz* rule has no applicability here

18  since Plaintiffs' bad faith claim is based on the alleged misrepresentations and omissions of the

19  defendants and Sales Agents ***during the annuity sales process*** rather than any improper handling of

20  the annuities after purchase. *See Progressive West Ins. Co. v. Superior Court*, 135 Cal. App. 4th

21  263, 280 (2005) (distinguishing *Schwartz* where claims handling not at issue). Likewise, *Dalrymple*

22  dealt with the question of whether bad faith could result from a delay in issuing benefits to an

23  insured; again, a situation where benefits were due under the policy, not the act of seeking to sell

24  insurance to customers. Therefore, Plaintiffs can state no bad faith claim against National Western.

25     **6.  PLAINTIFFS' RELIANCE ON CALIFORNIA INSURANCE CODE**

26         **SECTIONS 785-790.10 SHOULD BE STRICKEN**

27        Even if the bad faith action is permitted to remain, Plaintiffs' reference to California

28  Insurance Code sections 785-790.10 as a basis for their bad faith action (¶ 230, and Prayer, page 50,

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

¶ J), must be stricken. No private right of action exists under the statute. Cal. Ins. Code, §§ 785-790.10. Under section 789, only administrative penalties are provided: "Actions for injunctive relief, penalties specified in Section 789.3, damages, restitution, and all other remedies in law, may be brought in superior court by the Attorney General, district attorney, or city attorney on behalf of the people of California." *See also* Ins. Code, § 789.3. Sections 785 and 789 should be stricken.

### 7. THE CLAIMS OF MILLER (AND EFFECTIVELY ALL NON-CALIFORNIA CLASS MEMBERS) FOR VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE SECTIONS 17200 AND 17500 ARE BARRED

California Business & Professions Code sections 17200 and 17500 ("UCL") cannot be asserted if the action involves "claims of nonresidents arising from conduct occurring entirely outside of California." *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (1999). In *Norwest*, the plaintiffs attempted to establish a national class based on alleged UCL violations. The court disallowed the UCL[16] to apply to extraterritorial claims. *Id.* at 222-25. At most, the UCL could only be "invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California." *Id.* at 224-25. Here, Miller, a Pennsylvania resident, alleges to have been harmed by conduct occurring in Pennsylvania, or at the very least from Texas, the jurisdiction from which National Western conducts its business. (¶ 14.) There are no claims of conduct occurring in California involving National Western that would bring Miller's claim against National Western within the scope the UCL. Thus, Miller's UCL claims (and effectively those of all non-California class members seeking relief under the UCL) should be dismissed.

### 8. CONCLUSION

National Western respectfully requests that the Court grant its motion dismiss.

Dated: July 27, 2006

BARGER & WOLEN LLP

By: _____
LARRY M. GOLUB
Attorneys for Defendant National
Western Life Insurance Company

---

[16] The UCL includes both sections 17200 and 17500. *See People for Ethical Treatment of Animals, Inc. v. California Milk Producers Advisory Board*, 125 Cal. App. 4th 871, 877-78 (2005).

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800





# STATEMENT OF BENEFIT INFORMATION

### NATIONAL WESTERN LIFE INSURANCE COMPANY
850 EAST ANDERSON LANE, AUSTIN, TEXAS  78752-1602

NAME: PETER J GLENANE                        CERTIFICATE NUMBER: 0101050048
ISSUE DATE: 07/11/03                         ISSUE AGE: 70
ASSUMED DATE OF FIRST PAYMENT: 07/11/03      ANNUITY DATE:            07/11/2032*
ASSUMED FREQUENCY OF PAYMENT: SINGLE         ASSUMED GROSS PAYMENT:   117,296.00

NORMAL MINIMUM ADDNL. DEPOSIT:    100
NORMAL MAXIMUM ADDNL. DEPOSIT: SEE POLICY
                                 AGENT: MADDY, GALEN
                                        2604-B EL CAMINO REAL#38
                                        CARLSBAD CA 92008

COVERAGE NAME: FLEXIBLE PREMIUM DEFERRED ANNUITY

ANNUITY PAYOUT FORM:  10 YEARS CERTAIN AND LIFE

| END OF YEAR | TOTAL PAYMENTS | MINIMUM GUARANTEED CERTIFICATE VALUE |
|---|---|---|
| 1 | 117,296.00 | 96,417 |
| 2 | 117,296.00 | 99,069 |
| 3 | 117,296.00 | 101,793 |
| 4 | 117,296.00 | 104,592 |
| 5 | 117,296.00 | 107,469 |
| 6 | 117,296.00 | 110,424 |
| 7 | 117,296.00 | 113,461 |
| 8 | 117,296.00 | 116,581 |
| 9 | 117,296.00 | 119,787 |
| 10 | 117,296.00 | 123,081 |
| 11 | 117,296.00 | 126,466 |
| 12 | 117,296.00 | 129,944 |
| 13 | 117,296.00 | 133,517 |
| 14 | 117,296.00 | 137,189 |
| 15 | 117,296.00 | 140,962 |
| 20 | 117,296.00 | 161,439 |

AGE 99*   117,296.00        208,085
          --------- ANNUITY PAYOUT AT ANNUITY DATE ---------
          1,386.95 AT GUARANTEED INTEREST RATE AND GUARANTEED ANNUITY PAYOUT RATE

RENEWAL GUARANTEED INTEREST IS   2.75% ANNUALLY
     Fixed interest rate under option B or option C for the first certificate year is  3.00%

This is an illustration only. An illustration is not intended to predict actual
performance. Interest rates, dividends, and values set forth in the illustration
are not guaranteed except for those items clearly labelled as guaranteed.

     THIS CERTIFICATE MAY RESULT IN A LOSS IF KEPT FOR ONLY  8 YEARS,  ASSUMING
     WITHDRAWAL VALUES ARE BASED ON MINIMUM GUARANTEED VALUE.

These amounts have not been adjusted for the premium tax, if any.

## STATEMENT OF BENEFIT INFORMATION                                    (PAGE 2 OF 2)

This annuity certificate provides a Minimum Guaranteed Certificate Value equal to 80% of first year premiums and 87.5% of premiums received thereafter, less withdrawals all accumulated at an effective rate of 2.75% interest. The Minimum Guaranteed Certificate Value is an alternative calculation that applies as a floor in the calculation of Cash Surrender Value, annuitization benefit or Death Benefit.

While under Interest Credit Option A, we will credit amounts at each certificate anniversary linked in part to the S&P 500 Composite Stock Price Index (which excludes dividends.)** However, if you elect Interest Credit Option B we will credit, while under this option, amounts based on a fixed interest rate set by us which will never be less than the Minimum Guaranteed Interest Rate shown on page 3 of the Certificate. Interest Credit Option C is also available in any certificate year. The beginning of year value is split into two parts under Option C. 50% earns interest under Interest Credit Option A and 50% earns interest under Interest Credit Option B. The death benefit is at least equal to the Minimum Guaranteed Certificate Value and may be larger depending on the Interest Credit Option chosen and the results thereunder.

Under any Interest Credit Option, interest is credited to the Account Value before any adjustment for partial withdrawals made during the Certificate Year. The amount withdrawn and any applicable charges are included in the interest calculation. The Account Value for the following Certificate Year is reduced by such withdrawals and any applicable charges, accumulated at interest as we declare from the date of withdrawal to the Certificate Anniversary. Thus, partial withdrawals made between anniversary dates are credited interest under the applicable Interest Credit Option, but are also charged interest by National Western Life during that part of the Certificate Year when the funds were no longer in the annuity.

Interest Credit Options A, B and C are available only during certificate years 1 through 15. After 15 years a fixed interest rate, as we declare, applies.

** "Standard & Poor's®", "S&P®", "S&P 500®", Standard & Poor's 500", and "500" are trademarks of the McGraw-Hill Companies, Inc. and have been licensed for use by National Western Life Insurance Company. The Option Annuity is not sponsored, endorsed, sold or promoted by Standard & Poor's, and Standard & Poor's makes no representation regarding the advisability of purchasing this product.

# NATIONAL WESTERN LIFE INSURANCE COMPANY

## INDIVIDUAL RETIREMENT ANNUITY ENDORSEMENT

This endorsement is issued as a part of the policy and to any certificates to which it is attached. Notwithstanding anything to the contrary in the policy, the following changes and/or additions apply with respect to the person covered under the policy.

The Owner having so requested, and in order that the coverage under the policy may qualify as a Retirement Annuity under Section 408 of the Internal Revenue Code and any subsequent amendments thereto (The Code), the coverage is hereby modified as follows:

1. The entire interest of the Owner in the Retirement Annuity is nonforfeitable and the Retirement Annuity is not transferable by the Owner. Records will be maintained for each Owner who is also the Annuitant. The annuity is established for the exclusive benefit of the Owner or Owner's beneficiaries.

2. Except in the case of a rollover contribution described in section 402(c), 403(a)(4), 403(b)(8), 408(d)(3), or a contribution made in accordance with the terms of a Simplified Employee Pension Program (SEP) as described in section 408(k), the annual premium for any taxable year will not exceed the lesser of $2,000 or 100% of compensation. Contributions of up to $2,000 may be made for each spouse if the combined compensation of both spouses is at least equal to the contributed amount. No contributions will be accepted unless they are in cash.

   No contributions will be accepted under a SIMPLE plan established by an employer pursuant to Code Section 408(p). No transfer or rollover of funds attributable to contributions made by a particular employer under its SIMPLE plan will be accepted from a SIMPLE IRA, that is, an IRA used in conjunction with a SIMPLE plan, prior to the expiration of the 2 year period beginning on the date the individual first participated in that employer's SIMPLE plan.

3. The Owner may not borrow any money under or by use of the annuity.

4. The entire interest of the Owner will be distributed, or commence to be distributed, no later than the first day of April following the calendar year in which the Owner attains age 70½ (required beginning date), in equal or substantially equal amounts, over (i) the life of the Owner, or the lives of the Owner and the Owner's designated beneficiary, or (ii) a period certain not extending beyond the life expectancy of the Owner or the joint and last survivor expectancy of the Owner and the Owner's designated beneficiary.

   Annuity payments must be made in periodic payments at intervals of no longer than one year.

In addition, annuity payments must be either noncreasing or they may increase only as provided in Q&A F-3 of section 1.401(a)(9)-1 of the Proposed IncomeTax Regulations.

All distributions in the form of annuity payments shall be made in accordance with the requirements of section 401(a)(9) of the Code, including the incidental death benefit requirements of section 401(a)(9)(G) of the Code, and the regulations thereunder, including the minimum distribution incidental benefit requirement of section 1.401(a)(9)-2 of the Proposed Income Tax Regulations.

Life expectancy is computed by use of the expected return multiples in Tables V and VI of section 1.72-9 of the Income Tax Regulations. Unless otherwise elected by the individual by the time distributions are required to begin, life expectancies will be recalculated annually. Such election shall be irrevocable by the individual and will apply to all subsequent years. The life expectancy of a non-spouse beneficiary may not be recalculated. Instead, life expectancy will be calculated using the attained age of such beneficiary during the calendar year in which the individual attains age 70½, and payments for subsequent years shall be calculated based on such life expectancy reduced by one for each calendar year which has elapsed since the calendar year life expectancy was first calculated.

If the Owner dies before the entire interest is distributed, the following distribution provisions will apply:

(a) If the Owner dies after distribution of his interest has commenced, the remaining portion of such interest will continue to be distributed at least as rapidly as under the method of distribution being used prior to the Owner's death.

(b) If the Owner dies before distribution of his interest commences, the Owner's entire interest will be distributed in accordance with one of the following four provisions:

(1) The Owner's entire interest will be paid within five (5) years after the date of the Owner's death.

(2) If the Owner's interest is payable to a beneficiary designated by the Owner and the Owner has not elected (1) above, then the entire interest will be distributed in substantially equal installments over a period certain not greater than the life expectancy of the designated beneficiary commencing no later than one (1) year after the date of the Owner's death. The designated beneficiary may elect at any time to receive greater payments.

(3) If the designated beneficiary is the individual's surviving spouse, the date distributions are required to begin in accordance with (2) above shall not be earlier than the later of (A) December 31 of the calendar year immediately following the calendar year in which the individual died or (B) December 31 of the calendar year in which the individual would have attained age 70$\frac{1}{2}$. The surviving spouse may accelerate these payments at any time, i.e., increase the frequency or amount of such payments.

(4) If the designated beneficiary is the Owner's surviving spouse, the spouse may treat the contract as his or her own individual retirement arrangement (IRA). This election will be deemed to have been made if such surviving spouse makes a regular IRA contribution to the contract, makes a rollover to or from such contract, or fails to elect any of the above three provisions.

(c) Life expectancy is computed by use of the expected return multiples in Tables V and VI of section 1.72-9 of the Income Tax Regulations. For purposes of distributions beginning after the individual's death, unless otherwise elected by the surviving spouse by the time distributions are required to begin, life expectancies shall be recalculated annually. Such election shall be irrevocable by the surviving spouse and shall apply to all subsequent years. In the case of any other designated beneficiary, life expectancies shall be calculated using the attained age of such beneficiary during the calendar year in which distributions are required to begin pursuant to this section, and payments for any subsequent calendar year shall be calculated based on such life expectancy reduced by one for each calendar year which has elapsed since the calendar year life expectancy was first calculated.

(d) Distributions in the form of installment payments

are considered to have begun if the distributions are made on account of the individual reaching his or her required beginning date. If the individual receives distributions prior to the required beginning date and the individual dies, distributions will not be considered to have begun.

(e) Distributions in the form of annuity payments are considered to have begun if distributions are made on account of the individual reaching his required beginning date or if prior to the required beginning date distributions irrevocably commence to an individual over a period permitted and in an annuity form acceptable under section 1.401(a)(9) of the Regulations.

5. The issuer of an individual retirement annuity will furnish annual calendar year reports concerning the status of the account or annuity.

6. We agree to submit reports to the Owner and appropriate agencies of the Federal Government at such time and in such manner and containing such information as is prescribed by Federal law or regulations.

