1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

In re NATIONAL WESTERN LIFE
INSURANCE DEFERRED
ANNUITIES LITIGATION

CASE NO. 05CV1018 JM (LSP)

**ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANT'S MOTION TO
DISMISS THE CONSOLIDATED
AND AMENDED CLASS ACTION
COMPLAINT**

This putative class action arises out of an alleged scheme to defraud senior citizens into purchasing deferred annuities that are inappropriate for them.  The Consolidated and Amended Class Action Complaint ("CAC") asserts the following nine claims: (1) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.; (2) financial elder abuse in violation of the California Welfare & Institutions Code; (3) violations of sections 17200 and (4) 17500 of the California Business & Professions Code; (5) breach of fiduciary duty; (6) aiding and abetting breach of fiduciary duty; (7) fraudulent concealment; (8) breach of the duty of good faith and fair dealing; and (9) unjust enrichment and imposition of constructive trust.  Defendant National Western Life Insurance Company ("NWL") now moves pursuant to Rule 12(b)(6) to dismiss the RICO, breach of fiduciary duty, and breach of the duty of good faith and fair dealing claims.  After considering the parties' papers and oral arguments, the court hereby **GRANTS IN PART** and **DENIES IN PART** the motion for the reasons set forth below.

## I. __BACKGROUND__

For purposes of this motion, the court accepts the well-pled allegations of the CAC as true. Experimental Eng'g, Inc. v. United Technologies Corp., 614 F.2d 1244, 1245 (9th Cir. 1980). At issue is the purchase and sale of deferred annuities to senior citizens. The CAC alleges that:

> An annuity is a contract between an annuity owner (or "annuitant") and an insurance company pursuant to which the annuity owner makes an upfront lump-sum payment or a series of payments to the insurance company. The insurance company, in turn, agrees to make payments to the annuity owner over a period of time. With a standard or "immediate" annuity, the annuitant has a right to a stream of income via payments from the insurance company that is usually guaranteed to last for as long as the annuitant is alive . . . . With a deferred annuity, the annuitant forgoes payment until some point in the future. . . . Thus, deferred annuities are very different from immediate annuities and provide a long-term investment vehicle, not an up front income stream.

CAC ¶¶ 17-18.

Moving defendant, NWL, is a Colorado corporation headquartered in Texas. NWL sells deferred annuities on a national basis through a network of sales agent organizations and individual sales agents, including defendants Centre Point Advisors, Inc. ("Centre Point") and Advanced Business Strategies Institute ("ABSI"). Both Centre Point and ABSI have defaulted in this action, and only NWL brings the present motion.

The named plaintiffs are Warren Petry of El Cajon, California; Mr. and Mrs. Peter and Mary Glenane of Vista, California; Mary Sweeney of San Diego County, California; and George Miller of Kingston, Pennsylvania (collectively "Plaintiffs"). Each of the Plaintiffs is at least 68 years old. With the exception of plaintiff Miller, Plaintiffs purchased NWL annuities wholly in California. Plaintiff Miller purchased his NWL annuity in Pennsylvania.

Plaintiffs allege that Defendants have engaged in a scheme to defraud Plaintiffs and other seniors into purchasing deferred annuities that were not appropriate for them. These annuities are inappropriate for Plaintiffs because they would not mature until well

after the annuitants' expected life span.  Therefore, Plaintiffs will either never receive any payments from their annuity policies, or be forced to access the annuity principal prematurely and incur substantial surrender charges as a result.  Defendants also fail to adequately disclose material information on the risks associated with deferred annuities so that Plaintiffs may make an informed buying decision.  Finally, NWL fraudulently manipulates the terms of the annuities after purchase in order to erode Plaintiffs' returns on them.

## II.    <u>STANDARD OF REVIEW</u>

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a court to dismiss a complaint for failure to state a claim upon which relief can be granted.  Such a dismissal can be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.  <u>See</u> <u>Balistreri v. Pacifica Police Dept.</u>, 901 F.2d 696, 699 (9th Cir. 1988).  In applying this standard, the court must treat all factual allegations as true and construe the complaint in the light most favorable to the plaintiff.  <u>Experimental Eng'g</u>, 614 F.2d at 1245; <u>see</u> <u>Concha v. London</u>, 62 F.3d 1493, 1500 (9th Cir. 1995).

## III.    <u>RICO</u>

Congress enacted RICO with the specific intent to "thwart the organized criminal invasion and acquisition of legitimate business enterprises and property."  <u>Oscar v. University Students Co-Operative Ass'n</u>, 965 F.2d 783, 786 (9th Cir. 1992).  To that end, § 1964(c) provides in relevant part that

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including reasonable attorney's fee[.]

18 U.S.C. § 1964(c).

The substantive provision of RICO, § 1962, describes the prohibited activities.  Plaintiffs here have alleged four RICO claims arising under § 1962(a)-(d), predicating their claims on violations of the federal mail and wire fraud statutes.  Defendant argues

1    that the McCarran-Ferguson Act precludes this court from applying RICO in this case.

2    Defendant further argues that even if McCarran-Ferguson does not preclude application

3    of RICO, the CAC fails to adequately allege the elements of a RICO claim.  The court

4    now addresses each argument in turn.

5        **A.    <u>The McCarran-Ferguson Act</u>**

6        McCarran-Ferguson provides in relevant part,

7        No Act of Congress shall be construed to invalidate, impair, or supersede
         any law enacted by any State for the purpose of regulating the business
8        of insurance, or which imposes a fee or tax upon such business, unless
         such Act specifically relates to the business of insurance.

9

10   15 U.S.C. § 1012(b).  Congress passed McCarran-Ferguson to ensure that federal law

11   would not automatically preempt state insurance laws unless the federal law specifically

12   related to the business of insurance.  <u>Humana Inc. v. Forsyth</u>, 525 U.S. 299, 306 (1999).