7. We will amend this endorsement from time to time in order to comply with the provisions of the Code and regulations thereunder. The Owner will be promptly furnished with a copy of any such change. If we are unable to obtain a favorable Internal Revenue Service opinion concerning such compliance, it will refund any premiums paid in any period during which the annuity under the Policy does not comply.

8. Any refund of premiums (other than those attributable to excess contributions) will be applied before the close of the calendar year following the year of the refund toward the payment of future premiums or the purchase of additional benefits.

9. In the event of a conflict between the terms of this endorsement and the terms of the Policy under which the certificate is issued, or any other endorsement, the terms of this endorsement will control.

If the certificate provides for future premium payments and if such premium payments are interrupted, the certificate will be reinstated at any date prior to maturity upon payment of a premium to us, and the minimum premium amount for reinstatement shall be $10.00; provided however, we may, at our option, either accept additional future payments or terminate the certificate by payment of the future payments terminate the certificate by payment in cash of the then present value of the paid up benefit if no premiums have been received for two full consecutive certificate years and the paid up annuity benefit at maturity would be less than $20 per month.

Compensation means wages, salaries, professional fees, or other amounts derived from or received for personal service actually rendered (including, but not limited to commissions paid salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, and bonuses) and includes earned income, as defined in section 401(c)(2) (reduced by the deduction the self-employed individual takes for contributions made to a self-employed retirement plan).

For purposes of this definition, section 401(c)(2) shall be applied as if the term "trade" or "business" for purposes of section 1402 included service described in subsection (c)(6). Compensation does not include amounts derived from or received as earnings or profits from property (including, but not limited to, interest and dividends) or amounts not includible in gross income. Compensation also does not include any amount received as a pension or annuity or as deferred compensation. The term "compensation" shall include any amount includible in the individual's gross income under section 71 with respect to a divorce or separation instrument described in subparagraph (A) of section 71(b)(2).

This endorsement takes effect and expires with the policy and any certificate to which it is attached. It is subject to all the applicable terms, conditions, limitations and exclusions of the policy that are not inconsistent with it. Nothing contained in this endorsement will be held to change, waive or extend any provisions of the policy except as stated above.

**President**

## CALIFORNIA LIFE AND HEALTH INSURANCE GUARANTEE ASSOCIATION ACT SUMMARY DOCUMENT AND DISCLAIMER

Residents of California who purchase life and health insurance and annuities should know that the insurance companies licensed in this state to write these types of insurance are members of the California Life and Health Insurance Guarantee Association ("CLHIGA"). The purpose of this Association is to assure that policyholders will be protected, within limits, in the unlikely event that a member insurer becomes financially unable to meet its obligations. If this should happen, the Guarantee Association will assess its other member insurance companies for the money to pay the claims of insured persons who live in this state and, in some cases, to keep coverage in force. The valuable extra protection provided through the Association is not unlimited, as noted in the box below, and is not a substitute for consumers' care in selecting insurers.

---

The California Life and Health Insurance Guarantee Association may not provide coverage for this policy. If coverage is provided, it may be subject to substantial limitations or exclusions, and require continued residency in California. You should not rely on coverage by the Association in selecting an insurance company or in selecting an insurance policy.

Coverage is *NOT* provided for your policy or any portion of it that is not guaranteed by the insurer or for which you have assumed the risk, such as a variable contract sold by prospectus.

Insurance companies or their agents are required by law to give or send you this notice. *However, insurance companies and their agents are prohibited by law from using the existence of the Guarantee Association to induce you to purchase any kind of insurance policy.*

Policyholders with additional questions should first contact their insurer or agent or may then contact

California Life and Health Insurance   or   Consumer Service Division
Guarantee Association      California Department of Insurance
P.O. Box 17319      300 South Spring Street
Beverly Hills, CA 90209-3319      Los Angeles, CA 90013

---

Below is a brief summary of this law's coverages, exclusions and limits. This summary does not cover all provisions of the law; nor does it in any way change anyone's rights or obligations under the Act or the rights or obligations of the Association.

## COVERAGE

Generally, individuals will be protected by the California Life Insurance Guarantee Association if they live in this state and hold a life insurance contract, or an annuity, or if they are insured under a group insurance contract, issued by a member insurer. The beneficiaries, payees or assignees of insured persons are protected as well, even if they live in another state.

(Please turn to back of page)

## EXCLUSIONS FROM COVERAGE

However, persons holding such policies are not protected by this Guarantee Association if:

- Their insurer was not authorized to do business in this state when it issued the policy or contract;
- Their policy was issued by a health care service plan (HMO), Blue Cross, Blue Shield, a charitable organization, a fraternal benefit society, a mandatory state pooling plan, a mutual assessment company, an insurance exchange, or a grants and annuities society;
- They are eligible for protection under the laws of another state. This may occur when the insolvent insurer was incorporated in another state whose guaranty association protects insureds who live outside that state.

The Guarantee Association also does not provide coverage for:

- Unallocated annuity contracts; that is, contracts which are not issued to and owned by an individual and which guarantee rights to group contract holders, not individuals;
- Employer and association plans, to the extent they are self-funded or uninsured;
- Synthetic guaranteed interest contracts;
- Any policy or portion of a policy which is not guaranteed by the insurer or for which the individual has assumed the risk, such as a variable contract sold by prospectus;
- Any policy of reinsurance unless an assumption certificate was issued;
- Interest rate yields that exceed an average rate;
- Any portion of a contract that provides dividends or experience rating credits.

## LIMITS ON AMOUNT OF COVERAGE

The Act limits the Association to pay benefits as follows:

## LIFE AND ANNUITY BENEFITS

- 80% of what the life insurance company would owe under a life policy or annuity contract up to
  - $100,000 in cash surrender values,
  - $100,000 in present value of annuities, or
  - $250,000 in life insurance death benefits.
- A maximum of $250,000 for any one insured life no matter how many policies and contracts there were with the same company, even if the policies provided different types of coverages.

## HEALTH BENEFITS

- A maximum of $200,000 of the contractual obligations that the health insurance company would owe were it not insolvent. The maximum may increase or decrease annually based upon changes in the health care cost component of the consumer price index.

## PREMIUM SURCHARGE

Member insurers are required to recoup assessments paid to the Association by way of a surcharge on premiums charged for health insurance policies to which the Act applies.



**NATIONAL WESTERN LIFE INSURANCE COMPANY**
**850 East Anderson Lane, Austin, Texas 78752-1602**

**NATIONAL WESTERN LIFE INSURANCE COMPANY**

**CALIFORNIA THIRTY DAY FREE LOOK**

IMPORTANT

YOU HAVE PURCHASED A LIFE INSURANCE POLICY OR ANNUITY CON-
TRACT.   CAREFULLY REVIEW IT FOR LIMITATIONS.

THIS POLICY MAY BE RETURNED WITHIN 30 DAYS FROM THE DATE
YOU RECEIVED IT FOR A FULL REFUND BY RETURNING IT TO THE
INSURANCE COMPANY OR AGENT WHO SOLD YOU THIS POLI-
CY. AFTER THIRTY DAYS, CANCELLATION MAY RESULT IN A SUB-
STANTIAL PENALTY, KNOWN AS A SURRENDER CHARGE.

*Ross E. Moody*

President

01-4266

# NOTICE

If you have a complaint about this policy or National Western Life Insurance Company, you should contact the Company, its agent or other representative. You may write National Western Life Insurance Company at:

850 East Anderson Lane
Austin, Texas 78752-1602

or call:

1-800-922-9422

If this does not produce a satisfactory solution to your complaint, you may contact the

California Department of Insurance
300 South Spring Street
Los Angeles, CA 90013

CONSUMER HOTLINE
1-800-927-4357

NATIONAL WESTERN
LIFE INSURANCE COMPANY

850 East Anderson Lane Austin, Texas 78752-1602

# NATIONAL WESTERN LIFE INSURANCE COMPANY

### A Stock Company

### EXECUTIVE OFFICE, AUSTIN, TEXAS
### HOME OFFICE, DENVER, COLORADO

| | | | |
|---|---|---|---|
| **ANNUITANT** | PETER J GLENANE | 0101050048 | **CERTIFICATE NUMBER** |
| **CERTIFICATE DATE** | JULY 11, 2003 | 70 | **ISSUE AGE** |
| **POLICYHOLDER** | CONSUMERS NATIONWIDE TRUST | PETER J GLENANE | **OWNER** |
| **POLICY NUMBER** | F0607 | JULY 11, 2032 | **ANNUITY DATE** |

### CERTIFICATE

**NATIONAL WESTERN LIFE INSURANCE COMPANY** is called "we", "our" or "us". We will pay you a monthly income beginning on the Annuity Date. Monthly income payments are subject to the conditions and provisions of the Policy and/or certificate.

### PREMIUM PAYMENTS

The initial premium payment is due in an amount determined by you on your Certificate Date. Further premium payments can be made at any time thereafter at your option. We do have the right to limit premium payments in any renewal year to the amount of premium payments made in the preceding year. Each payment must be at least $100.00.

### IMPORTANT

## YOU HAVE PURCHASED AN ANNUITY CONTRACT. CAREFULLY REVIEW IT FOR LIMITATIONS.

## THIS CERTIFICATE MAY BE RETURNED WITHIN 30 DAYS FROM THE DATE YOU RECEIVED IT FOR A FULL REFUND BY RETURNING IT TO THE INSURANCE COMPANY OR AGENT WHO SOLD YOU THIS CERTIFICATE. AFTER 30 DAYS, CANCELLATION MAY RESULT IN A PENALTY, KNOWN AS A SURRENDER CHARGE.

*P. Payne* DUPLICATE

| | |
|---|---|
| **Secretary** | **President** |

### READ YOUR CERTIFICATE CAREFULLY

FLEXIBLE PREMIUM DEFERRED ANNUITY - EQUITY INDEXED ANNUITY - INTEREST CREDIT OPTION LINKED IN PART TO STANDARD & POOR'S 500 INDEX - MONTHLY INCOME PAYMENTS BEGIN ON THE ANNUITY DATE. DEATH BENEFIT BEFORE ANNUITY DATE. NONPARTICIPATING.

## GUIDE TO YOUR CERTIFICATE

Certificate Data Page                    Page 3
Definitions                              Page 4
General Provisions                       Page 5
Annuity Benefits                         Page 7
Settlement Option Tables                 Page 15
Endorsements (only if attached)

# CERTIFICATE DATA PAGE

### NATIONAL WESTERN LIFE INSURANCE COMPANY
### 850 EAST ANDERSON LANE, AUSTIN, TEXAS 78752-1602
### 1-800-922-9422

| | | |
|---|---|---|
| ANNUITANT  PETER J GLENANE | 0101050048 | CERTIFICATE NUMBER |
| CERTIFICATE DATE  JULY 11, 2003 | 70 | ISSUE AGE |
| POLICYHOLDER  CONSUMERS NATIONWIDE TRUST | PETER J GLENANE | OWNER |
| POLICY NUMBER  F0607 | JULY 11, 2032 | ANNUITY DATE |

01-1117C
99

THE INITIAL PREMIUM IS $117,296.00
INTEREST CREDIT OPTION FOR THE FIRST CERTIFICATE YEAR: A
INDEX VALUE ON THE CERTIFICATE DATE:    988.67
CERTIFICATE TERM: 15 CERTIFICATE YEARS
MINIMUM VALUE: $5,000.00
ASSET FEE RATE FOR THE FIRST CERTIFICATE YEAR:  1.90%
PARTICIPATION RATE FOR THE FIRST CERTIFICATE YEAR: 100.00%
MINIMUM PARTICIPATION RATE: 0.00%
MAXIMUM ASSET FEE:  8.00%

MINIMUM GUARANTEED INTEREST RATE : 2.75%
Percentage of Premiums:

| Certificate Year | Percentage |
|---|---|
| all years | 100% |

Certificate       WITHDRAWAL CHARGE RATES:

| Year | - - - Schedule A - - - | | Year | - - - Schedule B - - - | |
|---|---|---|---|---|---|
| 1 | 25.00% | 11  12.50% | 1 | N/A | 11  10.00% |
| 2-6 | 25.00% | 12  10.00% | 2-6 | 10.00% | 12  10.00% |
| 7 | 22.50% | 13   7.50% | 7 | 10.00% | 13   7.50% |
| 8 | 20.00% | 14   5.00% | 8 | 10.00% | 14   5.00% |
| 9 | 17.50% | 15   2.50% | 9 | 10.00% | 15   2.50% |
| 10 | 15.00% | thereafter 0.00% | 10 | 10.00% | thereafter 0.00% |

ADDITIONAL FORMS
01-4010G-98 01-4266 SA-7155 01-A016-CA(REV.03/98) 01-A019-CA 01-4280-03

# NATIONAL WESTERN LIFE INSURANCE COMPANY

## CANCELLATION AND SURRENDER REQUESTS ENDORSEMENT

A cancellation or surrender of this policy/certificate is effective on the date the request for cancellation or surrender is received, if the request is made by written notice to us and contains, at a minumum all of the following:

1. An unequivocal request for cancellation or surrender.

2. The policy/certificate number of the policy/certificate.

3. The name of the insured on the policy/certificate.

4. The signature of the owner of the policy/certificate and, if required by the policy/certificate or by a legally binding document of which we have actual notice, the signature of a collateral assignee, irrevocable beneficiary, or other person having an interest in the policy through the legally binding document.

5. Either the policy/certificate itself, or in lieu of the policy/certificate, a statement that the policy/certificate has been lost or destroyed.

*Ross E. Moody*

**President**

## ARTICLE I - DEFINITIONS

**Age** refers to attained age on the last birthday.

**Annuitant** is the person named as Annuitant on Page 3.

**Annuity Date** means the date we begin monthly income payments.

**App** means the enrollment application for this certificate.

**Certificate Anniversary** means the month and day shown on Page 3 in the Certificate Date for each year after the Certificate Date.

**Certificate Year** means the yearly period which starts on the Certificate Date and yearly periods that start on each Certificate Anniversary thereafter.

**Certificate Term** is the time period as shown on Page 3, during which withdrawal charges apply, and at the end of which the certificate may continue as described in the Certificate Continuation section.