13   McCarran-Ferguson was Congress's response to <u>United States v. South-Eastern</u>

14   <u>Underwriters Ass'n</u>, 322 U.S. 533, 553 (1944), which held that an insurance company

15   doing business across state lines engaged in interstate commerce.  Prior to <u>South-</u>

16   <u>Eastern Underwriters</u>, the Supreme Court "had consistently held that the business of

17   insurance was not commerce."  <u>Humana</u>, 525 U.S. at 306 (citing <u>Paul v. Virginia</u>, 8

18   Wall. 168, 183 (1869)).

19       Thus, McCarran-Ferguson will preclude application of federal law if (1) the

20   federal law does not specifically relate to the business of insurance, (2) defendant's

21   challenged acts constitute "the business of insurance", (3) California has enacted a law

22   or laws regulating defendant's challenged acts, and (4) California law would be

23   invalidated, impaired, or superseded by allowing the California plaintiffs' RICO claims.

24    § 1012(b); <u>Merchants Home Delivery Serv. Inc. v. Reliance Group Holdings, Inc.</u>, 50

25   F.3d 1486, 1489 (9th Cir. 1995).  The parties only dispute whether factors (2) and (4)

26   preclude application of RICO here.

27        ***1.    "The Business of Insurance"***

28        Plaintiffs contend that the alleged scheme is not the "business of insurance" but

                                              - 4 -                              05cv1018

1  rather the "business of fraud."  Defendant responds that the Ninth Circuit's decision in

2  Merchants Home, supra, undermines Plaintiffs' contention.

3        Whether a practice constitutes "the business of insurance" for purposes of

4  McCarran-Ferguson depends on whether the practice has the effect of transferring or

5  spreading the policyholders' risks; whether the practice is an integral part of the policy

6  relationship between the insurer and the insured; and whether the practice is limited to

7  entities within the insurance industry.  Merchants Home, 50 F.3d at 1490 (citing United

8  Labor Life Ins. Co. v. Piereno, 454 U.S. 119, 129 (1982)).

9        Applying these factors here, the court finds that the conduct alleged constitutes

10  the business of insurance.  The CAC alleges that agents of NWL failed to disclose

11  material information regarding the terms of the annuities to senior citizens so that they

12  may understand the true risks and costs of these products.  CAC ¶ 4.  This practice has

13  the effect of spreading the policyholder's risk; it just does so on unfavorable terms.

14  Therefore the first factor is satisfied.  The fraudulent scheme is an integral part of the

15  policy relationship because it involves the sales practices between the insurer and

16  insured and the terms of the resulting policy.  Furthermore, since the selling of annuities

17  is limited to the insurance industry, the third factor is met.  Id. ¶ 17.

18        Relying on  Thacker v. New York Life Ins. Co., 796 F. Supp. 1338, 1342 (E.D.

19  Cal. 1992), Plaintiffs argue that National Western's alleged pattern of fraud does not

20  constitute "the business of insurance" but the "business of fraud."  Oppo. at 14-15.  In

21  Merchants Home, the Ninth Circuit impliedly rejected Plaintiffs' interpretation of

22  Thacker when it found that fraud in the form of overcharging for premiums on actual

23  policies was "the business of insurance."  See Merchants Home, 50 F.3d at 1490

24  (rejecting proposition that a practice forbidden by law is per se not the business of

25  insurance because "[t]his interpretation of the rule would read the McCarran-Ferguson

26  Act out of existence.  Any practice which violated any federal statute would, by

27  definition, not be the 'business of insurance,' resulting in all federal statutes applying

28  to the business of insurance with their 'full rigor.'  See [NAACP v. American Family

05cv1018

Mut. Ins. Co., 978 F.2d 287 (7th Cir. 1992)].").   Nor is the court persuaded by

Plaintiffs' argument that

> Indeed, this is not a case about the selling and issuance of life insurance to which McCarran-Ferguson would readily apply . . . . If anything, the deferred annuities at issue are complex financial instruments more akin to unregistered securities – not insurance . . . . Moreover, plaintiffs seek relief from the fraudulent stratagems used by NWL to target and sell improper deferred annuities to seniors.

Oppo. at 15.   First, Plaintiffs' argument that the deferred annuities here are not

insurance but securities is too far-sweeping.   Second, Merchants Home found that the

fraudulent stratagems used in that case were "the business of insurance" so long as the

three factors– whether the practice transfers risk, whether the practice is integral to

policy relationship, and whether the practice is limited to insurance industry–are

satisfied.   Merchants Home, 50 F.3d at 1490.

In sum, the court finds that the conduct alleged here amounts to "the business of

insurance" for purposes of McCarran-Ferguson.   The next issue is whether applying

RICO would invalidate, impair, or supersede California's insurance laws.

## 2. *Impairment of State Law*

The test for whether application of a federal law would impair state law for

purposes of McCarran-Ferguson is as follows:

> When federal law does not **directly conflict** with state regulation, and when application of the federal law would not **frustrate any declared state policy or interfere with a State's administrative regime**, the McCarran-Ferguson Act does not preclude its application.

Humana, 525 U.S. at 310 (emphasis added).   Thus, this court must ascertain

California's "declared state policy" and whether applying RICO here would frustrate

or interfere with that policy.   In Humana, the Supreme Court reasoned that because the

Nevada insurance statutes authorize a private right of action for violations of various

unfair insurance practices, "we see no frustration of state policy in the RICO litigation

at issue here.   RICO's private right of action and treble damages provision appears to

complement Nevada's statutory and common-law claims for relief."   Id. at 313.

1    Therefore, the Court concluded, McCarran-Ferguson presented no bar to plaintiff's

2    RICO claim.  Id. at 314.

3         The parties dispute the applicability of Humana to this case because Humana did

4    not address whether allowing a RICO claim would impair state policy when the state

5    does not expressly provide a statutory private right of action to enforce its insurance

6    code.  Such is the situation in California, and Defendant contends that the absence of

7    such a cause of action under the insurance code means that Plaintiffs' RICO claims fail

8    pursuant to Humana.   Courts are divided on whether this "statutory cause of action"

9    distinction is material to the Humana impairment analysis.  Compare LaBarre v. Credit

10   Acceptance Corp., 175 F.3d 640, 643 (8th Cir. 1999) (distinction material) with

11   American Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc., 367 F.3d 212, 232 (4th

12   Cir. 2004) (distinction immaterial).  For the following reasons, the court finds that the

13   proper approach is to deem the distinction immaterial as this approach conforms better

14   to the principles underlying Humana.