**Issue Age** is Annuitant's age on the Certificate Date.

**Joint Annuitant** is the person named as the second payee under the Survivorship Annuity in Option 4 under Section 3.1.

**Owner** means the certificateholder. The Annuitant is the Owner, unless another Owner is named on the App or later changed.

**Policy** means the group annuity Policy issued to the Policyholder.

**Policyholder** means the entity to which the Policy is issued.

**You/your/yours** means an Owner and certificateholder.

**Penalty-Free** refers to withdrawals on which no withdrawal charge is made.

"Standard & Poor's®", "S&P®", "S&P 500®", "Standard & Poor's 500" and "500" are trademarks of The McGraw-Hill Companies, Inc. and have been licensed for use by National Western Life Insurance Company. This product is not sponsored, endorsed, sold or promoted by Standard & Poor's, and Standard & Poor's makes no representation regarding the advisability of purchasing this product.

## ARTICLE II - GENERAL PROVISIONS

**Section 2.1 - Entire Contract.** The entire contract is made up of:

1. the policy;
2. the application of the policyholder, a copy of which is attached to the policy;
3. the certificate;
4. the enrollment application for the certificate; and
5. any endorsements, riders, and amendments.

We issued the Certificate to the Owner under the group policy. The Certificate describes the principle terms and provisions of the contract. The enrollment application is attached to the Certificate and made a part thereof.

Only our officers may change the benefits under the Policy or waive a right or requirement. No agent may do this. Such change or waiver must be in writing.

**Section 2.2 - Owner.** Unless changed, the Owner is named in the App. If the Owner is not the Annuitant and the named Owner and contingent Owner, if any, die, the Owner is the Annuitant.

The Owner may use all rights while the Annuitant is alive. These include the right to:

1. Change the Beneficiary;
2. Receive proceeds;
3. Elect options; and
4. Change the Owner.

**Section 2.3 - Beneficiary.** Unless changed, the payee to whom the death benefit is paid, is the beneficiary named in the App. A living payee is one living on the earlier of:

1. The day we receive due proof of the Annuitant's death; or
2. The 15th day past the Annuitant's death.

Unless changed:

1. If there is more than one payee in the same class, equal shares will be paid;
2. The share of any payee not living will be paid to the rest of the payees of the same class; and
3. If no payee is living, the payee will be the Annuitant's estate.

**Section 2.4 - Change of Owner or Beneficiary.** Changes in the designation of the Beneficiary may be made by the Owner's written request on forms provided by us, completed by the Owner, and forwarded to us during the lifetime of the Annuitant. After the change is recorded at our home office, it will be effective as of the date of the Owner's request described herein. It will not apply to any payment made or action taken by us before it was recorded.

Once we accept this change, it takes effect as of the date you signed the request, subject to any action we take before we accept the change.

**Section 2.5 - Incontestability.** All statements made in the App are representations and not warranties.

No statement will be used by us in defense of a claim or to contest this certificate, unless it is in the signed App. We may not contest your annuity benefit under the Policy once this certificate has been in force, while the Annuitant is alive, for two years from its Certificate Date.

**Section 2.6 - Assignment.** The annuity benefits under the Policy, evidenced by this certificate, may not be assigned, sold, transferred or pledged as collateral for a loan or for any other purpose.

**Section 2.7 - Misstatement of Age or Sex.** If the age or sex of the Annuitant or Joint Annuitant is incorrect, we will change the amounts we pay to the amounts based on the correct age and sex.

1. Any overpayment we made will be deducted from future payments.
2. Any underpayment we made will be paid in full with the next payment due.

**Section 2.8 - Proof of Age and Sex.** No income payments will be made until we receive proof satisfactory of the Annuitant's age and sex.

**Section 2.9 - Proof of Survival.** We have the right to require proof that the Annuitant is alive at the time each income payment is due.

**Section 2.10 - Settlement.** All payments made by us under the certificate shall be made from our office in Austin, Texas.

**Section 2.11 - Nonparticipating.** The Policy is a nonparticipating Policy. Neither the Policy nor your certificate will participate in our surplus earnings.

**Section 2.12 - Annual Report.** We will prepare a report at the end of each Certificate Year that this certificate is in force. We will mail this report to you within 60 days of the end of each Certificate Year. The report will show:

1. Premiums received during the Certificate Year;
2. Withdrawals during the Certificate Year;
3. Interest credits during the Certificate Year;
4. Account Value;
5. Certificate Value; and
6. Cash Surrender Value.

**Section 2.13 - Change of Annuity Date.** The Annuity Date stated in this certificate may be changed. You must write to us and request the change. However, you may not choose an Annuity Date that occurs before the 5th Certificate Anniversary.

## ARTICLE III - ANNUITY BENEFITS

**Section 3.1 - Settlement Options.** Before the Annuity Date, you may write to us and choose one of the options below. If you do not later change your choice, this option will apply.

The amount used on the Annuity Date to provide any of the Settlement Options is the Certificate Value.

**Option 1 - Income for Life.** Payments based on the Option 1 Table will be made until the Annuitant dies. Monthly income payments will begin on the Annuity Date.

**Option 2 - Life Income with a Guaranteed Period.** Payments based on the Option 2 Table may be guaranteed for 5, 10, 15 or 20 years. After the guaranteed payments have been made, payments will be made until the Annuitant dies. Monthly income payments will begin on the Annuity Date.

**Option 3 - Life Income with Installment Refund.** Payments based on the Option 3 Table are guaranteed until the total amount paid equals the amount applied to this option on the Annuity Date. After the guaranteed payments have been made, payments will be made until the Annuitant dies. Monthly income payments will begin on the Annuity Date.

**Option 4 - Survivorship Annuity.** Payments will be made as long as the Annuitant lives. After the Annuitant dies, payments are made for as long as the Joint Annuitant lives. Monthly income payments will begin on the Annuity Date.

**Option 5 - Monthly Income for a Fixed Period.** Equal monthly income payments, beginning on the Annuity Date, will be made for not less than 5 years nor more than 30 years.

**Option 6 - Annual Income for a Fixed Period.** Equal annual payments will be made for not less than 5 years nor more than 30 years. Payments will begin one year after the Annuity Date.

**Option 7 - Proceeds Held at Interest Only.** The proceeds are held by us at interest only for such period that you and we agree upon, but not less than 5 years. You may elect to have the interest payments held by us and accumulated with the proceeds or paid on a periodic basis. Before the end of the interest period you may elect to have the funds applied to any other option described in this Section. At the end of the interest period you may take the remaining balance in cash.

If you do not choose an option at least 30 days before the Annuity Date, the Life Income with a 10-Year Guaranteed Period will be paid.

On request, we may provide other options based upon actuarial equivalents of Options 1, 2, 3 or 4.

Guaranteed payments for Options 1, 2, 3 and 4 are calculated using the 1983 Table a (female), projected to 1995, and the interest rates shown on the Option 1 and 2 Table and Option 3 Table made part of this certificate. The attained age of the payee when the option starts will be adjusted downward by 1 year for each full 5 year period that has elapsed since January 1, 1995. For Options 5, 6 and 7 the guaranteed interest rate is 2.0%.

We may, at our option, use an interest rate which is higher than the guaranteed interest rate to calculate payments and credit funds left on deposit.

If the monthly income payment is less than $20, we may change to quarterly, semi-annual or annual payments to equal or exceed the minimum amount. The amount of such payments will be calculated based on the same mortality table, if any, and interest rate we use in calculating the monthly income.

We reserve the right to reduce the payments under this section after such payments have begun, to reflect any Federal, State or Municipal taxes, or any fees or assessments, payment of which is required or authorized by law, which have not otherwise been deducted or offset.

**Section 3.2 - Certificate Value.** The Certificate Value equals the greater of:

1. the Account Value; or
2. the Minimum Guaranteed Certificate Value.

**Section 3.3 - Account Value.** The Account Value equals:

1. On your Certificate Date - The Percentage of Premiums for the first Certificate Year as shown on Page 3 times the Initial Premium;
2. Between the Certificate Date and the first Certificate Anniversary:
   (a) The Percentage of Premiums for the first Certificate Year as shown on Page 3 times the sum of the Initial Premium and premiums received after the Certificate Date and on or before the 20th calendar day following the Certificate Date; less
   (b) any withdrawals and applicable withdrawal charges taken during the Certificate Year with interest, as we declare, from the date withdrawn to the current date; plus
   (c) the Interest Credit under Option B, if Interest Credit B is in effect for the first Certificate Year, or the Interest Credit under Option C, if Interest Credit Option C is in effect for the first Certificate Year; plus
   (d) The Percentage of Premiums for the first Certificate Year as shown on Page 3 times any premiums received after the 20th calendar day following the Certificate Date, such amount increased by interest, as we declare, at a rate not less than the Minimum Guaranteed Interest Rate shown on Page 3, for the period from the date received to the current date.
3. On the first Certificate Anniversary:
   (a) The Percentage of Premiums for the first Certificate Year as shown on Page 3 times the sum of the Initial Premium and premiums received after the Certificate Date and on or before the 20th calendar day following the Certificate Date; less
   (b) any withdrawals and applicable withdrawal charges taken during the Certificate Year with interest, as we declare, from the date withdrawn to the first Certificate Anniversary; plus
   (c) the Interest Credit under Option A, B, or C, whichever is in effect; plus
   (d) The Percentage of Premiums for the first Certificate Year as shown on Page 3 times any premiums received after the 20th calendar day following the Certificate Date, such amount increased by interest, as we declare, at a rate not less than the Minimum Guaranteed Interest Rate shown on Page 3, for the period from the date received to the first Certificate Anniversary.
4. Between Certificate Anniversaries after the first Certificate Anniversary:
   (a) your Account Value on the last Certificate Anniversary; less
   (b) any withdrawals and applicable withdrawal charges taken during the last Certificate Year with interest, as we declare, from the date withdrawn to the current date; plus
   (c) the Interest Credit under Option B, if Interest Credit Option B is in effect for the current Certificate Year, or the Interest Credit under Option C, if Interest Credit Option C is in effect for the current Certificate Year; plus
   (d) the Percentage of Premiums for the current Certificate Year as shown on Page 3 times any premiums received since the last Certificate Anniversary, such amount increased by interest, as we declare, at a rate not less than the Minimum Guaranteed Interest Rate shown on Page 3, for the period from the date received to the current date.
5. On any Certificate Anniversary after the first Certificate Anniversary:
   (a) your Account Value on the last Certificate Anniversary; less
   (b) any withdrawals and applicable withdrawal charges taken during the Certificate Year with interest, as we declare, from the date withdrawn to the current Certificate Anniversary; plus
   (c) the Interest Credit under Option A or B or C, whichever is in effect for the current Certificate Year; plus
   (d) the Percentage of Premiums for the current Certificate Year as shown on Page 3 times any premiums received since the last Certificate Anniversary, such amount increased by interest, as we declare, at a rate not less than the Minimum Guaranteed Interest Rate shown on Page 3, for the period from the date received to the current Certificate Anniversary.

**Section 3.4 - Minimum Guaranteed Certificate Value.** The Minimum Guaranteed Certificate Value equals:

1. 80% of premiums received in the first Certificate Year and 87.5% of premiums received after the first Certificate Year; less
2. any withdrawals;
3. all accumulated at the Minimum Guaranteed Interest Rate shown on Page 3.

**Section 3.5 - Cash Surrender Value/Withdrawal of Cash.** The Cash Surrender Value of this certificate is the greater of:

1. the Account Value less the withdrawal charge; or
2. the Minimum Guaranteed Certificate Value.

You may withdraw cash at any time on or before the Annuity Date.

1. You must tell us how much you want to withdraw and complete all forms required by us.
2. The amount withdrawn must be at least $500.00, (except when exercising the Systematic Withdrawal of Interest Option), or the Cash Value, if less. You may not take a partial withdrawal, unless the Certificate Value, after the withdrawal, is at least equal to the Minimum Value shown on Page 3.
3. The Withdrawal Charge Rate is shown on Page 3. Schedule A rates apply to the portion of the Account Value attributable to the Percentage of Premiums for the first Certificate Year times the premiums received in the first Certificate Year and interest credited for such amounts adjusted for prior withdrawals and withdrawal charges and interest thereon. Schedule B rates apply to the portion of the Account Value attributable to the applicable Percentage of Premiums shown on Page 3 times the premiums received after the first Certificate Year and interest credited on such amounts, adjusted for prior withdrawals and withdrawal charges and interest thereon.
   (a) partial withdrawal charge - multiply the partial withdrawal amount by the Withdrawal Charge Rate for the correct schedule shown on Page 3. Partial withdrawals and withdrawal charges will reduce the Account Value as described in Section 3.8.
   (b) full withdrawal charge - multiply the Account Value, plus any penalty-free partial withdrawal amounts taken in the 12 months prior to request for full withdrawal of the Cash Surrender Value, by the withdrawal charge rate for the correct schedule shown on Page 3.
4. You may withdraw amounts as described in the Penalty-Free Withdrawal Option section or the Systematic Withdrawal of Interest Option section below without withdrawal charges.
5. Your Certificate Value will be adjusted as described in the Account Value and Minimum Guaranteed Certificate Value section.
6. If you withdraw the entire Cash Surrender Value, this certificate will terminate.
7. We may defer payment for up to 6 months after we receive your request for cash.

**Section 3.6 - Penalty-Free Withdrawal Option.** Each Certificate Year, after the first year, you may make one penalty-free partial withdrawal of up to 10% of your Account Value. Such partial withdrawal will be made without a withdrawal charge. Any partial withdrawal amount in excess of the penalty-free amount will be subject to a withdrawal charge.

We treat any penalty-free withdrawals you take within the prior 12 months from the date of a request for full withdrawal of the Cash Value as having been made in anticipation of the full withdrawal of the Cash Surrender Value. Therefore, a full withdrawal charge is made on that amount, including penalty-free withdrawal, at the time of the full withdrawal of the Cash Surrender Value.