15                    ***3.     California's Declared State Policy***

16        California prohibits certain unfair trade practices within the insurance industry.

17   Cal. Ins. Code § 790.03.  In Moradi-Shalal v. Fireman's Fund Ins. Co., 46 Cal.3d 287,

18   304-05 (1988), the California Supreme Court held that the insurance code does not

19   allow a private right of action, only administrative remedies, for violations of section

20   790.03.  Defendant asks the court to infer from Moradi-Shalal that California has a

21   declared state policy against allowing private suits against insurers for practices made

22   unlawful by the California insurance code.  See Mot. at 8; Reply at 3.

23        The court finds Defendant's argument assumes too much.  The holding in

24   Moradi-Shalal–that no private right of action exists to enforce section 790.03–is limited

25   to actions brought by third parties and insureds against insurers for bad faith refusal to

26   settle.  Manufacturers Life Ins. Co. v. Superior Court, 10 Cal. 4th 257, 280 (1995). In

27   addition, California plaintiffs who are barred by Moradi-Shalal from bringing those

28   particular kinds of claims are nevertheless permitted to bring common law fraud and

breach of contract claims against insurers for the same conduct. <u>Moradi-Shalal</u>, 46 Cal. 3d at 304-05. Nor does <u>Moradi-Shalal</u> bar all statutory, as opposed to common law, causes of action against insurers; in <u>Manufacturers Life</u>, the California Supreme Court allowed an antitrust claim under California's Cartwright Act against the defendant insurer for wrongful conduct falling outside <u>Moradi-Shalal</u>'s prohibitive sweep.[1] <u>See</u> <u>Manufacturers Life</u>, 10 Cal. 4th at 280, 284. Taken together, <u>Moradi-Shalal</u> and <u>Manufacturers Life</u> do not support Defendant's contention that California has a broad policy prohibiting all private rights of action against insurers. Rather, these authorities demonstrate that although California may limit certain statutory remedies for certain claims under its insurance code, California still provides for a robust policy in favor of vindicating the rights of private plaintiffs damaged by an insurer's unlawful conduct.

Against this backdrop, the court holds that allowing a RICO claim here would not impair, impede, or supersede California law for purposes of McCarran-Ferguson. <u>Humana</u>, 525 U.S. at 310. Allowing a RICO claim here would (1) advance California's interest in combating insurance fraud, and (2) not frustrate California's policy prohibiting private actions against insurers for bad faith refusal to settle. Rather, applying RICO would complement California's allowance for common law and non-insurance code statutory private remedies. <u>See</u> <u>Merchants Home</u>, 50 F.3d at 1492; <u>cf.</u> <u>American Chiropractic Ass'n</u>, 367 F.3d at 232.

Defendant cites <u>Am. Int'l Group, Inc. v. Superior Court</u>, 234 Cal. App. 3d 749 (1991) (hereinafter "<u>AIG</u>") for the proposition that applying RICO would impair California law. In <u>AIG</u>, the court held that McCarran-Ferguson barred the insured's RICO claim against defendant insurer because, under <u>Moradi-Shalal</u>, the Insurance Code does not allow a private right of action for violations of its unfair trade practices

---

[1]   Although Plaintiffs here are asserting a statutory right of action under federal law, not state law, the court finds this distinction immaterial for purposes of the impairment analysis, and the parties have not put forth argument to the contrary.

provision.[2]  Id. at 764-65.  The court finds AIG unpersuasive and declines to follow it since whether McCarran-Ferguson precludes a RICO claim is a question of federal law. See Thacker, 796 F. Supp. at 1343, n.6 (citing D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 455-56 (1942).

To the extent Defendant argues this court should not rely on Merchants Home because it "disregarded the declared state policy of California", Mot. at 9, this argument erroneously assumes that California's policy is in fact to disallow all private remedies for conduct violative of its insurance code.  Nor is the court persuaded by Defendant's argument that "the reasoning of Humana is clearly at odds with Merchants, and supersedes it."  Id.  Humana unanimously affirmed the Ninth Circuit, which had relied on Merchants Home for its decision.  Forsyth v. Humana, Inc., 114 F.3d 1467, 1479-80 (9th Cir. 1997).  Humana interpreted Merchants Home as providing a "direct conflict" test for impairment, and eventually adopted this "direct conflict" language in its own formulation of the impairment test for purposes of McCarran-Ferguson.  Humana, 525 U.S. at 305, 310.  Therefore, it cannot reasonably be said that Humana is at odds with Merchants Home.  To the contrary, the two decisions are entirely consistent with one another.

For the foregoing reasons, the court finds that McCarran-Ferguson does not bar the California plaintiffs' RICO claims.  The court now turns to the issue of whether the CAC adequately pleads the elements of a claim arising under RICO.

**B.    "Enterprise" Element**

In order to state a claim under any subsection of § 1962, the complaint must adequately allege the existence of a RICO "enterprise."  An enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals, associated in fact although not a legal entity[.]"  18 U.S.C. § 1961(4).  The existence of an associated-in-fact enterprise requires proof of

---

[2]    The AIG court noted that plaintiff was still free to bring common law fraud or breach of contract claims.  234 Cal. App. 3d at 768.

an ongoing organization and that the various associates function as a continuing unit. See United States v. Turkette, 452 U.S. 576, 583 (1981).  Furthermore, "a RICO enterprise must have an ascertainable structure separate and apart from the structure inherent in the conduct of the pattern of racketeering activity." Chang v. Chen, 80 F.3d 1293, 1295 (9th Cir. 1996).  This interpretation was adopted out of concern "that an overly broad construction of the term 'enterprise' would render that element of the offense interchangeable with the 'pattern of racketeering' element. Id. at 1297. The a RICO enterprise cannot be merely the sum of the predicate racketeering acts; rather, "[a]t a minimum, to be an enterprise, an entity must exhibit 'some sort of structure . . . for the making of decisions, whether it be hierarchical or consensual' . . . . The structure should provide 'some mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis.'" Id. at 1299 (quoting United States v. Riccobene, 709 F.2d 214, 222 (3d Cir. 1983)).  As explained in United States v. Bledshoe, 674 F.2d 647 (8th Cir. 1982), the enterprise

> cannot simply be the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these acts. Any two criminal acts will necessarily be surrounded by some degree of organization and no two individuals will ever jointly perpetrate a crime without some degree of association apart from the commission of the crime itself. Thus unless the inclusion of the enterprise element requires proof of some structure separate from the racketeering activity and distinct from the organization which is a necessary incident to the racketeering, the Act simply punishes the commission of two of the specified crimes within a 10-year period.