**Section 3.7 - Systematic Withdrawal of Interest Option.** After the first Certificate Year, you, at your option may elect to make withdrawals of interest earnings without withdrawal charges for the year in which the request is made and such withdrawals for each Certificate Year thereafter without withdrawal charges subject to the following conditions:

1. The request must be made on a form furnished by us;
2. The interest to be withdrawn is limited to that credited, if any, during the last complete Certificate Year preceding the date of the request. Interest to be withdrawn under this option in any Certificate Year is limited to the annual amount of interest credited during the prior Certificate Year;
3. Selecting this option will nullify any right to make penalty-free partial withdrawals from the Account Value once each Certificate Year during the period the election of this option remains in effect;
4. Once requested, the Systematic Withdrawal of Interest Option will continue, subject to the certificate being in effect, until and unless we receive written notice at our office in Austin, Texas, that you wish to terminate this option;
5. Payments under this option may be made as directed by you either monthly (1/12 times the annual amount), quarterly (1/4 times the annual amount), semi-annually (1/2 times the annual amount) or annually. No payment for an amount less than $100 will be made unless the mode of payment is annual, nor will a payment be made that includes principal. We may change the mode of payment to one paid less frequently to meet the $100 minimum payment requirement;
6. Additional withdrawals in any Certificate Year during which this election is in effect will be subject to the withdrawal charges shown on Page 3;
7. No portion of a full withdrawal of the Cash Surrender Value during the surrender charge period can be without a withdrawal charge. We treat any penalty-free withdrawals you take within the 12 months prior to the date of full withdrawal of the Cash Surrender Value request as having been made in anticipation of full withdrawal of the Cash Surrender Value. Therefore, a full withdrawal charge is made for that amount, including Systematic Withdrawal of Interest payments, at the time of full withdrawal of the Cash Surrender Value.

**Section 3.8 - Partial Withdrawals.** Partial withdrawals and withdrawal charges (described in Section 3.5, 3.6 and 3.7) will reduce the Account Value as follows:

1. They will first be charged against the portion of premiums received in Certificate Years after the first multiplied by the applicable Percentage of Premiums shown on Page 3 and interest on such amounts, adjusted for prior withdrawals and withdrawal charges and interest thereon; and
2. They will then be charged against the portion of premiums received in the first Certificate Year multiplied by the Percentage of Premiums for the first Certificate Year and interest on such amounts, adjusted for prior withdrawals and withdrawal charges and interest thereon.

**Section 3.9 - Minimum Guaranteed Interest Rate.** The Minimum Guaranteed Interest Rate, as shown on Page 3, is guaranteed until the certificate terminates and is calculated as an effective annual rate.

**Section 3.10 - Index.** The Index is the Standard & Poor's 500 Composite Stock Price Index, which excludes dividends. If publication of the Index is discontinued, or the calculation is substantially changed or is not available to us, we will substitute a suitable alternative index and notify you in writing.

**Section 3.11 - Index Date.** The Index Date is the last day of each monthly period beginning on the Certificate Date and the same day of each month thereafter. If the same day does not exist in a month, such as the 31st, we use the first preceding day. Example: If the Certificate Date is January 1, 1997, the first Index Date is January 31, 1997, and the last day of each following month.

**Section 3.12 - Index Value.** The Index Value is the closing value of the Index. The Index Value on the Certificate Date shown on Page 3 is the Index Value on the first day preceding the Certificate Date for which the Index Value is available. The Index Value on any Certificate Anniversary is the Index Value on the first day preceding the Certificate Anniversary for which the Index Value is available. If the Index Value is not available for any Index Date, except for reasons stated in Section 3.10, we will use the Index Value on the first preceding day for which the Index Value is available.

**Section 3.13 - Correction of Error In Index Value.** If Standard & Poor's publishes a correction of the Index Value within 30 days of the original publication, the Index Value used in this certificate will be the corrected Index Value. However, if Standard & Poor's publishes a correction of the Index Value more than 30 days past the original publication, the Index Value used in this certificate will be the Index Value as originally published.

**Section 3.14 - Index Average.** The Index Average is the average of the Index Values on the 12 Index Dates during each certificate year. As a hypothetical example: Assume the Certificate Date is January 7, and the Index Dates and Index Values are as follows:

| Index Date | Index Value | Index Date | Index Value |
|------------|-------------|------------|-------------|
| 2/6 | 500 | 8/6 | 600 |
| 3/6 | 520 | 9/6 | 580 |
| 4/6 | 540 | 10/6 | 560 |
| 5/6 | 560 | 11/6 | 540 |
| 6/6 | 580 | 12/6 | 520 |
| 7/6 | 600 | 1/6 | 500 |

The sum of the Index Values equals 6,600.
The Index Average equals 550 (6,600 divided by 12).

**Section 3.15 - Interest Credit Option A.**

1. If Interest Credit under Option A is in effect for the first Certificate Year:

On the first Certificate Anniversary the Interest Credit under Option A equals (a) divided by (b), the result multipled by (e), less (c), the result multiplied by (d), where:

- (a) is the Index Average for the first Certificate Year, minus the Index Value on the Certificate Date, shown on Page 3.
- (b) is the Index Value on the Certificate Date.
- (c) is the Asset Fee Rate for the first Certificate Year expressed as a decimal number.
- (d) the Percentage of Premiums for the first Certificate Year as shown on Page 3 times the sum of the Initial Premium and premiums received after the Certificate Date and on or before the 20th calendar day following the Certificate Date.
- (e) is the Participation Rate for the first Certificate Year shown on Page 3.

2. If Interest Credit under Option A is in effect for any Certificate Year after the first:

On Certificate Anniversaries after the first, the Interest Credit under Option A equals (a) divided by (b), the result multipled by (e), less (c), the result multiplied by (d), where:

- (a) is the Index Average for the current Certificate Year, minus the Index Value on the prior Certificate Anniversary.
- (b) is the Index Value on the prior Certificate Anniversary.
- (c) is the Asset Fee Rate for the current Certificate Year expressed as a decimal number.
- (d) is your Account Value on the prior Certificate Anniversary.
- (e) is the Participation Rate for the current Certificate Year. (Such rate will never be less than the Minimum Participation Rate shown on Page 3.)

The Interest Credit under Option A will never be less than zero (0).

### Section 3.16 - Interest Credit Option B.

1. If Interest Credit Option B is in effect for the first Certificate Year:

On any specified date after the Certificate Date and on or before the first Certificate Anniversary the Interest Credit under Option B equals

    a. the Percentage of Premiums for the first Certificate Year as shown on Page 3 times the sum of the Initial Premium and premiums received after the Certificate Date and on or before the 20th calendar day following the Certificate Date with interest, as we declare, to the specified date, less

    b. the Percentage of Premiums for the first Certificate Year as shown on Page 3 times the sum of the Initial Premium and premiums received after the Certificate Date and on or before the 20th calendar day following the Certificate Date.

2. If Interest Credit Option B is in effect for any Certificate Year after the first:

On any specified date after the first Certificate Anniversary Interest Credit under Option B equals

    a. the Account Value on the last Certificate Anniversary with interest, as we declare, to the specified date; less

    b. the Account Value on the last Certificate Anniversary.

The interest rate(s) declared as of the Certificate Date or Certificate Anniversary will never be declared for periods of less than one year and will never be less than the Minimum Guaranteed Interest Rate shown on Page 3.

### Section 3.17 - Interest Credit Option C.

1. If Interest Credit under Option C is in effect for the first Certificate Year:

On the first Certificate Anniversary the Interest Credit under Option C equals (1) plus (2) where:

    (1) equals (a) divided by (b), the result multiplied by (e), less (c), the result multiplied by (d); where:

        (a) is the Index Average for the first Certificate Year, minus the Index Value on the Certificate Date, shown on Page 3.

        (b) is the Index Value on the Certificate Date.

        (c) is the Asset Fee Rate for the first Certificate Year expressed as a decimal number.

        (d) is 50% of the Percentage of Premiums for the first Certificate Year as shown on Page 3 times the sum of the Initial Premium and premiums received after the Certificate Date and on or before the 20th calendar day following the Certificate Date.

        (e) is the Participation Rate for the first Certificate Year shown on Page 3.

The Interest Credit under (1) will never be less than zero (0).

    (2) equals (f) less (g) where:

        (f) is 50% of the Percentage of Premiums for the first Certificate Year as shown on Page 3 times the sum of the Initial Premium and premiums received after the Certificate Date and on or before the 20th calendar day following the Certificate Date with interest, as we declare, to the specified date, and

        (g) is 50% of the Percentage of Premiums for the first Certificate Year as shown on Page 3 times the sum of the Initial Premium and premiums received after the Certificate Date and on or before the 20th calendar day following the Certificate Date.

Between the Certificate Date and the first Certificate Anniversary, the Interest Credit under Option C equals (f) less (g) where:

(f) is 50% of the Percentage of Premiums for the first Certificate Year as shown on Page 3 times the sum of the Initial Premium and premiums received after the Certificate Date and on or before the 20th calendar day following the Certificate Date with interest, as we declare, to the specified date, and

(g) is 50% of the Percentage of Premiums for the first Certificate Year as shown on Page 3 times the sum of the Initial Premium and premiums received after the Certificate Date and on or before the 20th calendar day following the Certificate Date.

The interest rate(s) declared as of the Certificate Date referred to in (f) above will never be declared for periods of less than one year and will never be less than the Minimum Guaranteed Interest Rate shown on Page 3. Such rate will be the same as that which would be in effect if Interest Credit Option B was elected.

2. If Interest Credit under Option C is in effect for any Certificate Year after the first:

On Certificate Anniversaries after the first, the Interest Credit under Option C equals (1) plus (2) where:

(1) equals (a) divided by (b), the result multiplied by (e), less (c), the result multiplied by (d), where:

(a) is the Index Average for the current Certificate Year, minus the Index Value on the prior Certificate Anniversary.
(b) is the Index Value on the prior Certificate Anniversary.
(c) is the Asset Fee Rate for the current Certificate Year expressed as a decimal number.
(d) is 50% of your Account Value on the prior Certificate Anniversary.
(e) is the Participation Rate for the current Certificate Year. (Such rate will never be less than the Minimum Participation Rate shown on Page 3.)

The Interest Credit under (1) will never be less than zero (0).

(2) equals (f) less (g) where:

(f) is 50% of your Account Value on the last Certificate Anniversary with interest, as we declare, to the current Certificate Anniversary; and
(g) is 50% of your Account Value on the last Certificate Anniversary.

Between Certificate Anniversaries after the first, the Interest Credit under Option C equals (f) less (g) where:

(f) is 50% of your Account Value on the last Certificate Anniversary with interest, as we declare, to the specified date; and
(g) is 50% of your Account Value on the last Certificate Anniversary.

The interest rate(s) declared as of the Certificate Anniversary referred to in (f) above will never be declared for periods of less than one year and will never be less than the Minimum Guaranteed Interest Rate shown on Page 3. Such rate will be the same as that which would be in effect if Interest Credit Option B were elected.

**Section 3.18 - Interest Credit Option Election.** The Interest Credit Option that you have elected for the first Certificate Year is shown on Page 3. For Certificate Years after the first Certificate Year, election of an Interest Credit Option must be made by written notice to us. Such written notice must be received in our office in Austin, Texas prior to 20 days before your Certificate Anniversary. If no election is made, the option is in effect for the current Certificate Year will continue in effect the next Certificate Year.

**Section 3.19 - Asset Fee Rate.** The Asset Fee Rate is used in the calculation of the Interest Credit under Options A and C. The Asset Fee Rate for the first Certificate Year is shown on Page 3. The Asset Fee Rate for subsequent Certificate Years is declared by us on each Certificate Anniversary for the following Certificate Year. The Asset Fee Rate will never exceed the Maximum Asset Fee Rate shown on Page 3.

**Section 3.20 - Participation Rate.** The Participation Rate is used in the calculation of the Interest Credit under Options A and C. The Participation Rate for the first Certificate Year is shown on Page 3. The Participation Rate for subsequent Certificate Years is declared by us on each Certificate Anniversary for the following Certificate Year. The Participation Rate will never be less than the Minimum Participation Rate shown on Page 3.

**Section 3.21 - Certificate Continuation.** At the end of the Certificate Term, unless you elect Option 2 which is described in Section 3.22, we will continue your certificate under the following conditions:

1. Your Certificate Value will equal your Certificate Value on the last day of the Certificate Term, plus premiums received since the last day of the Certificate Term, less any withdrawals, with interest credited at rate(s) of interest we declare in advance for periods of not less than one year, but never less than the Minimum Guaranteed Interest Rate shown on Page 3;
2. Your Cash Surrender Value will equal your Certificate Value;
3. If you take any withdrawals at the end of the Certificate Term, we will adjust your values by subtracting the withdrawal amount from your Certificate Value; and
4. Interest Credit under Options A, B and C no longer apply.

**Section 3.22 - Certificate Term Options.** You may write to us and elect one of the Options below to take effect at or after the Certificate Term.
1. Partial withdrawal with no withdrawal charges.
2. Surrender this certificate with no withdrawal charges.

**Section 3.23 - Paid-Up Annuity.** This certificate will be continued as a paid-up deferred annuity:

1. On the Certificate Anniversary following a Certificate Year during which no premiums were paid; or
2. The date we receive a written request from you for this option.

While continued as a paid-up deferred annuity, this certificate will continue in full force and effect. You may exercise all rights described in this certificate.

**Section 3.24 - Death Benefit if Annuitant Dies Before Annuity Date.** We will pay to the beneficiary:
1. The Account Value less the withdrawal charge, if any, or the Minimum Guaranteed Certificate Value, if greater, on the date of death as a single sum, or
2. Benefits provided by the Certificate Value if applied under one of the settlement options in Section 3.1.

Payment will be made when we receive due proof of the Annuitant's death.

If no election is made by the beneficiary, we will pay in a single sum as described in 1 above in this Section 3.24.

**Section 3.25 - Death Benefit If Annuitant Dies On Or After Annuity Date.** We will pay to the beneficiary any unpaid guaranteed amounts as provided by the Settlement Option in force on the date of death. No other death benefits will be paid.