Id. at 664.

Chang is a case where the alleged enterprise lacked the requisite degree of separateness.  There, the persons perpetrating the real estate fraud were three individuals: one who obtained options on the land, another who opened escrow and the third who solicited buyers and established the purchase price.  The RICO enterprise consisted of the three individuals conducting the fraudulent sales transactions.  As noted by the Ninth Circuit, the organization must have an existence or structure beyond that which is necessary to committing the predicate acts of racketeering.  Chang, 80 F.3d at

1299.  Because the complaint failed to allege that the organization possessed a sufficient structure outside of the racketeering activities, the <u>Chang</u> court concluded that each defendant conducted his or her role in the alleged fraudulent real estate transactions autonomously.  <u>Id.</u> at 1300.  While the complaint alleged that the individuals conspired to commit the predicate acts of racketeering activity, the court noted that a conspiracy "is not an enterprise for purposes of RICO."  <u>Id.</u>

The Ninth Circuit has also addressed the involvement of a corporation, which provides a separate, ascertainable structure to the RICO enterprise.  "It is true that the involvement of a corporation, which has an existence separate from its participation in the racketeering activity, can satisfy the enterprise element's requirement of a separate structure."  <u>Id.</u>

Here, the alleged enterprise is composed of Defendants, sales agents that have earned or received commissions for selling a deferred annuity to a senior citizen, and any others that have facilitated the sale or sold a deferred annuity to a senior.  CAC ¶ 105.  Defendant argues that the CAC fails to allege the existence of a RICO enterprise because the allegations indicate that each member of the alleged enterprise acted autonomously to facilitate the sale of annuities without a centralized decision-making apparatus.  <u>Chang</u>, 80 F.3d at 1299.  At most, Defendant contends, the allegations support finding a conspiracy, and a conspiracy is not an enterprise for RICO purposes.  <u>Id.</u> at 1300.

Defendant's contention lacks merit.  Unlike <u>Chang</u>, the CAC here alleges a system of authority that guided the operation of the enterprise.  The CAC alleges the existence of a common communication network through which enterprise participants share information on a regular basis for the purposes of fraudulently selling deferred annuities to senior citizens.  CAC ¶ 109.  The CAC also alleges that Defendants develop and disseminate misleading marketing and sales materials, including "high-pressure sales techniques and scripted sales presentations" to be used by individual sales agents.  <u>Id.</u> ¶¶ 42, 112.  The CAC further alleges that the Defendants instruct sales agents to use

standardized sales materials and techniques, and reward sales agents with "perks and high commissions for selling a deferred annuities to a senior citizen[.]" Id. ¶¶ 49, 112. If true, these allegations would support a finding that the enterprise provides "some mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis." Chang, 80 F.3d at 1299 (quotations omitted). The allegations speak to a comprehensive, coordinated system that exists for the perpetuation of fraud upon senior citizens, from initial identification of the sales target to the purchase of the deferred annuity itself, complete with a reward system that motivates sales agents to repeat the cycle on an ongoing basis.

On the other hand, the CAC alleges that

> NWL has increasingly relied on independent agents/brokers, such as Mikhail and Maddy, and IMOs to market and sell its equity-indexed deferred annuities. This has undercut NWL's ability to properly train and supervise its brokers and agents such that it no longer ensures Sales Agents disclose all material information about its deferred annuity products to consumers at the point of sale.

CAC ¶ 47. This allegation if true would not support a finding that there exists "a system of authority that guided the operation of the alleged enterprise." Chang, 80 F.3d at 1300. However, when viewed as a whole, the CAC otherwise adequately alleges the necessary degree of ongoing control and coordination to survive the instant motion to dismiss.

The court also finds that the CAC sufficiently alleges the existence of an enterprise separate and apart from the predicate acts, that is, "a structure to the organization beyond that which was inherent in the alleged acts of racketeering activity." Id. at 1300. The CAC alleges that many of Defendants' services and products are legitimate and non-fraudulent. CAC ¶¶ 107, 113. Defendants are alleged to be corporations, which can satisfy "the enterprise element's requirement of a separate structure" so long as the corporations alleged to be part of the RICO enterprise were involved in the RICO activity and had legal existences separate from their participation in the racketeering. Chang, 80 F.3d at 1300 (citing United States v. Feldman, 853 F.2d

648, 660 (9th Cir. 1988)).  Defendants NWL, Centre Point, and ABSI are all alleged to have participated in the RICO activity here and have to conduct legitimate business alongside the alleged predicate acts of racketeering.  CAC ¶¶ 107, 113.  Multiple corporations associating with numerous individuals to form a RICO enterprise, which is the allegation here, is enough to satisfy the requirement that the enterprise have a separate and distinct structure from the RICO defendant. CAC ¶ 105; see, e.g. Feldman, 853 F.2d at 656.

For the foregoing reasons, the court finds that the CAC adequately alleges the enterprise element of a RICO claim.

### C.   Mail and Wire Fraud Allegations

Defendant also attacks the sufficiency of the mail and wire fraud allegations. Defendant contends that since Plaintiffs' fraud allegations are not plead with sufficient particularity, the complaint fails to adequately allege the "racketeering activity" element.