**Section 3.26 - Taxes, Fees, Assessments.** Any Federal, State or Municipal taxes, or any fees or assessments, payment of which is required or authorized by law, will be deducted from the benefits under Article III.

## OPTION 1 AND 2 TABLE - MINIMUM INCOME FOR LIFE
## OR LIFE INCOME WITH GUARANTEED PERIOD

Monthly payments per $1,000 of proceeds based on adjusted age of payee when option starts.
The payment for ages not shown will be furnished upon request.
Payments based on 1983 Table a (female), projected to 1995, and 2.50% interest.

| Adjusted Age of Payee | Income For Life | 5 Years Guaranteed | 10 Years Guaranteed | 15 Years Guaranteed | 20 Years Guaranteed |
|---|---|---|---|---|---|
| 50 | $ 3.41 | $ 3.41 | $ 3.40 | $ 3.38 | $ 3.35 |
| 51 | 3.46 | 3.46 | 3.45 | 3.43 | 3.40 |
| 52 | 3.52 | 3.51 | 3.50 | 3.48 | 3.45 |
| 53 | 3.57 | 3.57 | 3.55 | 3.54 | 3.50 |
| 54 | 3.63 | 3.63 | 3.62 | 3.59 | 3.55 |
| 55 | 3.70 | 3.69 | 3.68 | 3.65 | 3.61 |
| 56 | 3.77 | 3.76 | 3.74 | 3.71 | 3.66 |
| 57 | 3.84 | 3.83 | 3.81 | 3.77 | 3.72 |
| 58 | 3.91 | 3.90 | 3.88 | 3.84 | 3.78 |
| 59 | 3.99 | 3.98 | 3.96 | 3.91 | 3.84 |
| 60 | 4.07 | 4.06 | 4.03 | 3.98 | 3.90 |
| 61 | 4.16 | 4.15 | 4.12 | 4.06 | 3.96 |
| 62 | 4.25 | 4.24 | 4.20 | 4.13 | 4.03 |
| 63 | 4.35 | 4.34 | 4.29 | 4.21 | 4.10 |
| 64 | 4.46 | 4.44 | 4.39 | 4.30 | 4.16 |
| 65 | 4.57 | 4.55 | 4.49 | 4.39 | 4.23 |
| 66 | 4.69 | 4.66 | 4.60 | 4.48 | 4.30 |
| 67 | 4.81 | 4.78 | 4.71 | 4.57 | 4.37 |
| 68 | 4.94 | 4.91 | 4.82 | 4.57 | 4.45 |
| 69 | 5.08 | 5.05 | 4.95 | 4.77 | 4.51 |
| 70 | 5.23 | 5.19 | 5.08 | 4.87 | 4.58 |
| 71 | 5.39 | 5.35 | 5.21 | 4.98 | 4.65 |
| 72 | 5.56 | 5.51 | 5.35 | 5.09 | 4.71 |
| 73 | 5.74 | 5.68 | 5.51 | 5.20 | 4.78 |
| 74 | 5.94 | 5.87 | 5.68 | 5.30 | 4.84 |
| 75 | 6.15 | 6.07 | 5.83 | 5.41 | 4.89 |
| 76 | 6.38 | 6.29 | 6.00 | 5.52 | 4.94 |
| 77 | 6.63 | 6.52 | 6.18 | 5.63 | 4.99 |
| 78 | 6.90 | 6.77 | 6.36 | 5.73 | 5.03 |
| 79 | 7.19 | 7.03 | 6.55 | 5.83 | 5.07 |
| 80* | 7.51 | 7.31 | 6.73 | 5.92 | 5.10 |

* and over

## OPTION 3 TABLE - LIFE INCOME WITH INSTALLMENT REFUND

Monthly payments per $1,000 of proceeds based on adjusted age of payee when option starts.
The payment for ages not shown will be furnished upon request.
Payments based on 1983 Table a (female), projected to 1995, and 2.50% interest.

| Adjusted Age of Payee | | Adjusted Age of Payee | | Adjusted Age of Payee | |
|---|---|---|---|---|---|
| 50 | $ 3.32 | 60 | $ 3.87 | 70 | $ 4.73 |
| 51 | 3.37 | 61 | 3.94 | 71 | 4.85 |
| 52 | 3.41 | 62 | 4.01 | 72 | 4.96 |
| 53 | 3.46 | 63 | 4.08 | 73 | 5.09 |
| 54 | 3.51 | 64 | 4.18 | 74 | 5.22 |
| 55 | 3.56 | 65 | 4.25 | 75 | 5.36 |
| 56 | 3.62 | 66 | 4.34 | 76 | 5.51 |
| 57 | 3.68 | 67 | 4.43 | 77 | 5.66 |
| 58 | 3.74 | 68 | 4.52 | 78 | 5.82 |
| 59 | 3.80 | 69 | 4.63 | 79 | 5.99 |
| | | | | 80* | 6.17 |

* and over

**NATIONAL WESTERN LIFE INSURANCE COMPANY**

105004 8

**APPLICATION FOR ANNUITY**
850 East Anderson Lane • Austin, Texas 78752-1602

**ANNUITANT:**
Name _PETER J. GLENANE_ Sex _M_ Birth Date _5/11/33_ Age _69_ Soc. Sec. No _572 56 4210_

Address _622 VIA SANTA PAULO_ City _VISTA_ State _CA._ Zip _92083_

Employer _RETIRED_ Annual Salary $ _____

**OWNER:** This section must be left blank on IRA, SEP AND TSA plans.
Full Name (if other than annuitant) _____ Soc. Sec. No. _____

Address _____ City _____ State _____ Zip _____

Joint Owner _____ Soc. Sec. No. _____

Contingent Owner (if other than annuitant) _____ Soc. Sec. No _____

**BENEFICIARY OF ANNUITANT:**
Primary Beneficiary _MARY GLENANE_ Relationship to Annuitant _WIFE_

Contingent Beneficiary _LEGAL CHILDREN, PER STIRPES._ Relationship to Annuitant _____

**PLAN:** Plan Name _CONFIDENCE 2000_
Tax Status: ☐ Non-Qualified ☒ IRA ☐ HR-10(Keogh) ☐ 403b(TSA) ☐ SEP/IRA ☐ 401k
☐ Other _____

Will this annuity replace any existing insurance or annuities in this or any other company? ................ ☐ Yes ☐ No
(If yes, complete applicable replacement forms in states where required.)

**PREMIUMS:**
Premiums: Submitted with application $ _____ If IRA, premium submitted applies to tax year _____
Amount to be billed $ _____ Expected first yearly premium $ _Rollover 102,000 +_
Anticipated amount on policy exchanges or transfers $ _____
(If any, attach Transfer Form No. SA-8600, the policy/document that is to be exchanged, and any applicable replacement form.)

Mode: ☐ Single Premium ☐ Annual ☐ Semi-annual ☐ Monthly ☐ Other _____
☐ 9 pay per year ☐ 10 pay per year Circle months not to bill: J F M A M J J A S O N D

Date for 1st premium billing: Month _____ Day _____ Year _____

Billing Type: ☐ Bank Draft ☐ Direct Bill ☐ List Bill ☐ Government Allotment ☐ _____

Special Billing Instructions: Billing Name _____   MAY 16 2003
Address _____ City _____ State _____ Zip _____

**SPECIAL REQUESTS:**
_TRANSFERS FROM MORGAN STANLEY AND ORANGE COUNTY_
_TEACHERS FEDERAL CREDIT UNION. MONIES FROM CREDIT UNION_
_TO GO INTO FIXED ACCT UNTIL ANNIVERSARY date of policy THEN INDEX (8200)_

I have read the statements above and to the best of my knowledge and belief they are true and correct. Any statement made by either the agent of this application or by any other person shall not be binding on the Company unless such statement is reduced to writing by the Company and made a part of the annuity contract. I have received and read a copy of the annuity information brochure and understand the features of the plan of insurance applied for.

Signed in (City) _CARLSBAD_ (State) _Ca_ on (date) _APRIL 15, 2003_

AGENT: If signed in Florida, my Florida State Insurance License number is . _____
my Agent Name is (printed) _____

✔ _Peter J Glenane_ 34009 ✔
Annuitant Signature    Owner Signature

X _gro_
Agent Signature (agent must complete reverse side)    Joint Owner Signature

01-9046-95    Page 1 of 2

51

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: AMERICAN INVESTORS | : | |
| LIFE INSURANCE CO. ANNUITY | : | MDL DOCKET NO. 1712 |
| MARKETING AND SALES PRACTICES | : | |
| LITIGATION | : | |

| | |
|---|---|
| Relates to: | : |
| PRICE v. AMERUS ANNUITY | : |
| GROUP COMPANY, No. 04-3329 | : |
| and | : |
| MILLER v. AMERUS GROUP | : |
| COMPANY, No. 04-3799 | : |

MEMORANDUM AND ORDER

McLaughlin, J.                                              June 2, 2006

In these two putative class actions, the plaintiffs sue
several defendants for damages arising from alleged fraudulent
schemes involving the sale of unnecessary and unsuitable estate
planning instruments and annuities.  The defendants allegedly
participated in the scheme through their involvement in one of
three groups: the "Annuity Group" (AmerUs Group Co., AmerUs
Annuity Group Co. (AAG), and American Investors Life Insurance
Company, Inc. (AILIC)); the "Sales Group" (Brian J. Newmark,
Estate Planning Advisors Corp. (EPAC), Ben Consulting Group
(BEN), Funding & Financial Services (FFS), Victoria L. Larson,
Kenneth Krygowski, Stephen Strope, Patriot Group, and/or Addison
Group); and the attorneys (Barry O. Bohmueller or Brett
Weinstein).

**EXHIBIT B**                                              52

The plaintiffs bring claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, as well as numerous claims based on state law. The Court concludes that the plaintiffs have failed to state a claim under RICO. Because RICO is the basis of the Court's subject matter jurisdiction, the Court will not address the plaintiffs' state law claims at this time. The Court will, however, dismiss all claims against certain defendants because the complaints do not allege any facts concerning their involvement in the alleged wrongful activities in these cases. The Court will allow the plaintiffs to amend their complaints.

I.   Factual Background

The complaints are long (each in excess of fifty pages) and contain many conclusory factual and legal contentions. Accepting the facts alleged in the complaints as true, the following events gave rise to this litigation.[1]

---

1.     When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court accepts all facts and allegations listed in the complaint as true and construes them in the light most favorable to the plaintiff. H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 249 (1989); Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

A.    <u>Beryl and Charlotte Price</u>

In early 2002, in response to a newspaper advertisement, Beryl and Charlotte Price attended a seminar on EPAC's estate planning services.  The Prices were in their mid-seventies at the time.  At the seminar, Victoria Larson and other EPAC representatives made a presentation detailing how EPAC's services could benefit the Prices and the other attendees.  (<u>Price</u> Compl. ¶¶ 37-38.)

Shortly after the seminar, Ms. Larson called the Prices twice, and arranged to meet with them in their home.  During that meeting, on or around January 23, 2002, Ms. Larson spoke to the Prices about the ostensible advantages of a living trust.  Ms. Larson led the Prices to believe that she was a qualified, experienced estate planner working with the office of Attorney Barry O. Bohmueller.  She did not disclose that she was a licensed insurance agent or that she received commissions for the sale of living trusts and annuities.  (<u>Id.</u> ¶¶ 38-41.)

Directly after the meeting, the Prices gave Ms. Larson a check for $1,845.00 payable to "Bohmueller Law Offices" for the purchase of a living trust kit.  The Prices received an Engagement Letter from Attorney Bohmueller, which stated that he would consult with them and prepare a basic estate planning package.  (<u>Id.</u> ¶¶ 42, 44(a).)

On February 13, 2002, Attorney Bohmueller sent the living trust documents to EPAC for delivery to the Prices. On the same day, Attorney Bohmueller sent one or more letters to the Prices, appointing Ms. Larson as his delivery agent for the living trust kit and asking the Prices to confirm receipt of the documents. (Id. ¶ 42, 44(b).)

On or around February 28, 2002, Ms. Larson returned to the Prices' home to deliver a loose leaf binder containing the living trust documents that Attorney Bohmueller had ostensibly prepared. Ms. Larson explained the legal provisions of the documents, showed the Prices where to sign, and notarized several of the signed documents. (Id. ¶ 43.)

Ms. Larson told the Prices that she or Attorney Bohmueller would take all of the necessary actions to properly establish and fund the living trust. She did not inform the Prices that they needed to transfer their residence or any other assets into the trust, and she did not do so on their behalf. (Id. ¶¶ 56-57.)

In the course of selling the Prices the living trust kit, Ms. Larson also persuaded the Prices to liquidate a total of $61,000 from their IRA accounts to purchase two AILIC deferred annuities. Payments on both annuities began after ten years. Ms. Larson told the Prices that the rate of return on the annuities would be greater than what they were earning from their

-4-

55

current investments, and that the interest rate on the annuities could only increase. (<u>Id.</u> ¶¶ 47-48, 50.)

When the Prices told Ms. Larson that they wanted 25% of their investment to be available for distribution the following year, she assured them that the annuities would allow such a distribution. She did not disclose that the annuities imposed penalties for early withdrawals. (<u>Id.</u> ¶ 51.)

On March 20 and April 10, 2002, AILIC, through AAG, mailed the Prices letters indicating that it had sent the annuities to Mr. Newmark for delivery to Mr. Price. (<u>Id.</u> ¶ 52.)

On September 27, 2002, Mr. Newmark and EPAC wrote a letter to the Prices informing them that they would begin to receive EPAC's newsletter, "Advisor Quarterly," which would contain financial advice and "other senior related topics." In the letter, Mr. Newmark also asked the Prices to call EPAC if they were solicited by other organizations about estate planning or other financial services. (<u>Id.</u> ¶ 54.)

When the Prices did not receive their expected distribution from the annuities the following year, they contacted Ms. Larson. She told them that there was nothing she could do for them. (<u>Id.</u> ¶ 56.)