Rule 9(b)'s requirement that allegations of fraud be plead with particularity applies to civil RICO claims.  Edwards v. Marin Park, Inc., 356 F.3d 1058, 1065-66 (9th Cir. 2004).  To allege a violation of the mail fraud statute, Plaintiffs must show that (1) defendants formed a scheme or artifice to defraud; (2) the defendants used the mails or caused a use of the mails in furtherance of the scheme; and (3) the defendants did so with specific intent to deceive or defraud.   Schreiber Distributing Co. v. Serv-well Furniture Co., Inc., 806 F.2d 1393, 1399-1400 (9th Cir. 1986).  As to the wire fraud allegation, Plaintiffs must show (1) the formation of a scheme or artifice to defraud, (2) use of the U.S. wires in furtherance of the scheme, and (3) specific intent to deceive or defraud.  Id. at 1400.  To satisfy Rule 9(b), the complaint must "state the time, place, and specific content of the parties to the misrepresentation."  See id. at 1401.

As Defendant correctly points out, the CAC fails to allege that any interstate phone calls or use of the mails took place between Defendants and Plaintiffs.  Although it can be inferred that NWL, a Colorado corporation headquartered in Texas, used the

mail or made interstate phone calls to Plaintiffs residing in California and Pennsylvania, the court is reluctant to draw such an inference when dealing with a necessary element of the claim.  This action has a defined and limited number of plaintiff-purchasers and defendant-sellers.  As counsel acknowledged during oral argument, Plaintiffs should at least provide the specific details of mailings and interstate phone calls with respect to the named Plaintiffs.  Transcript at 27.

That being said, the court finds the current allegations are sufficiently particular to withstand the instant motion.  Plaintiffs allege thousands of fraudulent mail and phone communications, but do not state the time, place, and specific content of the communications.  CAC ¶¶125, 162.  The CAC provides a strong basis, implicit in the pleadings, that Plaintiffs were contacted through use of the mails and interstate wires in connection with the alleged fraud. This strong basis is enough to satisfy the federal notice pleading standard.  Conley v. Gibson, 355 U.S. 41, 48 (1957) ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.").  In the interest of moving this litigation forward, further details as to the particular mailings or interstate wire communications can be dealt with in discovery and later evidentiary proceedings if necessary.  Plaintiffs' counsel has already indicated that additional details with respect to communications with Plaintiffs can be provided.  Transcript at 27.

**D.    "Pattern of Racketeering" Element**

To state a RICO claim, the plaintiff must allege a "pattern of racketeering", which is defined as at least two predicate offenses within a ten-year period.  18 U.S.C. § 1961(5).  Defendant argues that because the complaint fails to allege mail and wire fraud with sufficient particularity, it also fails to adequately allege the pattern of racketeering element.  Mot. at 21.

Because the court has determined that the CAC adequately alleges mail and wire fraud, Defendant's argument is rejected.  Moreover, the CAC alleges thousands of mail

and interstate wire communications, and the individual transactions alleged occurred within the last ten years, between 1999 and 2003.  CAC ¶¶ 125, 162.  Thus, the CAC adequately pleads a pattern of racketeering activity.

**E.    Section 1962(a)**

Defendant contends that the CAC fails to state a § 1962(a) claim, which provides in relevant part

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).  To state a § 1962(a) claim, the plaintiff must allege an "investment injury", that is, he "'must allege facts tending to show that he or she was injured by the use or investment of racketeering income.'"  Wagh v. Metris Direct, Inc., 363 F.3d 821, 828 (9th Cir. 2003) (quoting Nugget Hydroelectric L.P. v. Pacific Gas & Elec. Co., 981 F.2d 429 (9th Cir. 1992).  Defendant argues that the CAC fails to allege such an investment injury.

The court agrees with Defendant.  Plaintiffs allege injuries from the racketeering itself–mail and wire fraud–but not any injury from the investment of proceeds obtained through the predicate acts of racketeering.  See CAC ¶¶ 104, 114, 124, 138.  Although the CAC alleges that Defendants fraudulently derived income from Plaintiffs and used that income to establish and/or operate the alleged enterprise, id. ¶ 151, it does not allege "a causal link between [Plaintiffs' injury] and the defendant's violation."  Wagh, 363 F.3d at 829.  The mere allegation that Defendants used proceeds from the fraudulent scheme to establish and/or operate the enterprise is insufficient.  Id. at 828-29 (rejecting argument that a RICO defendant's reinvestment of racketeering proceeds derived from plaintiff into the general affairs of the enterprise is enough to satisfy investment injury requirement under § 1962(a)).

05cv1018

1    Plaintiffs argue that no such separate "investment injury" showing is required,

2    citing In re Nat'l Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig., 682 F.

3    Supp. 1073 (C.D. Cal. 1987) and Lee v. Gen. Nutrition Cos., Inc., 2001 U.S. Dist.

4    LEXIS 24739 (C.D. Cal. Nov. 26, 2001).  Oppo. at 18-19.  Those cases, however, were

5    decided before and are inconsistent with Wagh to the extent that Wagh explicitly held

6    that a separate investment injury is required for § 1962(a) claims.  Wagh, 363 F.3d at

7    829.

8    Accordingly, the court finds that the CAC fails to state a § 1962(a) claim.

9    **F.**    **Section 1962(b)**

10    RICO prohibits "any person through a pattern of racketeering activity . . . to

11    acquire or maintain, directly or indirectly, any interest in or control of any enterprise

12    which is engaged in, or the activities of which affect, interstate or foreign commerce."

13    18 U.S.C. § 1962(b).  To state a §1962(b) claim, a plaintiff must allege that the

14    defendant's activity led to defendant's control over or acquisition of a RICO enterprise,

15    and that Plaintiffs were injured as a result of said control or acquisition.  Wagh, 363

16    F.3d at 830.  This means that Plaintiffs must allege a specific nexus between the control

17    of the enterprise and the racketeering activity.  Id.

18    Defendant argues that the complaint fails to allege that Plaintiffs have suffered

19    injury as a result of Defendants having acquired control of the alleged enterprise.  Mot.