B. <u>Joseph Healy</u>

In or around August 2001, Joseph Healy attended an

-5-

estate planning seminar sponsored by FFS.  Mr. Healy was eighty-five years old at the time.  At the seminar, Ms. Larson gave Mr. Healy a piece of paper that indicated that she was a "Certified Senior Advisor" for EPAC.  (Id. ¶¶ 61-62.)

Sometime after the seminar, Ms. Larson and Mr. Krygowski visited Mr. Healy at his home to discuss his estate plan and the purported advantages of a living trust.  Ms. Larson and Mr. Krygowski also led Mr. Healy to believe that they were qualified and experienced estate planners working with Attorney Bohmueller's office.  Ms. Larson gave Mr. Healy a card from "Bohmueller Law Offices" on which she had written her name.  Neither Ms. Larson or Mr. Krygowski told Mr. Healy that they were licensed insurance agents or that they received commissions for the sale of living trusts and annuities.  (Id. ¶¶ 62-64.)

On or around August 29, 2001, Mr. Healy gave Mr. Krygowski a check for $1,795.00 payable to "Bohmueller Law Offices" for the purchase of a living trust kit.  Like the Prices, Mr. Healy received an Engagement Letter from Attorney Bohmueller stating that he would consult with Mr. Price and prepare a basic estate planning package for him.  (Id. ¶ 65.)

On or around November 26, 2001, Ms. Larson and Mr. Krygowski persuaded Mr. Healy to purchase an AILIC deferred annuity.  Neither Ms. Larson or Mr. Krygowski disclosed that the annuity imposed penalties for withdrawals on the principal in the

-6-

57

first ten years.  Payments on the annuity were scheduled to begin in fifteen years.  (Id. ¶¶ 65-67.)

AILIC issued Mr. Healy's annuity on December 12, 2001. On or around that date, AAG mailed the annuity to Mr. Krygowski for delivery to Mr. Healy.  The annuity was delivered to Mr. Healy on December 19, 2001.  On January 14, 2002, AAG mailed Mr. Healy a letter signed by AAG's president and CEO thanking him for selecting AILIC as his annuity provider.  (Id. ¶¶ 67-69.)

On March 4, 2002, Mr. Healy mailed a letter to Ms. Larson at FFS, formally rescinding his purchase of the annuity. Mr. Healy copied Mr. Krygowski, Mr. Newmark, and AILIC on the letter.  (Id. ¶ 72.)

Sometime in March or April 2002, Mr. Healy sought the advice of a trusts and estates attorney to determine the legitimacy of the living trust kit and the suitability of the annuity he had purchased.  On May 29, 2002, Mr. Healy's attorney wrote to AILIC and again sought to rescind the annuity.  AAG responded on July 22, 2002 that it would not honor a rescission. (Id. ¶¶ 72-74.)

C.    George Miller

Sometime in 1999, George Miller responded by mail to a newspaper advertisement concerning Weinstein living trusts.  Mr. Miller was seventy-four years old at the time.  Ms. Larson and

-7-

58

other representatives of Addison Group informed Mr. Miller that
they could provide estate planning services that would benefit
him.  Ms. Larson telephoned Mr. Miller to arrange to meet with
him in his home. (<u>Miller</u> Compl. ¶¶ 45-47.)

Ms. Larson met with Mr. Miller once, on or about June
22, 1999.  She spoke with Mr. Miller about the supposed
advantages of a living trust, and led him to believe that she was
a qualified estate planner working with Attorney Brett Weinstein.
She did not inform Mr. Miller that she was an insurance agent, or
that she received commissions from the sale of living trusts and
annuities.  That day, Mr. Miller gave Ms. Larson a check for
$1,995 payable to Attorney Weinstein for the purchase of a living
trust kit. (<u>Id.</u> ¶¶ 48-53).

Following Ms. Larson's meeting with Mr. Miller,
Attorney Weinstein appointed Stephen Strope to be his delivery
agent for the living trust kit.  On August 5, 1999, Mr. Strope
visited Mr. Miller to deliver the living trust documents
ostensibly prepared by Attorney Weinstein.  Mr. Strope explained
various provisions in the documents, showed Mr. Miller where to
sign, and notarized some of the signed documents.  Like Ms.
Larson, Mr. Strope led Mr. Miller to believe that he was a
qualified estate planner working with Attorney Weinstein, and did
not inform Mr. Miller that he was an insurance agent who received
commissions from the sale of living trusts and annuities.  (<u>Id.</u>

-8-

59

¶¶ 51-52, 58-60.)

During this period of time in 1999, Mr. Strope persuaded Mr. Miller to liquidate $215,000 from his investment portfolio of predominately blue chip investments to purchase an annuity from American Equity Investment Life Insurance Company, Inc. (American Equity). Mr. Strope told Mr. Miller that the rate of return on the annuity would be 26.95% per annum, and that the annuity would make Mr. Miller a millionaire in five years. Mr. Strope did not disclose that the annuity would not make any payments for ten years, or that it imposed surrender charges for early withdrawals of principal. (Id. ¶¶ 54-57.)

In 2000, Mr. Miller received a statement in the mail from American Equity and discovered that the rate of return for the annuity was 3% as opposed to the 26.95% Mr. Strope had promised. When Mr. Miller complained to Mr. Strope, Mr. Strope blamed the decreased rate of return on the decline in the stock market. (Id. ¶ 61.)

Mr. Strope then convinced Mr. Miller to purchase an annuity from AILIC. Mr. Strope did not disclose to Mr. Miller that this annuity would not make payments for fifteen years, or that it also imposed early surrender charges. (Id. ¶ 62.)

In June 2003, Mr. Strope called to inform Mr. Miller that he had switched companies, and would fix what was wrong with the prior annuities. He persuaded Mr. Miller to surrender his

-9-

American Equity annuity, thereby incurring a surrender charge of over $20,000, to purchase an annuity from National Western Life Insurance Company, Inc. (National Western). Mr. Strope guaranteed Mr. Miller that the National Western annuity rate of return would never be less than 12%. Mr. Strope did not disclose that this annuity would not make payments for twenty years, or that it imposed early surrender charges as well. National Western issued this annuity on June 18, 2003. Mr. Miller was 79 years old by this time. (Id. ¶¶ 63-65.)

Mr. Strope has not responded to Mr. Miller's attempts to contact him since he purchased the National Western annuity. When Mr. Miller telephoned Attorney Weinstein to complain about Mr. Strope, Weinstein told Miller that Strope had worked for him, but that he had fired him because of his poor performance. In fact, Attorney Weinstein had never employed Mr. Strope directly; rather, Strope worked for the Sales Group on Weinstein's and the Annuity Group's behalf. (Id. ¶ 67.)

II. Description of the Defendants

According to the complaints, the three groups of defendants cooperated in the sale of living trust kits and annuities in the following manner.

-10-

61

A.    Annuity Group

Members of the Annuity Group allegedly issued,
underwrote, and profited from the sale of unsuitable annuities,
less the commissions paid to members of the Sales Group.  (Price
Compl. ¶ 102(c); Miller Compl. ¶ 94(c).)

Both the Price and Miller complaints name AmerUs Group,
AAG, and AILIC as the Annuity Group defendants.  AILIC is a
wholly owned subsidiary of AAG.  AAG is a wholly owned subsidiary
of AmerUs Group Co.  (Price Compl. ¶ 18; Miller Compl. ¶ 19.)[2]

B.    Sales Group

The Sales Group allegedly performed the legwork that
induced members of the putative classes to purchase living trust
kits and annuities.  Sales Group members allegedly were agents of
one or more of the Annuity Group defendants and one or both of
the attorneys.  (Price Compl. ¶¶ 4, 102(a); Miller Compl. ¶¶ 4,
94(a).)

Both the Price and Miller complaints name Mr. Newmark,
EPAC, BEN, FFS, and Ms. Larson as members of the Sales Group.
Mr. Newmark was the President of EPAC and BEN, and the principal
and/or controlling person of FFS.  He was also an independent

---

2.      The plaintiff in Miller initially named National
Western Life and American Equity as additional defendants in the
Annuity Group, but has since voluntarily dismissed all claims
against them.

insurance agent appointed with AILIC and AAG.  EPAC (previously named FFS) and BEN engaged in the business of marketing and selling living trust kits drafted by Attorney Bohmueller and/or Attorney Weinstein, and annuities underwritten by AILIC and/or AAG.  FFS sponsored and presented seminars on estate planning. Ms. Larson worked for Mr. Newmark and/or his companies, and was also an agent of the Annuity Group defendants.  (Price Compl. ¶¶ 20-24; Miller Compl. ¶¶ 25-28, 32.)

In addition, the Price complaint alone names Kenneth Krygowski as another member of the Sales Group.  Mr. Krygowski worked for one or more of Mr. Newmark's companies, and was also an agent of AAG and AILIC.  (Price Compl. ¶ 25.)

The Miller complaint alone names Stephen Strope, Patriot Group, and Addison Group as additional members of the Sales Group.  Mr. Strope worked for EPAC, Patriot Group, and Addison Group, and was also an agent of one or more of the Annuity Group defendants.  Both Patriot Group and Addison Group employed one or more salespersons who worked on behalf of one or more of the Annuity Group defendants.  (Miller Compl. ¶¶ 29, 31, 33.)

C.    Attorneys

The attorneys ostensibly prepared the living trust documents.  They helped members of the Sales Group to profit from

-12-

63

selling the living trust kits and annuities by allowing them to cloak the sales as part of an attorney-client relationship. (<u>Price</u> Compl. ¶ 102(b); <u>Miller</u> Compl. ¶ 94(b).)

The <u>Price</u> complaint names Barry O. Bohmueller as the attorney defendant; the <u>Miller</u> complaint names Brett Weinstein.

## III. <u>Overview of the Claims</u>

The plaintiffs have brought nine-count complaints against the defendants as follows:

| Counts | Price | Miller |
|---|---|---|
| I: Violation of RICO | All defendants | All defendants |
| II: Violation of the Pennsylvania UTPCPL | All defendants | All defendants |
| III: Bad Faith | AILIC and AAG | AILIC, AAG, and AmerUs Group |
| IV: Negligent Supervision | AILIC, AAG, AmerUs Group, and Bohmueller | AILIC, AAG, AmerUs Group, and Weinstein |
| V: Respondeat Superior | AILIC, AAG, AmerUs Group, and Bohmueller | AILIC, AAG, AmerUs Group, and Weinstein |
| VI: Fraudulent Misrepresentation | All defendants | All defendants |
| VII: Negligent Misrepresentation | All defendants | All defendants |
| VIII: Civil Conspiracy | All defendants | All defendants |
| IX: Quantum Meruit/Unjust Enrichment | All defendants | All defendants |

-13-

64

Each defendant, except Addison Group, has moved to dismiss. The following motions to dismiss are pending before the Court:

- AmerUs Group, AAG, and AILIC's motions to dismiss the entirety of both complaints;

- Mr. Newmark, EPAC, BEN, FFS and Ms. Larson's motions to dismiss all counts against Mr. Newmark, EPAC, BEN, and FFS, and Counts VI-VIII against Ms. Larson, in both complaints;

- Mr. Krygowski's motion to dismiss all counts against him in the Price complaint;

- Mr. Strope's motion to dismiss Counts I and VI-VIII of the Miller complaint;

- Patriot Group's motion to dismiss Counts I and VI-VII of the Miller complaint;

- Attorney Bohmueller's motion to dismiss Counts I-II and VI of the Price complaint; and

- Attorney Weinstein's motion to dismiss Counts I-II and VI-VIII of the Miller complaint.

IV.  Analysis

The Court will first discuss which defendants should be dismissed because there are no allegations of wrongdoing in fact against them.  Then the Court will turn to the merits of the RICO claim.

A.  Defendants Dismissed for Failure to State Any Claim

BEN should be dismissed from the Price case because the complaint does not allege that BEN engaged in any wrongdoing with

-14-

respect to the Prices or Mr. Healy.  The plaintiffs attempt to implicate BEN because, like EPAC and FFS, it was one of Mr. Newmark's companies and also engaged in the business of selling living trusts and annuities.  The complaint contains no facts suggesting that BEN made any misrepresentations, or employed Ms. Larson or Mr. Krygowski at the time they made alleged misrepresentations to the plaintiffs, however.

In addition, BEN, FFS, and Mr. Newmark should be dismissed from the Miller case because the complaint does not allege that these defendants did anything in fact in relation to Mr. Miller.  Although Ms. Larson and/or Mr. Strope may have worked for BEN or FFS at some point in time, the complaint contains no facts suggesting that Ms. Larson or Mr. Strope were so employed at the time they made the alleged misrepresentations to Mr. Miller.

B.    RICO Claim (Count I)

The plaintiffs allege that each of the defendants violated section 1962(c) of the RICO statutes, which provides in relevant part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

18 U.S.C. § 1962(c).  The plaintiffs bring suit under section

-15-

66

1964(c), which gives a private right of action to "any person injured in his business or property by reason of a violation of section 1962 . . . ." 18 U.S.C. § 1964(c).

    To state a claim for a violation of section 1962(c), a plaintiff must allege that the defendant (1) conducted or participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). The moving defendants argue that the plaintiffs have not adequately alleged one or more of these elements.[3]

_____

3.        Although Ms. Larson has not moved to dismiss the RICO claim and Addison Group has not filed any motion to dismiss, the Court may consider sua sponte the plaintiffs' ability to state a RICO claim against these defendants as well.  District courts may dismiss complaints under Rule 12(b)(6) sua sponte if service has been made and the plaintiff has had an opportunity to address the issue.  Grayson v. Mayview State Hosp., 293 F.3d 103, 111 n.15 (3d Cir. 2002) (sua sponte dismissal appropriate only after service of process); Oatess v. Sobolevitch, 914 F.2d 428, 430 n.5 (3d Cir. 1990) (same); Roman v. Jeffes, 904 F.2d 192, 196 (3d Cir. 1990) (court may raise deficiency of complaint on its own initiative, but plaintiff must have notice and an opportunity to respond orally or in writing); Dougherty v. Harper's Magazine Co., 537 F.2d 758, 761 (3d Cir. 1976) (same).