20    at 22.  Plaintiffs respond that using ill-gotten gains allows Defendants to "maintain" the

21    Enterprise, and this maintenance harms Plaintiffs by allowing Defendants to further

22    their fraud upon seniors.  Oppo. at 19.

23    Plaintiffs have the stronger argument here.  By its express terms, § 1962(b)

24    prohibits the maintenance of control or interest in any enterprise engaged in interstate

25    commerce through a pattern of racketeering activity.  The CAC alleges that Defendants

26    generated income from their fraudulent scheme, conduct which led to its acquisition,

27    maintenance, and control of the enterprise.  CAC ¶¶ 151, 152.  This conduct allegedly

28    resulted in economic harm to Plaintiffs.  Id. ¶¶ 152, 165.  These allegations are

1    sufficient to state a § 1962(b) claim.

2    **G.**    **Section 1962(c)**

3    Section 1962(c) provides

     It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Section 1962(c) requires the "person" to be an entity distinct from the "enterprise" itself. <u>Cedric Kushner Promotions, Ltd. v. Don King</u>, 533 U.S. 158, 161 (2001). Defendant contends this distinctness requirement is unsatisfied here.

     The RICO "persons" here are NWL, Centre Point, and ABSI. The "enterprise" is NWL, Centre Point, ABSI, individual sales agents, and any others who have participated in the scheme. CAC ¶ 105. Thus, the RICO "person" and "enterprise" here are distinct, because the alleged enterprise includes additional persons–the individual sales agents and any other participants–who are not RICO persons in this action. These allegations are enough to show that the RICO persons here were conducting not merely their own affairs but the affairs of the enterprise. <u>Cedric Kushner</u>, 533 U.S. at 163 (citing <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 185 (1993)).

     Defendant argues that these allegations are insufficient to show distinctness because the persons in the RICO enterprise are all agents of defendant NWL, and therefore the RICO defendants and RICO persons here are really the same. Mot. at 13. This argument, however, runs afoul of the Supreme Court guidance deeming an individual employee RICO person, acting within the scope of his employment, sufficiently distinct from the RICO enterprise–the employee's corporation–despite the agency relationship between the two. <u>Cedric Kushner</u>, 533 U.S. at 163 ("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status.").

     Defendant also argues that "the RICO enterprise cannot consist solely of the

           05cv1018

corporation under a different name–some separate entity must be identified that comprises the 'enterprise'."  Reply at 4.  However, as already stated, the RICO enterprise here does not simply consist solely of the named Defendants, but of the named Defendants together with individual sales agents and any other participants.  Moreover, it is the <u>association</u> of the multiple Defendants and sales agents which form the enterprise; this association is distinct from the individual corporate Defendants themselves.  <u>Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.</u>, 30 F.3d 339 (2d Cir. 1994), cited by Defendant, supports this conclusion.  There, the Second Circuit noted that although

> by virtue of the distinctness requirement, a corporate entity may not be both the RICO person and the RICO enterprise under section 1962(c) . .. [t]his does not foreclose the possibility of a corporate entity being held liable as a defendant under section 1962(c) when it associates with others to form an enterprise that is sufficiently distinct from itself.  In this regard we have noted that a section 1962(c) claim may be sustained where there is only a partial overlap between the RICO person and the RICO enterprise. . . and that a defendant may be a RICO person and one of a number of members of the RICO enterprise.

<u>Id.</u> at 344 (citations and internal quotations omitted).

Finally, Defendant's argument that the distinctness requirement is unmet here because the CAC fails to allege that the enterprise is engaged in activities that differ from the regular affairs of the corporate defendant is without merit.  Reply at 5.  As stated earlier, in addition to alleging that Defendants have engaged in fraud, the CAC also alleges that many of Defendants' services and products are legitimate and non-fraudulent.  <u>See</u> Part IIIB, <u>supra</u>.

In sum, the distinctness requirement is satisfied for purposes of § 1962(c).

The next § 1962(c) issue is whether plaintiff Miller's claim is barred because the Defendants could not have operated or managed the Enterprise which sold Miller a competitor's annuity.  In order to be liable under § 1962(c), the RICO defendant must have participated in the operation or management of the enterprise itself.  <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 183 (1993).

Defendant argues that even if the court finds the distinctness requirement

satisfied under § 1962(c), the court should still find that plaintiff Miller's claim is barred because the Defendants could not have operated or managed the Enterprise which sold Miller a competitor's annuity.  Mot. at 11.  This is because, according to Defendant, "Plaintiff Miller's RICO claim depends on National Western being held responsible for alleged damage caused by Miller's purchase of a ***competitor's*** annuity."  Reply at 4 (emphasis in original).  This argument misconstrues the allegations.  The CAC alleges that Miller first purchased a competitor's annuity from sales agent Larson and then liquidated that annuity to purchase a NWL annuity.  CAC ¶ 94.  The CAC alleges harm based on Defendants' inducement of Miller to use proceeds from liquidation of that competitor's annuity to purchase a NWL annuity, an annuity which was ultimately inappropriate for him, and not on Miller's purchase of the competitor's annuity per se.  This allegation is enough to show operation or management of the enterprise for § 1962(c) purposes.

**H.   Section 1962(d) claim**

Section 1962(d) provides, "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  The CAC alleges Defendants violated § 1962(d) by conspiring to violate § 1962(c).  CAC ¶ 166.  Defendant argues that because Plaintiffs have failed to  state a § 1962(c) claim, they have likewise failed to state a § 1962(d) claim.  Howard v. America Online, Inc., 208 F.3d 741, 751 (9th Cir. 2000).  However, since the court finds that the CAC adequately states a § 1962(c) claim, Defendant's argument is rejected.  Accordingly, the motion to dismiss the § 1962(d) claim is denied.

**IV.   STATE ALLEGATIONS**

Defendant challenges the sufficiency of the allegations with respect to the following pendant state claims.

**A.   Breach of Fiduciary Duty**

Defendant argues that Plaintiffs cannot state a breach of fiduciary duty claim because in California, an insurer does not owe a strict fiduciary duty to its insured.