    Ms. Larson's counsel accepted service on her behalf on the Price and Miller complaints on August 12 and 19, 2004, respectively.  (Price Doc. No. 15; Miller Doc. No. 6.)  The Miller complaint was served on Addison Group on October 18, 2004, pursuant to Fed. R. Civ. P. 4(c)(2) and the Court's October 4, 2004 Order.  (Miller Doc. Nos. 36, 42.)

    The Court has not questioned the adequacy of the plaintiffs' RICO pleadings on its own initiative.  The moving defendants raised and briefed this issue; the Court is only applying the moving defendants' arguments to the nonmoving defendants on its own initiative.  The plaintiffs have had

-16-

67

The Court will begin by determining whether the plaintiffs have adequately pled the existence of a RICO enterprise.  The Court will then discuss the conduct or participation, racketeering activity, and pattern elements.

1.    Existence of a Enterprise

An enterprise under RICO may be an individual, a legal entity such as a corporation, or "any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  The Price plaintiffs allege an association in fact enterprise consisting of all the defendants in that case. The Miller plaintiffs allege an association in fact consisting of all the defendants originally named in that case, including National Western and American Equity.[4]  The Court finds that the plaintiffs have failed to plead a valid RICO enterprise.

To prove that a RICO enterprise exists, plaintiffs must demonstrate: (1) an ongoing organization, formal or informal; (2) that the various associates function as a continuing unit; and (3) that the enterprise has an existence separate and apart from the alleged pattern of racketeering activity.  United States v.

opportunities to respond, and have responded, to these arguments both in writing and at oral argument.

4.      The plaintiff in Miller has voluntarily dismissed his claims against National Western and American Equity, but has not amended the complaint to remove these entities from the alleged enterprise.

-17-

68

Turkette, 452 U.S. 576, 583 (1981); United States v. Riccobene, 709 F.2d 214, 221 (3d Cir. 1983).

In Riccobene, the United States Court of Appeals for the Third Circuit explained that the first Turkette element requires a showing that "some sort of structure exists within the group for the making of decisions, whether it be hierarchical or consensual." Id. at 222. In other words, "there must be some mechanism for controlling and directing the affairs of the group on an on-going, rather than ad hoc, basis." Id.

Here, the complaints do not permit an inference that any organizational structure connected or controlled the various defendants. The plaintiffs have alleged that the Sales Group members were agents of the attorneys and the Annuity Group members. (Price Compl. ¶ 4; Miller Compl. ¶ 4.) The complaints do not allege how the attorneys and the Annuity Group were related, however. They could not have been controlled by Sales Group members, because, according to the complaints, the Sales Group members worked for them. The Miller complaint, moreover, does not allege any relationship between the AmerUs companies, National Western, and American Equity, or explain how these three competitors could have been working together towards a common goal. Overall, the pleadings fail to show how the defendants would have worked together to make decisions or resolve disputes.

The plaintiffs do allege that the defendants performed

-18-

certain critical roles within the enterprise: the attorneys
prepared the living trust documents and helped Sales Group
members gain access to the plaintiffs under the guise of an
attorney-client relationship; the members of the Sales Group
performed the legwork in selling the living trust kits and
annuities; and the members of the Annuity Group provided the
annuities.  The plaintiffs also allege that "[e]ach Defendant was
. . . aware that other members of the enterprise were . . .
acting to advance the enterprise's scheme . . . ."  (Price Compl.
¶¶ 102-104; Miller Compl. ¶¶ 94-96.)

        The fact that the defendants played particular roles
and were aware of each other's actions does not show a decision-
making structure, however.  Participants in any conspiracy will
play certain roles and have some idea of what the other
participants are doing.  Allegations demonstrating a conspiracy
to perform an underlying criminal offense, standing alone, are
not sufficient to allege the existence of an enterprise.  Seville
Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 790
n.5. (3d Cir. 1984).  The plaintiffs have described what may
appear to be an enterprise from the outside, but the collection
of entities and individuals contains no organizational structure
on the inside.[5]

---

5.      Zito v. Leasecomm Corp., 02-CIV-8074, 2004 U.S. Dist.
LEXIS 19778 (S.D.N.Y. Sept. 30, 2004), does not validate the
plaintiffs' enterprise pleadings.  The plaintiffs in Zito alleged

-19-

70

Several Courts of Appeals have rejected association in fact enterprise pleadings where the plaintiffs failed to allege any organizational structure for the enterprise. See Vandenbroeck v. CommonPoint Mortgage Co., 210 F.3d 696, 700 (6th Cir. 2000) (alleged enterprise "too unstable and fluid an entity to constitute a RICO enterprise"); Stachon v. United Consumers Club, Inc., 229 F.3d 673, 676 (7th Cir. 2000) (refusing to accept "vague allegations of a RICO enterprise made up of a string of participants . . . lacking any distinct existence and structure"); Simon v. Value Behavioral Health, Inc., 208 F.3d 1073, 1083 (9th Cir. 2000) (affirming dismissal where plaintiff "never alleged the existence of a system of authority that guided

---

that, as an association in fact, Leasecomm, its parent company MFI, and their dealers and vendors worked together to deceive customers into signing non-negotiable and deceptive leases on Leasecomm's overpriced and ineffective products. MFI/Leasecomm then allegedly used extreme collection and enforcement tactics against defaulting lessees. Id. at *3-4. The court found that the plaintiffs had properly pleaded an enterprise with a "hub and spoke" type structure, based on allegations that Leasecomm carefully vetted and supervised its dealers and centrally controlled the enterprise, and that the dealers understood that their arrangement with Leasecomm was part of a larger structure erected by MFI/Leasecomm. Id. at *24-28.

Unlike the plaintiffs in Zito, the plaintiffs here have not alleged that any entity centrally controlled the alleged enterprise. Sales Group members cannot be the "hub" here, because, as noted above, the complaints allege that the Sales Group members worked for the Annuity Group members and the attorneys. The complaints also preclude either Annuity Group members or the attorneys from being the "hub," because the complaints do not allege any direct relationship between the Annuity Groups and the attorneys.

-20-

the operation of the enterprise"). See also Feinstein v.
Resolution Trust Corp., 942 F.2d 34, 42 n.7 (1st Cir. 1991)
(approving dismissal where complaint contained "no allegations
articulating how any of the [defendants] may have comprised part
of an 'ongoing organization'").

In Vandenbroeck, the alleged enterprise was an
association in fact between a mortgage lender and numerous
secondary lenders with whom it did business. The plaintiffs
alleged that after obtaining a proposed interest rate from one of
the secondary lenders, the mortgage lender would itself make a
loan with an inflated interest rate and hidden fees, then sell
the loan to the secondary lender and pocket a fee. 210 F.3d at
698-699. The court found that the complaint failed to show any
type of mechanism by which this alleged group conducted its
affairs or made its decisions. Id. at 700. The court held that
allegations that certain parties did business with one another,
or even allegations that they conspired together, were "not
enough to trigger [RICO liability] if the parties [were] not
organized in a fashion that would enable them to function as a
racketeering organization for other purposes." Id. at 699.

The alleged enterprise in Stachon was an association in
fact consisting of a wholesale "buying club," its franchisees,
manufacturers, wholesalers, and members. The plaintiffs alleged
that the buying club fraudulently induced them to join by

-21-

misrepresenting the quality of its merchandise, its prices, and its buying power. 229 F.3d at 674. Like the Vandenbroeck court, the Stachon court held that the fact that the members of the alleged group had business dealings with one another over many years did not establish that they functioned as an ongoing structured organization. Id. at 677.

The Court is persuaded by these cases that, even under the liberal notice pleading standards, the enterprise pleadings here are inadequate.[6] The United States Court of Appeals for the Third Circuit's decisions in Seville Indus. Mach. Corp. v.

---

6.        The Court reaches this conclusion without deciding whether the plaintiffs have alleged the second and third elements of a RICO enterprise.

The second element requires plaintiffs to show that the defendants occupied continuing positions within the group consistent with the organizational structure established by the first element. Riccobene, 709 F.2d at 223. Because the Court finds that the plaintiffs have not alleged any organizational structure, the Court cannot determine whether the plaintiffs have alleged that the defendants occupied continuing positions.

The third element requires plaintiffs to show that the alleged enterprise had an existence separate and apart from the alleged pattern of racketeering activity. "Overseeing and coordinating the commission of several different predicate offenses and other activities on an on-going basis is adequate to satisfy the separate existence requirement." Id. at 224. In Town of Kearny v. Hudson Meadows Urban Renewal Corp., 829 F.2d 1263, 1266 (3d Cir. 1987), the court found that the separate existence requirement was satisfied where persons associated with the enterprise engaged in two separate but similar schemes. The Court notes that the Price complaint alleges that the defendants engaged in similar schemes with the Prices and Mr. Healy, and that both complaints allege that the defendants engaged in similar schemes with other elderly persons. (Price Compl. ¶ 76; Miller Compl. ¶ 68.)

-22-

73

Southmost Mach. Corp., 742 F.2d 786 (3d Cir. 1984) and Shearin v.
E.F. Hutton Group, Inc., 885 F.2d 1162 (3d Cir. 1989) do not call
for a contrary conclusion.

In Seville, the plaintiff alleged that each of the
defendants - two individuals and two corporations - was an
enterprise.  The district court acknowledged that each of the
defendants met the statutory definition of an enterprise (which
includes "any individual [or] corporation"), but dismissed the
complaint because the plaintiff did not plead the Turkette
elements.  742 F.2d at 789-790.  The Court of Appeals reversed.
The Court of Appeals held that, under the notice pleading rules,
the plaintiff's bare allegation that each of the defendants was
an enterprise was sufficient.  Id. at 790.

Seville is distinguishable from the present case
because the relevant enterprises in Seville were individuals and
corporations, not associations in fact.  Courts can reasonably
assume that individuals and corporations have an organizational
structure, are continuous, and have an existence separate and
apart from any alleged pattern of racketeering activity.  When it
comes to associations in fact, however, there is a greater risk
that the RICO statute "might be improperly employed to string
together predicate acts by unconnected defendants."  See Zito,
2004 U.S. Dist. LEXIS 19778 at *23.  In a footnote, the Court of
Appeals in Seville itself held that the plaintiff could not plead

-23-

association in fact enterprises consisting of various combinations of the defendants simply by alleging that the defendants conspired with each other to commit the underlying offenses. 742 F.2d at 790 n.5.

The United States Court of Appeals for the Third Circuit accepted a minimal association in fact enterprise pleading in Shearin, but that case is also distinguishable from the instant ones. There, the court held that it was sufficient for the plaintiff to plead that "the association of Hutton Group, Hutton Inc., and Hutton Trust . . . was an enterprise . . . ." 885 F.2d at 1165. Hutton Inc. and Hutton Trust were wholly owned subsidiaries of Hutton Group. Id. at 1164. This fact is significant because courts can also reasonably assume that a relationship between a corporation and its subsidiaries will have an organizational structure and existence independent of any alleged racketeering activity. Courts cannot make that inference when a complaint alleges an association in fact between widely disparate entities and individuals, as do the complaints here.

### 2.    Conduct or Participation – Operation or Management

A plaintiff bringing a section 1962(c) claim must not only show that an enterprise exists, but that each defendant conducted or participated in the conduct of the enterprise's

-24-

affairs.[7]  The Supreme Court has interpreted the conduct or

---

7.          Courts have also required section 1962(c) plaintiffs to
show that the defendant is distinct from the alleged enterprise.
This requirement stems from the statute's language that the
"person" sued must be "employed by or associated with" an
enterprise.  Because an enterprise cannot logically employ or
associate with itself, the defendant must be distinct from the
alleged enterprise.  Brittingham v. Mobil Corp., 943 F.2d 297,
300 (3d Cir. 1991), citing B.F. Hirsch v. Enright Refining Co.,
751 F.2d 628, 633-634 (3d Cir. 1984).

          The fact that a plaintiff alleges that all of the
defendants are part of an association in fact does not
necessarily destroy the person-enterprise distinction.  See St.
Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 445-447 and
n.16 (5th Cir. 2000) (three individuals distinct from the
association in fact of the three); Securitron Magnalock Corp. v.
Schnabolk, 65 F.3d 256, 263 (2d Cir. 1995) (individual and two
corporations he owned distinct from the association in fact of
the three).

          When a defendant is a corporation, however, the alleged
enterprise "must be more than an association of individuals or
entities conducting the normal affairs" of that corporation.
Brittingham, 943 F.2d at 301.  In Brittingham, the plaintiffs
brought a section 1962(c) claim against Mobil Oil Corporation and
its subsidiary for misrepresenting the degradable qualities of a
line of trash bags.  Id. at 299.  The plaintiffs alleged an
association in fact consisting of Mobil, its subsidiary, and the
advertising agencies they had hired to promote the trash bags.
Id. at 300.  The court found that the defendants were not
distinct from the alleged enterprise.  Because corporations must
always act through their employees or agents, the advertising
agencies were just an arm of Mobil.  Thus, the alleged enterprise
was just the corporation, writ large.  Id. at 301.

          Although Brittingham stands for the proposition that a
corporate defendant is not distinct from an association in fact
consisting solely of that corporation and its agents, the Supreme
Court and the United States Court of Appeals for the Third
Circuit have held that an individual defendant is distinct from a
corporation alleged to be the enterprise, even where that
individual is the corporation's president and controlling
shareholder.  Cedric Kushner Promotions, Ltd. v. King, 533 U.S.
158, 161 (2001); Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,
46 F.3d 258, 268 (3d Cir. 1995)

-25-

76

participation element to require plaintiffs to show that a

defendant participated in the operation or management of the

enterprise itself. <u>Reeves v. Ernst & Young</u>, 507 U.S. 170, 185

(1991).

Because the Court finds that the plaintiffs have not

alleged the existence of a RICO enterprise, the Court cannot

determine whether the plaintiffs have properly alleged that each

of the defendants participated in the operation or management of

any such enterprise. Any amended complaint in this case must

allege the conduct or participation element to survive a motion

to dismiss. <u>Univ. of Maryland at Baltimore v. Peat, Marwick,</u>

<u>Main & Co.</u>, 996 F.2d 1534, 1539 (3d Cir. 1993) (applying <u>Reeves</u>

in motion to dismiss context).