05cv1018

Mot. at 22 (citing  Vu v. Prudential Property, 26 Cal. 4th 1142, 1150-51 (2001)).
However, the Vu court also noted that in California, the insurer-insured relationship is
fiduciary in nature and carries with it heightened duties of good faith beyond those
found in an ordinary contract.  Vu, 26 Cal. 4th at 1150.  Interpreting Vu and other
California case law, the Central District of California has allowed a breach of fiduciary
duty claim under facts similar to the ones here:

> Defendant argues [relying on, inter alia, Vu] that plaintiff's claim for
> breach of fiduciary duty must be dismissed because under California
> law an insurer owes no fiduciary duty to its insureds, particularly
> where, as here, the alleged breach occurred prior to contract
> formation . . . Ninth Circuit courts, construing California law, hold
> that while the insurer-insured relationship is fiduciary in nature, it
> does not provide for an independent action for common law breach
> of fiduciary duty . . . .  The Court concludes plaintiffs [sic]
> allegations are sufficient to state [a] claim for common law breach
> of fiduciary duty against defendant, in that the relationship alleged
> is not simply that of an insurer-insured, but rather one which may
> entail a fiduciary duty . . . the Court cannot say with certainty that
> plaintiff can 'prove no set of facts' entitling him to relief on a breach
> of fiduciary theory.

Negrete ex rel. Ow v. Fidelity and Guaranty Life Ins. Co., 444 F. Supp. 2d 998, 1003-04
(C.D. Cal. 2006) (citations omitted); see also Estate of Migliaccio, 436 F. Supp. 2d
1095, 1108 (C.D. Cal. 2006) (same).

The court finds that Plaintiffs have stated a breach of fiduciary duty claim.
Construing the CAC in the light most favorable to plaintiff, the allegations here would
support a finding that a special relationship, fiduciary in nature, was created between
Plaintiffs and Defendants.  The sales agents allegedly held themselves out as objective
financial planners who act in Plaintiffs' best interests.  See CAC ¶¶ 66, 79.  Moreover,
senior citizens are a protected class in California and the annuities sold are allegedly
complex financial instruments which the average person cannot understand.  Id. ¶ 209.
Taken together, these allegations provide a basis for finding a fiduciary-like duty in that
"the insured must depend on the good faith and performance of the insurer" when
deciding whether to purchase a NWL deferred annuity.  Vu, 26 Cal. 4th at 1151.
Therefore, the court cannot say that "it appears beyond doubt" that the Plaintiffs can
prove no set of facts which would entitle them to relief on a fiduciary duty-based

theory.  Conley, 355 U.S. at 45.

Defendant argues this court should not rely on Negrete and Migliaccio because the weight of authority holds that no breach of fiduciary duty claim can be stated under the present facts.  Reply at 7 (citing Solomon v. N. Am. Life & Cas. Ins. Co., 151 F.3d 1132, 1138 (9th Cir. 1998); Vu, 26 Cal. 4th at 1150-51; Almon v. State Farm Fire & Cas. Co., 724 F. Supp. 765, 766 (S.D. Cal. 1989)).  Defendant's authorities are not controlling here.  In Solomon, the Ninth Circuit, construing California law, held that an insurer owes no fiduciary duty to its insured.  Solomon, 151 F.3d at 1138.  However, the Ninth Circuit did not address whether the rule would be different if the insurer had expressly held itself out as an objective expert acting in the insured's best interests, which is the allegation here.  Rather, the facts in Solomon suggest that the insurer and insured were dealing at arm's-length by way of a trustee intermediary: the defendant insurer in Solomon sold the policy to a trust formed for the purpose of obtaining a group insurance policy for trust participants; thereafter, the plaintiff insured became a participant of the trust and was issued term life insurance under the group policy.  Id. at 1134.  On this basis, Solomon is distinguishable and does not control the instant case.

Almon is also distinguishable.  There, the court held that, although in California the duty between the defendant insurer and plaintiff insureds was fiduciary in nature, "there is no independent cause of action for breach of fiduciary duty."  Almon, 724 F. Supp. at 766.  However, the court so held because California law "does not require the insurer to place the insured's interests before its own."  Id.  Here, the CAC alleges that Defendants' sales agents represented to senior citizens that the agents were acting in the seniors' best interests.  This allegation, not present in Almon, alters the analysis because, as already stated, it would tend to show that Defendants affirmatively put themselves in a fiduciary-like role.  Thus, Almon is not controlling.

In sum, although California does not recognize a strict fiduciary duty between insurer and insured, the court finds the allegations here, construed in the light most

05cv1018

1   favorable to Plaintiffs, are sufficient to state a claim for breach of fiduciary duty.

2               **B.**    **Duty of Good Faith and Fair Dealing**

3       In California, an insurer cannot breach the duty of good faith and fair dealing

4   unless benefits are due under the policy.  Waller v. Truck Ins. Exchange, Inc., 11 Cal.

5   4th 1, 36 (1995).  This is because "the covenant is implied as a supplement to the

6   express contractual covenants, to prevent a contracting party from engaging in conduct

7   that frustrates the other party's rights to the benefits of the agreement."  Id. at 36.

8       Here, Plaintiffs have not alleged that Defendants breached the annuity contracts,

9   only that the Defendants fraudulently induced the Plaintiffs to enter into them.

10   Therefore, they have not stated a claim for breach of the duty of good faith and fair

11   dealing.  Waller, 11 Cal. 4th at 36.

12       Plaintiffs offer two arguments as to why their breach of the duty of good faith

13   claim is not precluded by a failure to allege a breach of contract.  First, Plaintiffs

14   contend that their claim is premised not only on the annuity contracts, but also on

15   Defendants' alleged violations of Insurance Code section 785(a).[3]  Therefore, Plaintiffs

16   argue, their claim is viable without alleging a breach of contract.  This argument lacks

17   merit.  Although it appears that Defendants do owe Plaintiffs a duty pursuant to section

18   785(a), Plaintiffs have not identified whether California permits a private right of action

19   to enforce that provision.  Cf. Moradi-Shalal, 46 Cal. 3d at 304-05.