---

Assuming for the moment that the enterprise alleged in
each of these complaints was valid, the defendants would be
distinct from that enterprise due to the inclusion of the
attorneys in the enterprise. The complaints do not suggest that
the attorneys were conducting the normal affairs of the Annuity
Group defendants. The <u>Miller</u> complaint, moreover, does not
suggest that National Western and American Equity were acting on
behalf of the AmerUs entities.

Of course, the Court has found that the plaintiffs
failed to allege a valid enterprise in these complaints because
the complaints do not permit an inference of any decision-making
structure connecting the Annuity Group, the Sales Group, and the
attorneys. Depending on how the plaintiffs decide to amend the
enterprise pleadings, the person-enterprise distinction
requirement described above may preclude a finding of liability
against some or all of the defendants.

-26-

.3.    Predicate Acts - Mail and Wire Fraud

Ultimately, a plaintiff alleging a violation of section 1962(c) must show that the defendant conducted the alleged enterprise through a pattern of racketeering activity.  Here, the plaintiffs allege that the defendants engaged in a pattern of mail fraud and wire fraud, which are among the "racketeering activities" enumerated at 18 U.S.C. § 1961(1).[8]  Virtually all of the defendants have moved to dismiss the RICO claim on the ground that the plaintiffs have failed to allege mail or wire fraud with the necessary particularity.  Even though the Court has determined that the complaint must be dismissed for failure to plead a RICO enterprise, the Court will address the plaintiffs' racketeering pleadings so as to guide the parties in any continued litigation of these cases.

When plaintiffs allege that mail or wire fraud are the RICO predicate acts, they must plead the alleged fraud with particularity.  Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir. 2004); Fed. R. Civ. P. 9(b).  Plaintiffs must allege what

---

8.    The mail fraud statute, 18 U.S.C. § 1341, makes it a crime to mail or cause to be delivered by mail any matter or thing for the purpose of executing, or attempting to execute, any scheme or artifice to defraud.  The wire fraud statute, 18 U.S.C. § 1343, makes it a crime to transmit or cause to be transmitted any communication by wire, radio, or television in interstate or foreign commerce for the purpose of executing any scheme or artifice to defraud.  Thus, the statutes cover in-state mailings, but not in-state telephone calls.  Annulli v. Panikkar, 200 F.3d 189, 200 n.9 (3d Cir. 1999).

-27-

78

the alleged misrepresentation was, and who made it to whom.  <u>Lum</u>,
361 F.3d at 224.  In addition, plaintiffs should allege when or
where the alleged misrepresentation was made, or provide some
"alternative means of injecting precision and some measure of
substantiation into their allegations of fraud."  <u>Id.</u>, <u>citing</u>
<u>Seville</u>, 742 F.2d at 791.  Until a class is certified, a court
must judge the adequacy of the fraud allegations solely by
reference to the allegations relating to the named plaintiffs.
<u>Id.</u> at 225, <u>citing</u> <u>Rolo v. City Investing Co. Liquidating Trust</u>,
155 F.3d 644, 659 (3d Cir. 1998).

Detailed allegations regarding the fraudulent scheme
overall are not a substitute for detailed allegations about the
acts of mail or wire fraud.  <u>See</u> <u>Warden v. McLelland</u>, 288 F.3d
105, 114 (3d Cir. 2002); <u>Rolo</u>, 155 F.3d at 658-659.  In <u>Rolo</u>, the
plaintiffs made "quite detailed" allegations regarding the
fraudulent scheme and described the contents of the mailings in
"reasonably specific terms."  <u>Id.</u> at 658.  The Court held,
nevertheless, that the plaintiffs failed to plead mail fraud with
particularity because the complaint did not specify "when, by
whom, and to whom a mailing was sent, and the precise content of
each particular mailing."  <u>Id.</u> at 659.  Similarly, in <u>Warden</u>, the
complaint provided a "reasonably clear overall picture of what
has been alleged," but did "not state clearly how [the
communications alleged to constitute wire fraud] were false or

-28-

misleading or how they contributed to the alleged fraudulent scheme." 288 F.3d at 114. The Court of Appeals instructed the district court to re-examine the complaint and permit the plaintiffs to amend if appropriate. Id.

Mailings and wire communications do not have to be fraudulent in and of themselves to come within the mail and wire fraud statutes. Schmuck v. United States, 489 U.S. 705, 715. (1989). They do not even have to be an essential part of the fraudulent scheme; they only need to be "incident to an essential part of the scheme." Id. at 709-710. Use of the mails or wires even after money has been obtained through allegedly fraudulent means may come within the statute if it serves to lull the alleged victim into a false sense of security and prevent detection. United States v. Sampson, 371 U.S. 75, 81 (1962).

The defendant does not have to send the mailing or wire communication personally. A defendant may be liable where he or she acts "with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." Pereira v. United States, 347 U.S. 1, 8-9 (1954); United States v. Bentz, 21 F.3d 37, 40 (3d Cir. 1994).

From these cases, the Court discerns the following principle: to properly allege that a defendant committed an act of mail or wire fraud, plaintiffs must allege sufficient facts

-29-

regarding the named plaintiffs from which one can infer that the defendant used the mails or interstate wires as part of a scheme to defraud, or took some action where such use of the mails or interstate wires was reasonably foreseeable.

By this standard, some of the allegations in the complaint are too vague to state a claim for mail or wire fraud.[9] The complaint does set forth a number of reasonably specific mailings, however. With respect to the Prices, the plaintiffs have alleged that: Attorney Bohmueller sent the Prices an engagement letter and a letter appointing Ms. Larson to be the delivery agent for the living trust kit, and mailed the kit to

---

9.      This includes allegations that "Defendants" used "mass-mailings;" that the "Sales Group" used "written communications delivered though the mail, and oral communications . . . by means of telephone;" and that "each Defendant perpetuated their scheme" through:

    a.    letters from Defendants to Plaintiffs and members of
          the Class;
    b.    letters from Defendants to the tax advisors and/or
          accountants of Plaintiffs and members of the Class;
    c.    mailings from Defendants to other Defendants;
    d.    interstate telephone communications among Defendants;
    e.    communications via email and over the worldwide web;
          and
    f.    interstate telephone communications between Defendants
          and Plaintiff and members of the Class.

(Price Compl. ¶¶ 6, 77, 107; Miller Compl. ¶¶ 6, 69, 100.)

    Judge Padova reached the same conclusion in Gilmour v. Bohmueller, a case involving many of the same defendants and issues, before that case was transferred to this Court as part of the instant multidistrict litigation. Gilmour v. Bohmueller, Civ. Act. No. 04-2535, 2005 U.S. Dist. LEXIS 1611 at *20-21 (E.D. Pa. Jan. 27, 2005).

-30-

EPAC; AILIC mailed the two annuities to Mr. Newmark and sent
letters so informing the Prices both times; and EPAC and Mr.
Newmark sent the Prices a letter regarding forthcoming
newsletters and other financial planners.  With respect to Mr.
Healy, the plaintiffs have alleged that: Attorney Bohmueller sent
Mr. Healy an engagement letter; and AAG sent Mr. Healy a letter
of thanks, mailed his annuity to Mr. Krygowski, and sent
additional letters to Mr. Healy and his attorney regarding his
request for recision.  Finally, the plaintiffs have alleged that
Mr. Miller mailed a response to Mr. Weinstein's newspaper
advertisement, and that American Equity mailed him a statement.
(Price Compl. ¶¶ 42, 44, 52, 54, 65, 69, 71-74; Miller Compl. ¶¶
22, 61.)[10]

        The above mailings could be "incident to an essential
part" of the alleged fraudulent scheme.  Thus, the plaintiffs
have adequately pled at least one act of mail fraud against each
defendant other than BEN.  The plaintiffs have expressly alleged
that AAG, AILIC, EPAC, Mr. Newmark, and the attorneys directly

---

10.     The Court does not include the alleged telephone calls
between certain members of the Sales Group and the named
plaintiffs, or the call from Mr. Miller to Mr. Weinstein because
the complaints do not allege, and the Court cannot reasonably
infer, that any of these calls crossed state lines.  The
complaints allege that each of the plaintiffs resides in
Pennsylvania, and that Ms. Larson, Mr. Krygowski, Mr. Strope, and
Attorney Weinstein all reside and work in Pennsylvania.  (Price
Compl. ¶¶ 15-16, 19, 24-25; Miller Compl. ¶¶ 15, 22, 32-33.)  The
wire fraud statute does not cover in-state telephone calls.  See
note 8, above.

used or caused the use of the mails at least once. The complaint also supports an inference that Ms. Larson, Mr. Krygowski, and Mr. Strope each acted on one or more occasion with the knowledge that mailings from the Annuity Group defendants and the attorneys would follow in the ordinary course of business.

Finally, AmerUs Group Co., FFS, Patriot Group, and Addison Group (and AAG, AILIC, EPAC, Mr. Newmark, and the attorneys) may be liable under the theory of respondeat superior for the alleged racketeering conduct of their agents or employees, Ms. Larson, Mr. Krygowski, and/or Mr. Strope. "[T]he doctrine of respondeat superior may be applied under RICO where the structure of the statute does not otherwise forbid it." Petro-Tech, Inc. v. Western Co. of N. Am., 824 F.2d 1349, 1358 (3d Cir. 1987) (respondeat superior liability not available against a corporation alleged to be the enterprise because it would violate the person-enterprise distinction requirement).[11]

### 4.    Pattern of Racketeering Activity

The remaining question is whether the plaintiffs have alleged that each of the defendants engaged in a pattern of mail fraud. The Court will defer ruling on this question.

By definition, the RICO statute requires at least two

---

11.    See note 7, above, regarding why the person-enterprise distinction is not currently an issue in the instant cases.

-32-

acts of racketeering activity to make out a pattern. 18 U.S.C. §
1961(5). The Supreme Court has added that plaintiffs "must show
that the racketeering predicates are related, and that they
amount to or pose a threat of continued criminal activity."
H.J., Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989). Acts
are "related" if they have the "same or similar purposes,
results, participants, victims, or methods of commission." Id.
at 240. "Continuity" is satisfied if there has been "a closed
period of repeated conduct," or "past conduct that by its nature
projects into the future with a threat of repetition." Id. at
241.

        In determining whether a sufficient pattern has been
alleged against a particular defendant, courts must consider only
the predicate acts in which the defendant has been alleged to
participate. Banks v. Wolk, 918 F.2d 418, 421 (3d Cir. 1990).
Moreover, defendants cannot be held liable for aiding and
abetting another person's predicate acts. Pennsylvania Ass'n of
Edwards Heirs v. Rightenour, 235 F.3d 839, 843 (3d Cir. 2000)
(relying on Central Bank of Denver v. First Interstate Bank of
Denver, 511 U.S. 164, 191 (1994) (private plaintiffs may not
maintain an aiding and abetting suit under Section 10(b) of the
Securities Exchange Act of 1934)).

        As the above cases demonstrate, establishing a RICO
pattern depends in great part upon the plaintiffs named, the

-33-

84

particular defendants sued, and the predicate acts alleged. Because the Court is dismissing these complaints on other grounds, and the plaintiffs have indicated that they will file a consolidated amended class complaint covering all the putative class actions in this multidistrict litigation, the Court finds that it is not necessary to rule on the plaintiffs' pattern pleadings in their present state.

V.    Conclusion

Because the plaintiffs have not properly pleaded the existence of a RICO enterprise, they cannot establish a RICO violation under Section 1962(c). The Court declines to exercise supplemental jurisdiction over the plaintiffs' state law claims at this time. Although the Court is not certain that the plaintiffs can plead a RICO enterprise and state a RICO claim against all the current defendants, the Court will grant the plaintiffs leave to amend the complaints.

An appropriate Order follows.

-34-

85

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: AMERICAN INVESTORS       :
LIFE INSURANCE CO. ANNUITY      :    MDL DOCKET NO. 1712
MARKETING AND SALES PRACTICES   :
LITIGATION                      :
_____:
Relates to:                     :
PRICE v. AMERUS ANNUITY         :
GROUP COMPANY, No. 04-3329      :
and                             :
MILLER v. AMERUS GROUP          :
COMPANY, No. 04-3799            :

ORDER

        AND NOW, this 2nd day of June, 2006, upon consideration

of the Motions to Dismiss of:

   •    AmerUs Group Company, AmerUs Annuity Group Company, and
        American Investors Life Insurance Company, Inc. (Price
        Doc. No. 38; Miller Doc. No. 48);

   •    Brian J. Newmark, Estate Planning Advisors Corp., BEN
        Consulting Corp. ("BEN"), Funding and Financial
        Services Corp. ("FFS"), and Victoria Larson (Price Doc.
        No. 29; Miller Doc. No. 21);

   •    Kenneth Krygowski (Price Doc. No. 39);

   •    Stephen Strope (Miller Docket No. 43);

   •    Patriot Group (Miller Doc. No. 41);

   •    Barry Bohmueller (Price Doc. No. 21); and

   •    Brett Weinstein (Miller Docket No. 46);

and the oppositions, replies, and sur-replies thereto, and

following oral argument on February 23, 2005 and a status

conference on January 31, 2006, IT IS HEREBY ORDERED that said

motions are GRANTED in part.  The Court will dismiss all counts

as to BEN in the <u>Price</u> complaint; all counts as to BEN, FFS, and Mr. Newmark in the <u>Miller</u> complaint; and Count I as to all defendants in both complaints.  The plaintiffs may file an amended complaint.

Whereas the plaintiff in <u>Miller</u> has voluntarily dismissed his claims against National Western Life Insurance Company ("National Western") and American Equity Investment Life Insurance Company ("American Equity"), IT IS FURTHER ORDERED that the Motions to Dismiss by National Western (<u>Miller</u> Doc. No. 45) and American Equity (<u>Miller</u> Doc. No. 47) are DENIED as moot.

BY THE COURT:

/s/ Mary A. McLaughlin
MARY A. MCLAUGHLIN, J.

**87**