20       Second, Plaintiffs contend that Waller does not preclude their claim because

21   California cases decided after Waller have held that a plaintiff can state a claim for bad

22   faith without also alleging a corresponding breach of contract.  Oppo. at 22 (citing

23   Schwartz v. State Farm Fire & Cas. Co., 88 Cal. App. 4th 1329, 1339 (2001) and

24   Dalrymple v. United Services Auto. Ass'n., 40 Cal. App. 4th 497, 514-15 (1995)).

25

26       [3]    "All insurers, brokers, agents, and others engaged in the transaction of

27   insurance owe a prospective insured who is 65 years of age or older, a duty of honesty, good faith, and fair dealing.  This duty is in addition to

28   any other duty, whether express or implied, that may exist." Cal.Ins.Code § 785(a).

However, Plaintiffs misconstrue the applicability of <u>Schwartz</u> and <u>Dalrymple</u> here.  In <u>Schwartz</u>, defendant insurer State Farm, in paying out benefits, allegedly favored one insured over another, both of whom were eventually deemed entitled to benefits under the same policy.  The plaintiff insureds in <u>Schwartz</u> alleged this conduct violated the implied covenant of good faith and fair dealing.  State Farm argued that because no benefits were yet due to the disfavored insureds at the time it paid benefits to the favored insured, then it did not commit a breach of contract and therefore could not have violated the duty of good faith.  The court disagreed, relying on the principle that "a breach of the implied covenant of good faith is a breach of the contract." <u>Schwartz</u>, 88 Cal. App. 4th at 1339.  Therefore, plaintiff's bad faith claim was proper even though it was premised on conduct occurring before State Farm's contractual obligations had matured.

The allegations in this case are distinguishable from the facts in <u>Schwartz</u>.  In <u>Schwartz</u>, the plaintiffs argued the breach occurred when State Farm mishandled an existing contract. Here, Plaintiffs alleged that Defendants breached a duty of good faith and fair dealing in the contract formation stages. CAC ¶¶ 228-233.  Although the CAC alleges that Plaintiffs have retained counsel "to recover amounts due under the contracts" there is no allegation that such amounts are due. <u>Id.</u> ¶ 232.  In fact, the crux of the CAC seems to be that benefits will likely <u>never</u> become due within Plaintiffs' expected lifespans.

Likewise, in <u>Dalrymple</u>, plaintiff insured's bad faith claim challenged the manner in which defendant insurer paid her claim. <u>Dalrymple</u>, 40 Cal. App. 4th at 515. Although the insurer paid all benefits due, thereby fulfilling its contractual obligations, it had done so under a reservation of rights and had filed suit for declaratory relief regarding coverage.  The <u>Dalrymple</u> court found that the insurer could still have breached the duty of good faith in tort, notwithstanding that no breach of contract occurred. <u>Id.</u> at 514-15.  Unlike in <u>Dalrymple</u>, Plaintiffs here are not challenging the manner in which Defendants paid amounts due under the contract.  Rather, the focus

is on pre-contract sales techniques.

Accordingly, the court finds that Plaintiffs have failed to state a claim for breach of the duty of good faith and fair dealing.

**C.    Plaintiff Miller's Sections 17200 and 17500 Claims**

Defendant contends that plaintiff Miller's California unfair competition and false advertising claims are barred because he is a Pennsylvania resident whose purchase took place wholly outside of California.  Cal. Bus & Prof. Code §§ 17200, 17500.  In California, a non-resident plaintiff has no section 17200 claim against non-California defendants for conduct occurring entirely outside of California.  Norwest Mortgage, Inc v. Superior Court, 72 Cal. App. 4th 214, 229 (1999).  Although Norwest did not address whether this rule also applies to section 17500 claims for false advertising, presumably it does since applying California law to conduct having no connection to California would raise serious due process concerns.  Cf. id. at 227.

Plaintiffs do not dispute the rule of Norwest Mortgage, but instead contend that

> Plaintiff Miller (like the rest of the plaintiffs) alleges that a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in California, particularly that defendant transacted substantial business in California and failed to properly train and supervise agents about California law.

See Oppo. at 25.  However, the allegation is that Miller is a Pennsylvania resident who purchased a NWL annuity from a sales agent in Pennsylvania; NWL is a Colorado corporation headquartered in Texas.  Although the CAC alleges that NWL does substantial business in California, there are no allegations linking NWL's California conduct with the Miller transaction in Pennsylvania.  Plaintiffs try to cure this defect by pointing out that two California corporations, Centre Point and ABSI, are joined here as co-defendants.  Id.  However, this does not save Miller's claim absent some showing that Centre Point and ABSI participated in the Miller transaction.  Since the Complaint as alleged does not make this showing, Plaintiffs' argument is unpersuasive.

Accordingly, the court finds that plaintiff Miller, and the class plaintiffs

1  similarly-situated to Miller, cannot state claims arising under section 17200 and 17500.

2          **D.        <u>Request to Strike References to California Insurance Code</u>**

3          Finally, Defendant asks the court to strike references in the CAC to California

4  Insurance Code §§ 785-790.10 because these statutes do not provide a private cause of

5  action.  However, plaintiffs do not seek a cause of action under the Insurance Code, but

6  merely cite to its provisions as evidence of the applicable standard of conduct in support

7  of their other claims.  Therefore, Defendant's request is denied.

8  **V.    <u>CONCLUSION</u>**

9          The court **GRANTS** the motion with respect to the § 1962(a), breach of the duty

10  of good faith and fair dealing, and plaintiff Miller's sections 17200 and 17500 claims.

11  Accordingly, these claims are **DISMISSED** without prejudice.  As to the remaining

12  claims, the motion is **DENIED**.

13          **IT IS SO ORDERED.**

14  DATED:  December 7, 2006

15                                                   _____

16                                                   Hon. Jeffrey T. Miller
                                                     United States District Judge

17  cc: All Parties

18

19

20

21

22

23

24

25

26

27

28